# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀Case No. 1:17-cv-640-JL
⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀Hon. Joseph N. LaPlante
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
ANNETTE B. DEMAURO,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀⠀)
_____)

## DEFENDANT'S POST-TRIAL BRIEF, PROPOSED FINDINGS OF FACT, AND CONCLUSIONS OF LAW

ROSSARIO M.F. RIZZO
GERARD J. LEVINS
Counsel for the Defendant

*/s/ Rosario M.F. Rizzo*
ROSSARIO M.F. RIZZO
Rizzo Law Firm
801 Main Street
Concord, MA 01742-3313
T: 978-371-2500
F: 978-371-1352
E: rosario.rizzo@rizzolawfirm.com

*/s/ Gerard J. Levins*
GERARD J. LEVINS
Levins Tax Law
1671 Worcester Road, Suite 304
Framingham, MA 07017
T: 888-333-9501
F: 888-233-0291
E: gerard@levinstaxlaw.com

## Contents

Table of Contents..............................................................................................................ii

Table of Authorities.........................................................................................................iii

Post-Trial Brief, Proposed Findings of Fact and Conclusions of Law...............................1

I.      POST-TRIAL BRIEF.................................................................................................1

II.     PROPOSED FINDINGS OF FACT.........................................................................7

    A.      Ms. DeMauro's Background, Marriages, and Divorces.......................................7

    B.      Ms. DeMauro's Divorce Proceeds and Investment in UBS to Protect Her Money.........11

    C.      Ms. DeMauro Transfers Funds to Zurcher Kantonalbank.....................................14

    D.      Ms. DeMauro Transfers Funds From Kantonalbank to Oberbank............................17

    E.      Ms. DeMauro Makes Periodic Transfers Back to U.S., and After Joseph DeMauro Died Transfers All Remaining Funds Back to U.S.......................................................19

    F.      Tax Return, FBARS, and IRS Investigations.......................................................23

    G.      IRS Makes Willful FBAR Penalty Assessments.....................................................32

    H.      IRS Assess Penalty For Fraudulent Failure to File..............................................33

III.    CONCLUSIONS OF LAW ON FBAR PENALTIES.....................................................34

    A.      Ms. DeMauro Did Not Willfully Violate Her FBAR Obligations in 2007,2008, and 2009..34

    1.      Standard of Review.........................................................................................34

    2.      Burden of Proof.............................................................................................34

    3.      Willfulness.....................................................................................................34

          a.    The Bank Secrecy Act.............................................................................34

          b.    Elements of a Claim for Willful Failure to File an FBAR Form............................35

          c.    Willfulness Requires an Intentional Violation of a Known Legal Duty..................36

               (1) Statutory Construction..................................................................36

               (2) Knowledge Requirement is Consistent with Other Bank Secrecy Act Violations...37

               (3) Voluntary, Intentional Conduct is Required to Establish Willfulness to Maintain a Two-Tiered Liability Regime..............................................................38

               (4) Willfulness in Other Civil Tax Matters is Limited to Voluntary, Intentional Violations..............................................................................40

          d.    Ms. DeMauro Was Not Willful Even Under the Lower Recklessness Standard..........44

               (1) Ms. DeMauro Was Not Reckless Because She Had No Reason to Believe She Was Required to File FBARs....................................................................44

IV.    CONCLUSIONS OF LAW ON FBAR PENALTIES......................................................46

Defendant Annette DeMauro (Ms. DeMauro) respectfully submits her post-trial brief, proposed findings of fact, and conclusions of law pursuant to this Court's order.

## I. POST-TRIAL BRIEF

This case involves an attempt by the United States of America (the "USA" or the "government") to collect outstanding civil penalties assessed against Annette DeMauro ("Ms. DeMauro") for her alleged willful failure to timely file a Report of Foreign Bank and Financial Accounts ("FBAR"), Form TD F 90-22.1, as required by 31 U.S.C. § 3514 for the tax years 2007, 2008, and 2009. *See generally*, ECF No. [1] ("Complaint"). In the Complaint, The USA asserts three counts seeking to reduce to judgment the previously assessed FBAR penalties for each applicable year (2007, 2008, 2009), pursuant to 31 U.S.C. § 5321(a)(5), in the amount of $824,087.00, plus interest and statutory accruals (as of January 30, 2020 is $1,053,766.96) against Ms. DeMauro for 2007 through 2009. This case also involves a counterclaim by DeMauro against the USA to recover the assessment and payment of fraudulent failure to file penalties pursuant to 26 U.S.C. § 6551 (f) for the tax years 2005, 2006, 2007, and 2008, in the amount of $51,675.00, as well as interest. *See generally*, ECF No. [5] ("Counterclaim").

Ms. DeMauro was born in 1937. Her highest level of education was high school. She never worked where she was ever required to file a tax return. In 2002, at age 64, she filed his first tax return. In 1957, at the age of 19, she married Colonel Pinard ("Pinard"), who was a pilot for the United States Air Force. They had 2 children together, born in 1959 and 1960. From 1960 until 1975, she spent most of her time living on military bases in Germany, Tokyo, Thailand, and Okinawa, where she was a volunteer for the Red Cross. Ms. DeMauro never filed a joint tax return with Pinard. In 1975, she divorced Pinard.

1

In 1976 Ms. DeMauro married Joseph DeMauro. From 1976 until 1985, she spent most of her time in Saudi Arabia. While living in Saudi Arabia, she never had a paying job due to the fact women were prohibited from working. During the time period of 1976 until 1979, one of Ms. DeMauro's sons, attended school in Switzerland. It was during this time where Ms. DeMauro became aware of UBS, which was the financial institution in Switzerland used to make tuition payments on behalf of her son while attending school. During Ms. DeMauro's marriage to Joseph DeMauro, they purchased real estate in Florida, Tennessee, and New Hampshire. DeMauro never filed a joint tax return with Joseph DeMauro.

In 1994, she filed for divorce from Joseph. The contested divorce lasted 6+ years and DeMauro was awarded a judgment including but not limited to a $35 million cash award, which she never received, and the three real estate properties in Florida, Tennessee, and New Hampshire. The divorce decree stated in part, that any income taxes may be owing to the United States of America, the defendant [Joseph DeMauro] is hereby ordered to indemnify and hold harmless the plaintiff [Ms. DeMauro]. It was Ms. DeMauro's good faith mis-understanding that she would never have to pay taxes on any property (and income) received as a result of the divorce.

Despite a court restraining order, for more than 20 years until Joseph DeMauro died in 2013, Ms. DeMauro lived in constant fear that Joseph DeMauro was going to leave her penniless, and/or have her killed or beaten. DeMauro's divorce attorney, James S. Boumil ("Boumil"), testified (based on testimony from the divorce trial) that Joseph DeMauro beat Ms. DeMauro. Ms. DeMauro was in constant fear Joseph DeMauro was going to have her killed or beaten. DeMauro's CPA Ronald Quellet ("Quellet") testified that Ms. DeMauro informed him she was in fear of her life and her assets being taken by Joseph DeMauro. Ms. DeMauro testified

that Joseph DeMauro attempted to run her over, run her off the road, break into her house, put

and in her gasoline tank, slashed her ties, and attempted to burn her house down.

The divorce was finalized in 2000 and Ms. DeMauro sold the Florida real estate in order

to pay outstanding debts incurred during the divorce proceedings. Ms. DeMauro had to borrow

from friends and sell assets in order to survive during the 6+ years of divorce proceedings, Ms.

DeMauro for the first time in her life, at age 64, was learning to survive on her own. In

anticipation of receiving significant proceeds from the Florida sale, and to protect her money

from Joseph DeMauro, she decided to open up a bank account with UBS AG, a Swiss bank. Ms.

DeMauro did not travel to Switzerland to open up the bank account. She met with UBS

representatives in New York and Boston, specifically Hannes Rosch ("Rosch"), who became her

UBS AG investment adviser. In 2001, DeMauro sold the Florida real estate for approximately

$7.0 million, and after paying property taxes and legal fees of approximately $2.1 million and

estimated income taxes to the IRS in the amount of $1 million; she received a net amount of $3.9

million, which was transferred to Boumil's Clients Trust Account. With her legitimate fear that

Joseph DeMauro would do anything to get her money, Ms. DeMauro transferred $3.5 million to

UBS AG in Switzerland to protect it from Joseph DeMauro.

In early 2002, Quellet, who assisted Boumil during the divorce proceedings, prepared

DeMauro's 2001 tax return and based on Quellet's instructions, DeMauro filed her first tax

return. She was 64 years old. The 2001 tax return reported a gain of $3.9 million from the sale of

the Florida property. During the preparation of the 2001 tax return, DeMauro informed Quellet

that she transferred a large sum of money to a Swiss bank account. Quellet, who was a CPA

since 1979, testified DeMauro informed him she invested a substantial amount is a foreign bank

account. He further testified he was not aware until 2014 of the filing requirements for reporting

3

a foreign bank account on a tax return, specifically on Schedule B, and he did not know of the reporting requirements for filing a foreign bank account on a Report of Foreign Bank and Financial Accounts ("FBAR") until 2014.

Until the 2001 tax return, Ms. DeMauro was never required to file a tax return by herself. She never filed a joint tax return with either Pinard or Joseph DeMauro. She did not know the complexity of the tax laws. She did not possess the state of mind that one could deliberately, intentionally and knowingly conceal income earned from assets relating to her divorce, specifically the Florida proceeds invested in foreign bank accounts, and therefore she could not deliberately and intentionally fail to file tax returns. At the trial, DeMauro demonstrated (and the Court took notice) how clueless she was with respect to tax returns, and clueless when it came to the filing requirements of an FBAR. It is undisputed that DeMauro filed the 2001 tax return and reported the gain from the sale of the Florida real estate, paid $1 million in estimated taxes, and did not file another tax return or ever file an FBAR until after the IRS started a civil investigation in 2011.

As result of the IRS civil investigation, her case was referred to the IRS Criminal Division and the U.S. Attorney's office for criminal prosecution. Despite receiving a substantial amount of unreported interest income from foreign bank accounts and not filing any tax returns, and not disclosing her foreign bank account on FBARs, no criminal charges were filed against Ms. DeMauro.  When the IRS commenced their civil investigation, she engaged the Law Firm of Bove & Langa (Bove) to represent her before the IRS and she paid a retainer of $270,000.00. When the IRS matter went from a civil to a criminal investigation, Bove withdrew his representation of Ms. DeMauro. During the IRS civil investigation, a 2005 tax return, with DeMauro's name misspelled (DeMauroa), was produced by Quellet's former accounting firm

4

(BCOB). Ms. DeMauro recalls discussions with Quellet with respect to the preparation of the 2005 return, including informing him again that she had a bank account in Switzerland. She does not recall ever signing a tax return, or ever filing a 2005 tax return. Quellet prepared the 2005 tax return listing total income of approximately $22,000 and itemized deductions paid of $57,000. Despite the significant excess of expenses over income, Quellet never inquired of Ms. DeMauro as to how she could pay the deductions with limited income. The IRS confirmed the 2005 tax return was never filed, and there is no evidence that Ms. DeMauro ever received a copy.

During the IRS civil investigation, Ms. DeMauro provided written authorization to Bove to request information from UBS AG, Kantonalbank and Oberbank in order to prepare delinquent tax returns and FBARs. Bove engaged CPA Jeffrey A. Paquin to prepare DeMauro's delinquent 2005, 2006, 2007, 2008, and 2009 tax returns and delinquent 2005, 2006, 2007, 2008, and 2009 FBARs. In May 2012, Ms. DeMauro signed the delinquent tax returns and FBARs, and Bove submitted them on her behalf to the IRS Agent, along with full payment of all taxes, interest and penalties due. The IRS examined the delinquent tax returns and FBARs, accepted them as complete and accurate, but assessed the fraudulent failure to timely file penalty on the 2005, 2006, 2007 and 2008 tax returns, and the FBAR penalty for the alleged willful failure to file FBARs for the 2007, 2008 and 2009 tax years.

From 2000 until 2009, Ms. DeMauro's investment adviser was Rosch, and during that time period she invested her money with Rosch while he was at UBS and then Zürcher Kantonalbank. When Rosch needed an investment/banking document signed, he would fax the document, which Ms. DeMauro testified was never completely filled out, to Ms. DeMauro and instructed her to sign it and informed her that he would take care of everything.

In May 2009, DeMauro, with the intent of investing in real estate in the Czech Republic

(Czech), transferred money to Oberbank located in Czech in the name of a distant relative, Ivo Strunc, a U.S. and Czech citizen. In June 2009 and then again in August 2009, Rosch informed Ms. DeMauro she needed to close her bank accounts at Kantonalbank. In August/September 2009, with the assistance of her son, Ms. DeMauro flew to Switzerland to close out her Kantonalbank accounts, and transferred her money to several Oberbank accounts. Most of the money was invested in new Oberbank accounts in Ms. DeMauro's name, and some of the money was invested in Oberbank accounts previously set up in the names of Ivo and his mother Evo, for the purpose of investing in Czech real estate.

In October 2013, with the confirmation that Joseph DeMauro passed away, Ms. DeMauro transferred all her remaining monies back to the U.S. It is undisputed, from 2002 until 2013, Ms. DeMauro made several withdrawals/transfers from her foreign bank accounts to either the Boumil Law Firm Clients Trust Account then to USAA or directly to her U.S. account at USAA.

Based on this post-trial brief, along with the proposed findings of fact, and conclusions of law, and Ms. DeMauro's testimony during the trial where she demonstrated she was clueless with respect to tax and FBAR matters, lacked sophistication with respect to business and financial matters, had limited education, lived in constant fear for her life lost of her assets from Joseph DeMauro, and did not possess the state of mind to deliberately and intentionally file tax returns for the tax years 2005, 2006, 2007, and 2008, Ms. DeMauro contends the government did not meet its burden of proof by clear and convincing evidence that she deliberately and intentionally fraudulently failed to file tax returns for the tax years, and therefore she is not liable for the fraudulent failure to file penalties. And that the government did not meet its burden of proof by the preponderance of the evidence that she willfully or recklessly failed to file FBARs for the tax years 2007, 2008, and 2009, and therefore she is not liable for the willful FBAR penalties.

6

## II.     PROPOSED FINDINGD OF FACT

### A.  Ms. DeMauro Background, Marriages and Divorces

1.     At all relevant times, Ms. DeMauro was a citizen of the United States. (Stmt. Agr. Facts ("Agr. Fact") No. 2 (ECF No. 21).

2.     When the complaint was filed, Ms. DeMauro resided within the jurisdiction of the Court and owned real property within the jurisdiction of the Court. (Agr. Fact No. 1 (ECF No. 21)).

3.     Ms. DeMauro was born on July 29, 1937 (Agr. Fact No. 3 (ECF No. 21)).

4.     Ms. DeMauro's highest level of education was high school. (Agr. Fact No. 4 (ECF No. 21)).

5.     Ms. DeMauro said at trial that prior to getting married at 19, she did not recall ever working at a job where she received a form that she had to file a tax return. (Tr. 02/19/2020 am 120:6-120:9).

6.     Ms. DeMauro was first married to Lt. Colonel Robert Pinard in 1957. (Agr. Fact No. 5 (ECF No. 21)).

7.     Ms. DeMauro had two children, born in 1959 and 1960. (Agr. Fact No. 6 (ECF No. 21)).

8.     From 1960 until 1975, Ms. DeMauro spent most of her time living on military bases in Germany, Tokyo, Thailand, and Okinawa, where she was a volunteer worker for the Red Cross from 1961 to 1975. (Agr. Fact No. 7 (ECF No. 21)).

9.     Ms. DeMauro divorced Lt. Colonel Pinard in 1975. (Agr. Fact No. 8 (ECF No. 21)).

7

10.    Ms. DeMauro said at trial during her 15 – 16 years of marriage to Colonel Pinard, she never filed a tax return with Colonel Pinard, never signed anything, never filed a tax return herself, and had no recollection what a tax return was during those 16 years. (Tr. 02/19/2020 120:4-17).

11.    Ms. DeMauro married Joseph DeMauro in 1976. (Agr. Fact No. 9 (ECF No. 21)).

12.    Ms. DeMauro spent most of her time in Saudi Arabia from 1976 until 1985. (Agr. Fact No. 10 (ECF No. 21)).

13.    Ms. DeMauro said at trial that her son had gone to school at Tasis in Lugano, Switzerland in the late 70s while she lived in Saud Arabia and the school did business with UBS so all the children at the school had accounts at UBS. (Tr. 02/18/2020am 558-56;14.

14.    Ms. DeMauro and Joseph DeMauro purchased real estate in Manalapan, Florida, in 1983 (the "Florida Property"). (Agr. Fact No. 11 (ECF No. 21)).

15.    Ms. DeMauro and Joseph DeMauro also purchased real estate in Tennessee in 1983. (Agr. Fact No. 13 (ECF No. 21)).

16.    Ms. DeMauro and Joseph DeMauro purchased real estate in Rye Beach, New Hampshire, (the "Rye Beach Property") in 1987. (Agr. Fact No. 12 (ECF No. 21)) (Tr. 02/18/2020 am 44:16-44:18). The Rye Beach Property was located at 2595 Ocean Boulevard, Rye Beach, New Hampshire. (Tr. 02/18/2020 pm 78:17-79:1).

17.    In 1993, Ms. DeMauro filed for divorce from Joseph DeMauro on grounds of adultery. (Agr. Fact No. 14 (ECF No. 21)).

18.    Ms. DeMauro was divorced from Joseph DeMauro in February 2000. (Agr. Fact No. 15 (ECF No. 21)).

19.    Ms. DeMauro t said at trial after Joseph DeMauro got caught in an affair in

8

1989, he left the Rye Beach house she had to provide for her financial support by borrowing money from her mother, from a friend, and a friend of a lawyer, and sell jewelry, crystal dishes, some paintings. (Tr. 02/19/2020 am 1265:10-126:9).

20.     The divorce was contested, and Ms. DeMauro was awarded a judgment, including but not limited to a $35 million cash award, which was not paid, and the three parcels of real estate identified above. (Agr. Fact No. 16 (ECF No. 21)) (Tr. 02/18/2020 pm 78:3-79:1 (Rye Beach Property)).

21.     Ms. DeMauro said at trial she never filed a joint tax return with Joseph DeMauro. (Tr. 02/19/2020 126:10-126:14).

22.     Ms. DeMauro said at trial that she never filed a tax return in the 1990s because she didn't feel like she owned anything, owed anything, and was more concerned about not having any money. Taxes never crossed her mind when she was worried about starving to death. (Tr. 02/19/2020am 127:6-127:18).

23.     In her lengthy, contested divorce proceedings, attorney S. James Boumil represented Ms. DeMauro. (Agr. Fact No. 17 (ECF No. 21); Tr. 02/18/2020 pm 64:4-7, 80:20-21).

24.     During her divorce and in her successive attempts to collect her divorce judgment from Mr. DeMauro, Ms. DeMauro was represented by numerous lawyers and paid at least $1Million in legal fees. (Tr. 02/18/2020 am 46:12-22; 47:18-21, 88:23-89:10).

25.     With respect to taxes, the final decree of divorce between Ms. DeMauro and Joseph DeMauro provided: To the extent that any income and/or gifts taxes may be owing to the United States of America, any State of the United States, or any foreign jurisdiction, [Joseph DeMauro] is hereby ordered to indemnify and hold harmless the plaintiff from any and against

9

the same and to be solely responsible for the payment of any costs and reasonable attorney's fees incurred by [Annette DeMauro] in defense of same. (Ex. 40, Pg. 8-9).

26.     Ms. DeMauro said at trial, "My understanding was that whatever I received from the - - my divorce decree was mine and mine alone and that went for anything that I had received and it was nontaxable." (Tr. 02/18/2020 am 110:1-110:7).

27.     Pursuant to the final decree of divorce, the court further found and ruled that the defendant [Joseph DeMauro] indicated to the plaintiff [Ms. DeMauro] that unless she acceded to his offers for the payment of alimony and division of marital property, she would never receive anything from him and that he would continue, with the aid of his vast financial resources, to avoid service of process and arrest. (Agr. Fact No. 19 (ECF No. 21)).

28.     Ms. DeMauro said at trial pursuant to the divorce decree a restraining order was issued stating, "The defendant [Joseph DeMauro] is hereby ordered to have no contact, directly or indirectly, by telephone or otherwise, with the plaintiff [Ms. DeMauro] and shall not enter the property located at 2595 Ocean Boulevard, Rye Beach, New Hampshire." (Tr. 02/19/2020 am 110:10-110:18) (Ex. 40, Pg. 10).

29.     Ms. DeMauro said at trial that Joseph DeMauro "that he would see me to my death before he would give me a dime. He was very vengeful." (Tr. 02/19/2020 am 110:25-111:5)

30.     Ms. DeMauro said at trial that Joseph DeMauro continued to harass her, sending people around, threatening, slashed the tires, put sand in the truck, put sand in the seats of the car, tried to push in the windows in the solarium, have people come around and park on the side of the road at midnight, one-o'clock in the morning and just park there, just to scare her. At one time at seven o'clock in the morning he had four men to pull up in a Cadillac, a big black

Cadillac, and four men got out and stood on the side of the car facing my house with their arms folded. (Tr. 02/19/2020 111:12-112:4).

31.     Ms. DeMauro said at trial Joseph DeMauro tried to burn the backside of the house down. They put logs - - he did - - put logs or had someone put logs out, to set on fire. (Tr. 02/19/2020 114:4-114:6).

32.     Ms. DeMauro said at trial, "He tried to run me off the road. He told me if I continued with the divorce that I would be like the judge down in Florida; I'd be under the water, under the Atlantic, with concrete wrapped around my feet." That his intention was to kill her. (Tr.02/19/2020 am 112:7-111:18)

### B. Ms. DeMauro Divorce Proceeds and Investment in UBS to Protect Her Funds

33.     In 2000, Ms. DeMauro opened a bank account with UBS AG, a Swiss bank. (Agr. Fact No. 20 (ECF No. 21)). In setting up the account, Ms. DeMauro met with UBS representatives on multiple occasions, with one meeting occurring at the Waldorf-Astoria hotel in New York and a second meeting occurring in Boston. (Tr. 02/18/2020 am 53:2-54:18).

34.     DeMauro said at trial that she opened the UBS AG account to "protect" her money (Tr. 02/18/2020 54:10-54:14) from her ex-husband. (02/18/2020 am Tr. 59:8-21). At the time she opened the Swiss account, Ms. DeMauro had domestic bank accounts at both USAA and TD bank. (Tr. 02/18/2020 am 50:3-17). She maintained these accounts throughout the years at issue in this case and made large deposits into the USAA account. (Tr. 02/18/2020 am 90:2-5).

35.     Ms. DeMauro chose to open an account at UBS AG because her son had gone to school at Tasis in Lugano, Switzerland in the late 70s while she and her ex-husband lived in Saudi Arabia and the school did business with UBS so all the children at the school had accounts at UBS. (Tr. 02/18/2020 am 55:8-56:14.) Ms. DeMauro testified that she "assumed that if the

school could trust them, so could [she]." (*Id.*)

36.     Ms. DeMauro never sought advice from an attorney or financial advisor about opening a foreign account. (Tr. 02/18/2020 am 54:6-9, 54:19-55:2).

37.     In establishing her UBS AG account, Ms. DeMauro formed a client relationship with UBS client advisor Hannes Rosch. (Agr. Fact No. 21 (ECF No. 21)).

38.     Ms. DeMauro signed documents to open her UBS account in 2000 as a numbered bank account (that did not have her name on it). (Ex. 4, at IRS-APD-01-0264 (showing "numbered account" box checked on account opening document); Tr. 02/18/2020 am 64:13-65:2).

39.     In establishing her UBS AG account, Ms. DeMauro signed documents that requested that correspondence be generally maintained by the bank rather than sent to her, if not claimed by her, could be destroyed after a period of three years. (Ex. 4, at IRS-APD-01-0264) (under "correspondence instructions").

40.     Ms. DeMauro said at trial that Mr. Rosch sent her the account opening documents by fax, that the documents were not filled in when she received them, that she signed them without filling in any other information and then she faxed them back to Mr. Rosch. (Tr. 02/18/2020 am 62:25-63:7). dated July 26, 2000, but Ms. DeMauro testified at trial that she was unsure if this was the date she signed them. (Ex. 4; Tr. 02/18/2020 am 78:5-15).

41.     Ms. DeMauro said at trial that she never received monthly statements from UBS by mail and that she possibly received other correspondence from UBS by mail "maybe once or twice," if ever. (Tr. 02/18/2020 am 70:14-71:13).

42.     Ms. DeMauro opened up the accounts through in-person meetings with UBS representatives in the United States and never went to Zurich, Switzerland to sign them. (Ex. 4,

pp. 2-3; Tr. 02/18/2020 am 78:18-20).

43.     Rosch told Ms. DeMauro that UBS didn't want its employees carrying any client materials or communications on flights to the United States or for any communications to be sent to clients via mail. (Tr. 02/18/2020 am 63:12-17).

44.     When Ms. DeMauro opened the UBS account, she understood that the account would produce income. She testified at trial that Mr. Rosch had promised her a return of approximately 5% per year. (Tr. 02/18/2020 pm 63:20-63:25).

45.     In 2001, Ms. DeMauro sold the Florida Property, which she had received as part of her divorce from Joseph DeMauro, for approximately $7 million. (Agr. Fact No. 22 (ECF No. 21)). Ms. DeMauro knew before the sale was finalized that she could expect to receive several million dollars from the sale of the Florida Property. (Tr. 02/18/2020 am 49:24-50:2).

46.     When the sale of the Florida Property closed, Ms. DeMauro received approximately $3.5 million in net sales proceeds ("Proceeds") after paying almost $2.5 million in property taxes and legal fees, and remitting to the IRS $1.0 million as a payment to be applied to her anticipated 2001 federal income tax liability, which would have included capital gains tax upon the disposition of the Florida Property. (Agr. Fact No. 23 (ECF No. 21)).

47.     The Proceeds were deposited in 2001 in Ms. DeMauro's client account at Boumil's law firm. (Agr. Fact. No. 25 (ECF No. 21)).

48.     In 2002, Ms. DeMauro instructed Boumil to transfer the Proceeds from the trust account that his law firm maintained for her to her UBS AG account in Switzerland. (Agr. Fact No. 26 (ECF No. 21)).

49.     On August 19, 2002, UBS AG received a deposit of $3,500,000 into Ms.

13

DeMauro's UBS AG account from the trust account that Boumil's law firm maintained for Ms. DeMauro. (Agr. Fact No. 27 (ECF No. 21)).

50.     Rosch told Ms. DeMauro that he could get her at least a five percent return on her investment at UBS AG if he invested her money in currency. (Tr. 02/18/2020 am 60:7-10). Ms. DeMauro agreed to that investment strategy. (Tr. 02/18/2020 am 60:11-13). Ms. DeMauro understood that she would earn income from her UBS AG account. (Tr. 02/18/2020 am 60:14-16).

51.     In 2002, Ms. DeMauro's UBS AG account earned interest of $18,424. (Agr. Fact No. 30 (ECF No. 21)).

52.     In 2003, Ms. DeMauro's UBS AG account earned interest of $34,025. (Agr. Fact No. 31 (ECF No. 21)).

53.     In 2004, Ms. DeMauro's UBS AG account earned interest of $38,170. (Agr. Fact No. 32 (ECF No. 21)).

54.     In 2005, Ms. DeMauro's UBS AG account earned interest of $92,938. (Agr. Fact No. 33 (ECF No. 21)).

55.     In 2006, Ms. DeMauro's UBS AG account earned interest of $119,509. (Agr. Fact No. 34 (ECF No. 21)).

56.     On the following dates, interest in the following amounts was posted as deposits into Ms. DeMauro's UBS account: March 13, 2003 deposit of $17,000; January 28, 2005 deposit of $18,000; December 12, 2005 deposit of $40,000; April 21, 2006 deposit of $35,000; and September 25, 2006 deposit of $60,000. (Agr. Fact No. 28 (ECF No. 21)).

### C.  Ms. DeMauro Transfers Funds To Zürcher Kantonalbank

57.     By 2006, Hannes Rosch had left UBS AG and took a position with Zürcher

14

Kantonalbank in Switzerland. (Agr. Fact No. 37 (ECF No. 21)). Trial testimony revealed that he

became employed by Neue Zuercher Bank, but that he had the ability to open accounts with

Zürcher Kantonalbank. (Tr. 02/18/2020 pm 84:24-85:18). Ms. DeMauro waited "for Mr. Rosch

to get settled and went with him." (Tr. 02/18/2020 pm 84:15-85:1). UBS AG was concerned

from as early as September of 2004 that Rosch's departure from UBS AG meant that Ms.

DeMauro might not keep her funds with UBS AG. (Ex. 7, p. 2, entry for contact date

"20040917").

        58.     In September of 2006, Ms. DeMauro opened an account with Zürcher

Kantonalbank, which consisted of a main account and several subsidiary accounts. (Agr. Fact

No. 38 (ECF No. 21)). (Tr. 02/18/2020 pm 86:25-93:12).

        59.     Like the UBS account, the Zürcher Kantonalbank account also was a "hold mail"

account. This fact is not identified on the account opening documents, but is referenced on the

account statements, which indicate that a fee was being charged as a "hold mail" fee. (Ex. 14,

page 2 (PacquinSubpoena-00600)). (*See also* Tr. 02/18/2020 pm 95:6-96:23).

From the time the Zürcher Kantonalbank account was opened until 2009, Ms. DeMauro did not

recall receiving any statements from Zürcher Kantonalbank in the United States by mail. (Tr.

02/18/2020 pm 96:12-96:23).

        60.     Ms. DeMauro said at trial that Rosch told her not to worry about any

statements or anything regarding her account, that he would take care of everything, and I

didn't worry about it or think about it. (Tr. 02/18/2020 pm 97:2-97:7).

        61.     When Ms. DeMauro opened the Zürcher Kantonalbank account, she designated

the word "Orcha" to be used as a code word for the account. (Ex. 11, pp. 1, 3). The account

opening documents indicate that "[t]he opening up of code word and/or numbered cash and

securities accounts is a purely internal measure of the Bank in order to use discretion and keep the name of the holders secret to most of the Bank's employees." (Ex. 11, p. 3, ¶ 1).

62.    On or about October 17, 2006, Ms. DeMauro transferred $3,180,000 from her account at UBS AG to the Zürcher Kantonalbank accounts. (Agr. Fact No. 39 (ECF No. 21)).

63.    On or about January 3, 2007, Ms. DeMauro's Zürcher Kantonalbank accounts were credited with a capital increase of $30,000. (Agr. Fact No. 40 (ECF No. 21)).

64.    On or about April 11, 2007, Ms. DeMauro's Zürcher Kantonalbank accounts were credited with a capital increase of $30,000. (Agr. Fact No. 41 (ECF No. 21)).

65.    On or about July 4, 2007, Ms. DeMauro's Zürcher Kantonalbank accounts were credited with a capital increase of $35,000. (Agr. Fact No. 42 (ECF No. 21)).

66.    On or about September 3, 2009, Ms. DeMauro's Zürcher Kantonalbank accounts were credited with a "statement credit" of $99,962. (Agr. Fact No. 43 (ECF No. 21)).

67.    On or about September 7, 2009, Ms. DeMauro's Zürcher Kantonalbank accounts were credited with a "statement credit" of $14,962. (Agr. Fact No. 44 (ECF No. 21)).

68.    On or about September 23, 2009, Ms. DeMauro's Zürcher Kantonalbank accounts were credited with a "statement credit" of $500. (Agr. Fact No. 45 (ECF No. 21)).

69.    In 2006, Ms. DeMauro's Zürcher Kantonalbank accounts earned interest of $32,613. (Agr. Fact No. 46 (ECF No. 21)).In 2007, Ms. DeMauro's Zürcher Kantonalbank accounts earned interest of $130,531.00. (Agr. Fact No. 47 (ECF No. 21)).

70.    In 2008, Ms. DeMauro's Zürcher Kantonalbank accounts earned interest of $116,011.00. (Agr. Fact No. 48 (ECF No. 21)).

71.    In 2009, Ms. DeMauro's Zürcher Kantonalbank accounts earned interest of $14,793.00. (Agr. Fact No. 49 (ECF No. 21)).

16

### D. Ms. DeMauro Transfers Funds From Kantonalbank to Oberbank

72.     Ms. DeMauro opened a bank account with Oberbank ("Oberbank Account 1432"), in the Czech Republic on or before April 6, 2009. The account was opened under the name Ivo Strunc with a mailing address of PO Box 603 Rye Beach, N.H. 03871 USA, which was Ivo Strunc's mailing address. By September of 2009, the account was held under the name Eva Struncova with a mailing address in Nepomuk, Czech Republic. Thereafter, Oberbank Account 1432 was continuously held in the name of Eva Struncova until at least March 30, 2012. (Agr. Fact No. 60 (ECF No. 21)).

73.     Ivo Strunc and Eva Struncova are distant relatives of Ms. DeMauro. Ivo was related to Ms. DeMauro "through her English mother-in-law." (Tr. 02/19/2020 am 8:19-9:14). Eva was Ivo's mother. (Tr. 02/19/2020 am 8:23-8:25).

74.     Ms. DeMauro said at trial, "The purpose [transfers from Zurcher Kantonalbank to Oberbank] was I was considering property, two pieces of property there in Nepomuk, in the town where they lived, and so my reason for putting it there was for that reason. They were going to watch the project, help me with the project and all of that." (Tr. 02/19/2020 pm 9:2-9:12)

75.     Even though Oberbank Account 1432 was in the name of Ivo or Eva, the money in those accounts remained Ms. DeMauro's. (Tr. 02/19/2020 am 9:2-12, 46:25-47:11; *see also* Tr. 02/18/2020 am 28:8-21).

76.     Oberbank Account 1432 was held in U.S. Dollars. (Ex. 16, Oberbank Account Statement listing Account 1432 as a USD account, p. 3).

77.     Ms. DeMauro initially funded Oberbank Account 1432 on April 6, 2009 with approximately $200,000, transferred from her Zürcher Kantonalbank accounts. (Agr. Fact No.

17

61 (ECF No. 21)).

78.     Ms. DeMauro testified that she opened Oberbank Account 1432 in her relative's

name in order to invest in real property in the town of Nepomuk in the Czech Republic, the home

town of Ivo Strunc and Eva Struncova. (Tr. 02/19/2020 pm 9:2-12; *see also* DeMauro Dep. Tr.,

Ex. 63, 218:23-225:3).

79.     Ms. DeMauro testified that in June of 2009, Rosch called her and told her that she

had to close her accounts at Zürcher Kantonalbank because "the Swiss government said all

Americans had to get their accounts  - - close their accounts and get them out of Switzerland."

(Tr. 02/19/2020 am 22:15-24.)

80.     Ms. DeMauro traveled to Europe from August 23, 2009 to August 29, 2009 in

order to close her accounts at Zürcher Kantonalbank in Zurich and meet with Oberbank

representatives in the Czech Republic. (Agr. Fact No. 62 (ECF No. 21)).

81.     In August of 2009, Ms. DeMauro opened two additional bank accounts with

Oberbank ("Oberbank Account 1401" and "Oberbank Account 1598") in her own name. (Agr.

Fact No. 63 (ECF No. 21)).

82.     In August of 2009, Ms. DeMauro visited the town of Nepomuk in the Czech

Republic for the first time since 2002. (DeMauro Dep. Tr., Ex. 63, 219:7-11).

83.     Oberbank Account 1598 was held in Euros. (Ex. 31, Pgs. 3-4).

84.     Ms. DeMauro later opened an additional account at Oberbank, ("Oberbank

Account 1600). Oberbank Account 1600 was held in U.S. dollars. (Ex. 31, Pgs. 3-4).

85.     On or about September 23, 2009, Ms. DeMauro transferred $721,355 from her

Zürcher Kantonalbank accounts to Oberbank Account 1432. (Agr. Fact No. 66 (ECF No. 21)).

That was the account that Ms. DeMauro opened in April 2009 in the name of a relative, Ivo

Strunc.

86.     On or about September 24, 2009, Ms. DeMauro transferred the remaining funds in the Zürcher Kantonalbank accounts, approximately $2 million, to Oberbank Account 1598. (Agr. Fact No. 67 (ECF No. 21)).

87.     In 2009, Ms. DeMauro's Oberbank accounts earned interest of $6,046. (Agr. Fact No. 68 (ECF No. 21)).

### E.  Ms. DeMauro Makes Periodic Transfers Back to U.S., and After Joseph DeMauro Died Transferred All Remaining Funds Back to U.S.

88.     On or about October 10, 2003 Ms. DeMauro transferred $250,000 from the UBS AG account to her client account at Boumil's firm. On or about November 7, 2003, $250,000 was transferred from the client account maintained for her at Boumil's firm to Ms. DeMauro's domestic USAA bank account. (Agr. Fact No. 35 (ECF No. 21)).

89.     On or about June 16, 2004 Ms. DeMauro transferred $250,000 from the UBS AG account to her client account at Boumil's firm. On or about June 21, 2004, Boumil transferred $249,975 from the client account to Ms. DeMauro's domestic bank account. (Agr. Fact No. 36 (ECF No. 21)).

90.     On or about February 28, 2007, Ms. DeMauro transferred $170,000 from the Zürcher Kantonalbank accounts to her domestic USAA bank account. (Agr. Fact No. 50 (ECF No. 21)).

91.     On or about December 31, 2008, Ms. DeMauro transferred $329,408.00 from the Zürcher Kantonalbank accounts to her domestic USAA bank account. (Agr. Fact No. 51 (ECF No. 21)).

92.     On or about April 30, 2008, Ms. DeMauro transferred $204,408.00 from the

19

Zürcher Kantonalbank accounts to her domestic USAA bank account. (Agr. Fact No. 52 (ECF No. 21))

93.     After two years (2007-2008) of making direct transfers of funds from overseas accounts to her domestic bank accounts, in April of 2009 Ms. DeMauro continued to transfer funds through client account with Boumil. Thus, on or about April 8, 2009, Ms. DeMauro transferred $100,000 from Oberbank Account 1432 (which was initially funded just two days earlier through an opening deposit of $200,000) to her client account at Boumil's firm. (Agr. Fact No. 69 (ECF No. 21); Tr. 02/19/2020 am 11:7- 11:18.)

94.     On or about June 4, 2009, Ms. DeMauro transferred $95,079 from Oberbank Account 1432 to her client account at Boumil's firm. (Agr. Fact No. 70 (ECF No. 21)).

95.     At the time of the two Spring 2009 transfers from the Oberbank 1432 account (which was in a relative's name), Ms. DeMauro continued to have over $2.0 million on deposit with her Zürcher Kantonalbank account. Yet, Ms. DeMauro chose to transfer approximately $200,000 from the Oberbank account to her trust account with Boumil. (Tr. 02/19/2020 am 11:3-16:15).

96.     On or about July 31, 2009, Ms. DeMauro transferred $2,121.00 from the Zürcher Kantonalbank accounts to an unknown recipient. (Agr. Fact No. 53 (ECF No. 21)).

97.     On or about August 30, 2009, Ms. DeMauro transferred $100,000 from the Zürcher Kantonalbank accounts to her domestic USAA bank account. (Agr. Fact No. 64 (ECF No. 21)).

98.     On or about September 3, 2009, Ms. DeMauro transferred $150,009 from the Zürcher Kantonalbank accounts to her domestic USAA bank account. (Agr. Fact No. 65 (ECF No. 21)).

20

99.     On or about October 13, 2009, Ms. DeMauro transferred $180,109 from Oberbank Account 1432 to her client account at Boumil's firm. On or about October 21, 2009, Boumil sent Ms. DeMauro a check in the amount of $179,950 from the client account. (Agr. Fact No. 71 (ECF No. 21)).

100.    On or about October 14, 2009, Ms. DeMauro withdrew $543,301 from the Oberbank accounts by check made out to Ivo Strunc. (Agr. Fact No. 72 (ECF No. 21)).

101.    On or about January 7, 2010, Ivo Strunc withdrew $1,300 from Oberbank Account 1432. (Agr. Fact No. 73 (ECF No. 21)).

102.    On or about January 7, 2010, Ivo Strunc withdrew $9,500 from Oberbank Account 1432. Mr. Strunc brought this cash back to the United States. (Agr. Fact No. 73 (ECF No. 21)).

103.    On or about January 7, 2010, Ms. DeMauro transferred $100,081 from Oberbank Account 1432 to her client account at Boumil's firm. (Agr. Fact No. 75 (ECF No. 21)).

104.    On or about May 18, 2010, Ivo Strunc withdrew $9,500 from the Oberbank accounts. Mr. Strunc brought this cash back to the United States. (Agr. Fact No. 76 (ECF No. 21)).

105.    On or about May 18, 2010, Ms. DeMauro transferred $100,072 from the Oberbank accounts to her client account at Boumil's firm. (Agr. Fact No. 77 (ECF No. 21)).

106.    On or about June 25, 2010, Ms. DeMauro transferred $50,072 from the Oberbank accounts to her client account at Boumil's firm. Ms. DeMauro requested that Boumil give her those funds. On or about July 8, 2010, Boumil mailed her a check for $49,965. (Agr. Fact No. 78 (ECF No. 21)).

107.    On or about November 10, 2010, Ms. DeMauro transferred $85,084 from the

21

Oberbank accounts to her client account at Boumil's firm. (Agr. Fact No. 79 (ECF No. 21)).

108.    On or about March 11, 2011, Ms. DeMauro transferred $50,085 from Oberbank Account 1432 to her client account at Boumil's firm. (Agr. Fact No. 80 (ECF No. 21)).

109.    On April 29, 2011, Boumil received into his firm's client account, a transfer of $94,950 from Ivo Strunc. Boumil deducted $3,500 in legal fees owed to him, and then, on or about May 3, 2011, Boumil sent Ms. DeMauro a check from the client account in the amount of $91,450. (Agr. Fact No. 81 (ECF No. 21)).

110.    On or about June 15, 2011, Ms. DeMauro transferred $150,090 from the Oberbank accounts to her client account at Boumil's firm. Shortly thereafter, Boumil sent Ms. DeMauro a check for the amount he received in the client account. (Agr. Fact No. 82 (ECF No. 21)).

111.    On or about November 2, 2011, Ms. DeMauro transferred $100,081 from Oberbank Account 1600 to her client account at Boumil's firm. (Agr. Fact No. 83 (ECF No. 21)).

112.    On a date unknown, Ms. DeMauro transferred $270,000 from the Oberbank accounts to Bove and Langa PC as a retainer or payment for services. Bove and Langa represented Ms. DeMauro before the IRS. (Agr. Fact No. 85 (ECF No. 21).

113.    On or about April 6, 2012, Ms. DeMauro transferred $150,000 from the Oberbank accounts to her domestic account with USAA Bank. (Agr. Fact No. 84 (ECF No. 21)).

114.    Ms. DeMauro late-filed her income tax returns for the years 2005 through 2010 on or about May 17, 2012. (Agr. Fact Nos. 93,102 (ECF No. 21)).

115.    On or about September 4, 2012, Ms. DeMauro transferred $150,000 from the Oberbank accounts to her domestic account with USAA Bank. (Agr. Fact No. 86 (ECF No. 21)).

22

116.    On or about April 13, 2013, Ms. DeMauro transferred $149,940 from the Oberbank accounts to her domestic account with USAA Bank. (Agr. Fact No. 87 (ECF No. 21)). On or about September 7, 2013, Ms. DeMauro transferred $149,940 from the Oberbank accounts to her domestic account with USAA Bank. (Agr. Fact No. 88 (ECF No. 21)). On October 15, 2013, Joseph DeMauro passed away. (Ex. 16, P. 3).

117.    On or about November 26, 2013, Ms. DeMauro transferred $26,609 from the Oberbank accounts to her domestic account with USAA Bank. (Agr. Fact No. 89 (ECF No. 21)).

118.    On or about November 26, 2013, Ms. DeMauro transferred $671,488 from the Oberbank accounts to her domestic account with USAA Bank. (Agr. Fact No. 90 (ECF No. 21)).

119.    In the years after she opened her foreign account, the property taxes on the Rye Beach Property alone were around $50,000 per year. (Tr. 02/18/2020 am 104:2-104:20) (specific reference to 2003 year); (Tr. 02/18/2020 pm 73:10-73:15 ($57,000 of property taxes based on unfiled 2005 return)).

120.    At trial, Ms. DeMauro testified she transferred funds to pay "household expenses, personal expenses on [her] home, service people working there." (Tr. 02/18/2020 am 104:2- 104:10).

121.    In July 2019, Ms. DeMauro sold the Rye Beach Property, after the commencement of this lawsuit. (Tr. 02/18/2020 am 67:15-68:11). The sale price for the Rye Beach Property was $3.6 million. (Tr. 02/18/2020 am 67:24-68:1).

### F.  Tax Returns and FBARs

122.    Ms. DeMauro timely filed an individual income tax return for 2001, which reflected the estimated tax payments of $1 million paid to the IRS pursuant to the sale of the Florida Property, which was awarded to Ms. DeMauro in her divorce. That return reflected a tax

liability of $776,454, which resulted in a refund of $223,546. (Agr. Fact No. 24 (ECF No. 21); (Ex. 8 (client copy of 2001 return)).

123.    Ms. DeMauro testified she did not understand when the Florida Property was sold, why the professionals handling the sale paid to the government $1,000,000 of estimated tax on her behalf. They just told her the tax was paid, what the price of the house was, and that's all the information they gave me. (Tr. 02/18/20 pm 82:4-83:15).

124.    CPA Ronald Ouellet prepared Ms. DeMauro's 2001 income tax return. (Tr. 02/18/2020 pm 7:6-8; Ex. 8). It may have been prepared by someone on his staff, in which case he would have reviewed it. (Tr. 02/18/2020 pm 7:10-7:13).

125.    Before preparing Ms. DeMauro's return, Ouellet met with her. (Tr. 02/18/2020 pm 8:3-5). During that meeting, Ouellet would have asked Ms. DeMauro if she had any interest income. (Tr. 02/18/2020 pm 10:14-17.)

126.    At some point, during 2002 or 2003, Ouellet learned that Ms. DeMauro had transferred a significant amount of money into a Swiss bank account. (Tr. 02/18/2020 pm 15:1-15:17). He may have learned of this fact during preparation of her 2001 return. (Tr. 02/18/2020 pm 15:6-15:17).

127.    Quellet said at trial that in 2002 and 2003, and during the preparation of the 2001 tax return, he had an understanding that Ms. DeMauro actually transferred a significant amount of money to a Swiss bank account. (Tr. 02/18/2020 pm 15:1-16:4). Also, Quellet testified that in 2001, Ms. DeMauro informed him that she had foreign assets or a foreign bank account that she put there to protect from her ex-husband. (Tr. 40:1-40:4)

128.    Quellet said at trial Ms. DeMauro contacted him to have a 2002 tax return prepared.  (Tr. 02/18/2020 pm 18:20-18:22).

24

129.     Quellet said at trial that he prepared Ms. DeMauro's 2002 tax return but doesn't recall any conversation in particular other than her concern about her husband finding her assets. (Tr. 02/18/2020 pm 18:20-19:5)

130.     Quellet said at trial that he had no understanding back in 2001, 2002, 2003, 2004, 2005 as to what Form TD F 90-22.1 (FBAR) was. (Tr. 02/18/2020 pm 26:3-26:5). His first intimate knowledge of the FBAR form was 2014. (Tr. 02/18/2020 pm 26:6-26:17).

131.     Quellet said at trial that he discussed Ms. DeMauro's divorce during the preparation of her 2001, 2002, 2005, and 2011 tax returns. And she specifically talked about being in fear of her husband. She specifically mentioned that - - I believe she referred to him as a "gangster" and that she was in legitimate fear of her well being. She was in fear of her life and her assets being taken – the proceeds from the vacation property. ((Tr.02/18/2020 34-7-35:11).

132.     Quellet said at trial that in 2002 when he was preparing her 2001 tax return Ms. DeMauro informed him that she had a foreign bank account. And she was protecting assets she received from the vacation home. (Tr. 02/18/2020 pm 37:10-37:17).

133.     Quellet said at trial that even if a taxpayer doesn't have foreign interest income but has a foreign bank account, it still has to be reported on Schedule B, Part III. (Tr. 02/18/2018 pm 39:3-39:11).

134.     Schedule B, Part III, is entitled "Foreign Accounts and Trusts" and asked the filer if the filer had a financial interest in or signature authority over a financial account in a foreign country. The Schedule B also directs the filer to the instructions for Schedule B to determine the exceptions and filing requirements for Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts (the "FBAR") (Agr. Fact No. 98 (ECF No. 21)) (Ex. 17, p. 6).

135.     Quellet said at trial that his understanding back in 2014 was that only a third of

25

CPAs knew about FBARs. In 2010 only 25 percent of CPAs knew about FBARs, in 2005, only 2 percent of CPAs knew about FBARs, and in 2001, only 2 percent of CPAs knew about FBARs. (Tr. 02/18/2020 pm 42:12-43:2).

136.    Quellet said at trial that based on his understanding of his clients, that [he] thought 30, 40 percent of [his] clients have a very poor understanding of our tax system, and Ms. DeMauro would be in the lower 30 percent. (Tr. 02/18/2020 pm 51:10-51-23). That she did not strike me, in the communications that we had, as someone that had any real understanding of our taxes. (Tr. 02/18/2020 pm 52:17-52:19).

137.    Quellet testified that he doubted that any of the people in the courtroom know about FBARs back in 2001, 2006, 2007, 2008, and 2009. Ms. DeMauro that he would doubt any of the people in this courtroom, including Ms. DeMauro, knew about FBARs in 2001. (Tr. 02/18/2020 53:1-53:22).

138.    Ms. DeMauro has never filed federal individual income tax returns for the years 2002 through 2004, despite earning substantial interest from the UBS account in each of those years. (Agr. Fact Nos. 91, 30-32 (ECF No. 21)).

139.    Ouellet prepared extension requests to file income tax returns for the years 2002 through 2004, but did not prepare any income tax returns for Ms. DeMauro for these years. (Agr. Fact No. 92 (ECF No. 21)). (Ex. 17, p. 1 (e-mail from Ouellet's prior firm).

140.    In 2004 Ms. DeMauro was awarded a house in Tyngsboro, Massachusetts "Tyngsboro house") as part of her divorce from Joseph DeMauro. (Agr. Fact No. 94 (ECF No. 21)).

141.    In 2005, Ms. DeMauro sold the Tyngsboro house. (Agr. Fact No. 95 (ECF No. 21)).

142.     In 2006, Ms. DeMauro hired Ouellet to prepare a Form 1040 federal income tax return for the 2005 tax year. (Agr. Fact No. 96 (ECF No. 21)).

143.     Ouellet prepared a Form 1040 federal income tax return for Ms. DeMauro for the 2005 tax year. The prepared return included a Schedule B, which did not include the interest earned from Ms. DeMauro's UBS AG account. (Agr. Fact No. 97 (ECF No. 21)) (Ex. 17, prepared but unfiled 2005 return, page 6). Instead, the Schedule B only reports $8,464 Ms. DeMauro earned from her USAA Federal account.  (*Id.*)

144.     Ouellet testified that Ms. DeMauro would have provided the interest information for the 2005 federal income tax return that he prepared for Ms. DeMauro to his firm. (Tr. 02/18/2020 pm 21:14-22:4).

145.     Ouellet testified that Ms. DeMauro never asked him whether any interest earned from a Swiss bank would have been required to be reported on an income tax return. (Tr. 02/18/2020 pm 23:16-24:4).

146.     Ms. DeMauro testified that when Mr. Ouellet prepared a 2005 income tax return for her, he never asked her if she had a foreign account or if she earned any interest in 2005. (Tr. 02/18/2020 pm 75:20-76:21).

147.     On that Schedule B, question 7a asks if during 2005 the taxpayer had an interest in or a signature or other authority over a financial account in a foreign country, and the box is checked no. (Agr. Fact No. 99 (ECF No. 21)) (Ex. 17, page 6).

148.     Ms. DeMauro never filed the 2005 income tax return that her Mr. Ouellet prepared for her in 2006. (Agr. Fact No. 100 (ECF No. 21)) (This is an agreed fact, notwithstanding the contention in the e-mail from Ouellet's prior firm that the 2005 return Ouellet prepared for her was filed. *See* Ex. 17, p. 1.)

27

149.    Ms. DeMauro did not timely file income tax returns for the years 2005 through 2010. She filed delinquent income tax returns for these tax years on or about May 17, 2012, after the IRS began its investigation. (Agr. Fact Nos. 93,102 (ECF No. 21)) (Tr. 02/18/2020 pm 101:13-101:20).

150.    On or about May 17, 2012, Ms. DeMauro filed delinquent income tax returns for 2005 through 2010, paid all taxes, interest and penalties due on 2005, 2006, 2007, and 2008, and the IRS accepted the tax returns as filed. (*See* Ex. 55-59, Ex. 51-58).

151.    On April 12, 2012, Ms. DeMauro timely filed her 2011 federal income tax return. (Agr. Fact No. 101 (ECF No. 21)).

152.    Each of the late-filed returns for tax years 2005 through 2010 reported interest income from a foreign bank account or accounts. Each of the late-filed returns for tax years 2005 through 2010, on Schedule B, check the box "yes" in response to a question about whether the taxpayer has any interest in any foreign accounts. (Agr. Fact No. 103 (ECF No. 21)).

153.    When Ms. DeMauro, in 2012, filed her income tax returns for the 2007, 2008, and 2009 years, she answered question 7a "yes," and identified the countries in which she had foreign accounts during each year. (Ex. 57, p. 4, Ex. 58, p. 4, Ex. 59, p. 5)

154.    Ms. DeMauro, during each of the 2007, 2008, and 2009 calendar years, had an interest in a foreign bank, securities, or other financial account in which the aggregate balance, at some time during each respective year, exceeded $10,000. (Agr. Fact No. 104 (ECF No. 21)).

155.    Ms. DeMauro was required to report her interest in a foreign bank, securities, or other financial account for the 2007, 2008, and 2009 calendar years, to the United States by submitting, by June 30 of the following year, an FBAR. (Agr. Fact No. 105 (ECF No. 21)).

156.    Ms. DeMauro did not file an FBAR reporting her foreign accounts for the 2007

28

year by June 30, 2008. (Agr. Fact No. 106 (ECF No. 21)).

157.    Ms. DeMauro did not file an FBAR reporting her foreign accounts for the year

2008 by June 30, 2009. (Agr. Fact No. 107 (ECF No. 21)).

158.    Ms. DeMauro did not file an FBAR reporting her foreign accounts for the year

2009 by June 30, 2010. (Agr. Fact No. 108 (ECF No. 21)).

159.    During 2010, Ms. DeMauro sought estate planning services from attorney

Alexander Bove; however, Ms. DeMauro did not disclose to Mr. Bove the existence of her

foreign accounts until the IRS notified her that she was being investigated. (Ex. 32, Pg. 4; Ex.

63).

160.    On a date unknown, Ms. DeMauro transferred $270,000 from the Oberbank

accounts to Bove and Langa PC as a retainer or payment for services. Attorneys Alexander Bove

and Edward DeFranceschi represented Ms. DeMauro before the IRS. (Agr. Fact No. 85 (ECF

No. 21); Tr. 02/19/2020 am 26:20-25).

161.    Ms. DeMauro did not disclose to Mr. Bove or Mr. DeFranceschi that she

established an account at Oberbank in Ivo Strunc's name. (Tr. 02/19/2020 am 27:11-25; Ex. 31,

letter from Ms. DeMauro to Bove & Langa for filing 2012 taxes, which omits the Oberbank

account held in Ivo and Eva's names, Pgs. 2-4; Ex. 44, letter from accountant hired by Bove &

Langa to prepare Ms. DeMauro's tax returns and FBARS, Pgs. 1-2).

162.    During the IRS's investigation, the revenue agent served an Information

Document Request dated June 15, 2011 on Ms. DeMauro seeking "copies from all bank

statements from December 2001 through December 2010 to include domestic and foreign

accounts as well as interest/income producing accounts and non-interest/income producing

accounts." (Ex. 18, p. 1). In response to the IRS's Information Document Request, Ms.

DeMauro provided account statements for Oberbank accounts bearing her name. (Tr. 02/19/2020 am 43:9-47:11).    Until the Revenue Agent asked her representative about unaccounted for funds that had been transferred from the Zürcher Kantonalbank account to the undisclosed Oberbank account and issued another document request dated October 29, 2013, Ms. DeMauro did not disclose to the IRS the existence of the Oberbank account held in her relatives' names. (Ex. 32, pp. 5, 13-14). Finally, on November 19, 2013, Ms. DeMauro's representative faxed to the IRS an account statement, dated 21.06.10 or June 21, 2010, for Oberbank Account 1432. (Ex. 16, p. 3).

163.    At the conclusion of the IRS investigation, in the report prepared by the Kevin Tracy and approved by group manager Peter Goodwin, the IRS determined the taxpayer [Ms. DeMauro] cooperated during the examination in a timely fashion. Although summonses were issued for bank records and records from the taxpayer's former accountant, they were issued primarily for the convenience of the Service [IRS] to ensure that all source documents were obtained in a timely manner. (Ex. 35, ¶5).

164.    Bove & Langa hired CPA Jeffrey Paquin to prepare Ms. DeMauro's delinquent 2005 through 2010 tax returns and 2005 through 2010 FBARs. (Tr. 02/19/2020 am 49:25-50:8; Tr. 02/19/2020 pm 18:25-29:2, 19:7-9).

165.    Ms. DeMauro sent a fax to Bove & Langa dated April 3, 2012 in which she advised them to "release Mr. Paquin's services" and that she had "engaged another accountant." Because I don't think he knows what he is doing. (Tr. 02/19/2020 am 50:9-51:18).

166.    At trial, Ms. DeMauro said that she became frustrated with Mr. Paquin because he called her too much and had too many questions that she could not answer because she didn't know. (Tr. 02/19/2020 am 51:25-52: 15).

167. During the IRS's investigation, on or about May 14, 2012, Ms. DeMauro filed the delinquent FBARs for the 2007, 2008, and 2009 years. (Ex. 41, FBARs for 2005-2009 years). There was no evidence that the IRS did not accept these FBARS as filed.

168. Ms. DeMauro never disclosed to Mr. Paquin that she held an account at Oberbank in the name of Ivo Strunc or Eva Struncova. (Tr. 02/19/2020 pm 23:5-22). As noted in 169 above and 174 below, the IRS accepted the 2009 FBARs because the amounts transferred from Kantonalbank to Oberbank were already included on the FBARs under Kantonalbank.

169. Even when Ms. DeMauro filed the delinquent FBAR for the 2009 year, she did not include on the 2009 FBAR the Oberbank account that was in the name of Ivo Strunc and Eva Struncova. (Tr. 02/19/2020 am 65:13-67:34, also, Ex. 41, at pp. 15-17).

170. During at least a portion of 2007, the combined balance of Ms. DeMauro's accounts at Zürcher Kantonalbank exceeded $3,000,000. (Agr. Fact No. 54 (ECF No. 21)).

171. During at least a portion of 2008, the combined balance of Ms. DeMauro's accounts at Zürcher Kantonalbank exceeded $3,000,000. (Agr. Fact No. 55 (ECF No. 21)).

172. During at least a portion of 2009, the combined balance of Ms. DeMauro's foreign accounts was at least $2.9 million. (Agr. Fact No. 56 (ECF No. 21)).

173. During at least a portion of 2009, the balance of Ms. DeMauro's account at Oberbank held in her relatives' names, Oberbank Account 1432, exceeded $700,000. (Agr. Fact No. 66 (ECF No. 21)).

174. On June 30, 2008, the combined balance of Ms. DeMauro's Zürcher Kantonalbank accounts was $3,036,525. (Agr. Fact No. 57 (ECF No. 21)).

175. On June 30, 2009, the combined balance of Ms. DeMauro's Zürcher Kantonalbank accounts was $2,734,898. (Agr. Fact No. 58 (ECF No. 21)).

176.    On June 30, 2010, the combined balance of Ms. DeMauro's Oberbank accounts was $2,257,773. (Agr. Fact No. 59 (ECF No. 21)).

### G. IRS Makes Willful FBAR Penalty Assessments

177.    Ms. DeMauro consented to extend the time during which the penalties provided by 31 U.S.C. § 5321 for the 2007 and 2008 years could have been assessed until December 31, 2015. (Agr. Fact No. 109 (ECF No. 21)).

178.    On or about December 1, 2015, a delegate of the Secretary of the Treasury made an assessment, pursuant to 31 U.S.C. § 5321, against Ms. DeMauro in the amount of $274,695.72 for willful failure to submit an FBAR for the year ending December 31, 2007. (Agr. Fact No. 110 (ECF No. 21)).

179.    On or about December 1, 2015, a delegate of the Secretary of the Treasury made an assessment, pursuant to 31 U.S.C. § 5321, against Ms. DeMauro in the amount of $274,695.72 for willful failure to submit an FBAR for the year ending December 31, 2008. (Agr. Fact No. 111 (ECF No. 21)).

180.    On or about December 1, 2015, a delegate of the Secretary of the Treasury made an assessment, pursuant to 31 U.S.C. § 5321, against Ms. DeMauro in the amount of $274,695.72 for willful failure to submit an FBAR for the year ending December 31, 2009. (Agr. Fact No. 112 (ECF No. 21)).

181.    The IRS provided notice of the assessments made against her by mailing a letter containing notice of the assessments and a demand for payment to the address that she had provided to the IRS. (Ex. 2).

182.    The FBAR penalty was computed by taking 36.5% of the lowest June 30th aggregate balance ($2,257,773) in the Zürcher Kantonalbank account as of June 30, 2009. The

penalty of $824,087 was assessed equally in the amount of $274,695.72 over each of the years 2007, 2008, and 2009. (Agr. Fact No. 113 (ECF No. 21)) (Ex. 47).

183.    The amount of the assessment was chosen by the IRS from three different proposed penalty amounts, described in the report prepared by revenue agent Kevin Tracy and approved by group manager Peter Goodwin. (Ex. 47, p. 1, Tr. 02/19/2020 pm 64:21-67:4).

184.    At the conclusion of the IRS investigation, in the report prepared by the Kevin Tracy and approved by group manager Peter Goodwin, the IRS Revenue Agent believed the reason the taxpayer [Ms. DeMauro] opened the foreign account was to protect her assets from her ex-husband. The Revenue Agent understands that the taxpayer could still have filed FBARs but the taxpayer's ordeal with her ex-husband is compelling.  (See Ex.35 ¶1).

## H.  IRS Assesses Penalty for Fraudulent Failure to File

185.    For each of the 2005, 2006, 2007, and 2008 years, the IRS has made a penalty assessment pursuant to 26 U.S.C. § 6651(f) related to Ms. DeMauro's fraudulent failure to timely file a tax return by the due date for each respective return. For the 2005 year, the § 6651(f) penalty was in the amount of $13,506.75. For the 2006 year, the § 6651(f) penalty was in the amount of $26,871.40. For the 2007 year, the § 6651(f) penalty was in the amount of $20,697.30. For the 2008 year, the § 6651(f) penalty was in the amount of $17,006.33.

### III:  CONCLUSIONS OF LAW ON FBAR PENALTIES

**A.      Ms. DeMauro Did Not Willfully Violate Her FBAR Obligations in 2007, 2008, or 2009**

#### 1.      STANDARD OF REVIEW

186.    This Court reviews *de novo* whether Ms. DeMauro willfully violated the FBAR reporting requirement of 31 U.S.C. § 5314, and thus is subject to the willful FBAR penalties prescribed by 31 U.S.C. § 5321. DE 57 at *3; *Bedrosian v. United States*, No. 15-5853, 2017 WL 4946433, at *2 (E.D. Pa. Sept. 20, 2017); *United States v. Williams*, No. 1:09-cv-437, 2010 WL 3473311, at *1 (E.D. Va. Sept. 1, 2010), *rev'd on other grounds*, 489 Fed. Appx. 655 (4th Cir. 2012).

#### 2.      BURDEN OF PROOF

187.    The United States must prove each element of its FBAR penalty claims by a preponderance of the evidence. *United States v. McBride*, 908 F. Supp. 2d 1186, 1201 (D. Utah 2012). *See also Bedrosian v. United States*, 2017 WL 4946433 (E.D. Pa. 2017).

#### 3.      WILLFULNESS

##### a)      The Bank Secrecy Act

188.    The Report of Foreign Bank and Financial Accounts (FBAR) dates back to Congress's 1970 enactment of the Currency and Foreign Transactions Reporting Act (commonly known as the Bank Secrecy Act, or BSA). *See* Currency and Foreign Transactions Reporting Act, Pub. L. 91-508, 84 Stat. 1118 (1970). The BSA and its implementing regulations require U.S. persons having a financial interest in foreign accounts exceeding $10,000 to file Form TD-F 90.22-1 (Financial Accounts, simply referred to as "FBAR." *See* 31 C.F.R. §§ 1010.350; 1010.306(c)).

34

189.   Failure to file the required FBAR results in the possible imposition of penalties. Congress gave discretionary authority, providing penalties "may" be imposed for willful and non-willful violations. 31 U.S.C. § 5321(a)(5)(A)-(C). Congress also stated that no penalty should be imposed if any violation was due to reasonable cause. *Id.* at § 5321(a)(5)(B)(ii). For willful violations, the maximum statutorily authorized penalty is the greater of $100,000 or 50 percent of the relevant account balance. *Id.* at § 5321(a)(5)(C). During the years at issue, the FBAR was due by June 30 of each year for the preceding tax year.

### b)        Elements of a Claim for Willful Failure to File an FBAR Form

190.   To prevail upon its claim that Ms. DeMauro willfully failed to file a complete FBAR for any of the 2006-2009 tax years, the United States must establish six elements by a preponderance of the evidence: (1) a U.S. person (2) with a financial interest or signatory or other authority (3) over a foreign financial account (4) that exceeds $10,000 in value (5) willfully (6) failed to file a timely FBAR disclosing the account. *United States v. Zwerner*, NO. 13-22082-CIV- ALTONAGA/O'Sullivan, 2014 WL 11878430, at *2 (S.D. Fla. Apr. 29, 2014) *see also United States v. McBride*, 908 F. Supp. 2d 1186, 1201 (D. Utah 2012); *United States v. Flume*, No. 5:16- cv-73, 2018 WL 4378161, at *4 (S.D. Tex. 2018).

191.   At issue in this case is element (5)—whether the government has shown that Ms. DeMauro was willful. The government brings three separate claims that Ms. DeMauro willfully failed to file an FBAR for each of the 2007, 2008, and 2009 years. The government must prove by a preponderance of the evidence that Ms. DeMauro was willful with respect to each claim, i.e., each year in dispute.

192.   "Willfulness" is an intentional violation of an actual known legal duty and therefore, to show willfulness, the government must prove that Ms. DeMauro knew about the

35

FBAR requirements and that Ms. DeMauro knew the requirements applied to *her*. *See United States v. Wynn*, 61 F.3d 921, 928 (D.C. Cir. 1995); *United States v. Flume*, 2018 WL 4378161, at *5 n.9 (S.D. Tex. 2018). The government contends that willfulness also includes recklessness, i.e., a reckless disregard of a known obvious risk. DE 43 at *5.[4] The government has not proven Ms. DeMauro was willful under the actual- knowledge theory, or under its incorrect, broadly defined recklessness standard.

### c)    Willfulness Requires an Intentional Violation of a Known Legal Duty

193.    Section 5321 authorizes a penalty for willful violations of the FBAR reporting requirement, but does not define the term "willful." 31 U.S.C. § 5321. The basic rules of statutory construction, the BSA itself, and other civil tax matters necessitates willfulness to require an intentional violation of a known legal duty.

### (1)    Statutory Construction

194.    As a matter of statutory construction, courts have recognized the validity of using a dictionary to define the meaning of common words in a statute, when the statute lacks a specific definition. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566-69 (2012).

195.    In the general context "willful," is defined as, "done deliberately or intentional conduct." Willful Definition, Merriam- Webster.com, http://merriam-webster.com/dictionary/willful (last visited March 27, 2020). In the legal sense, "willful" is defined as, "voluntary and intentional." Black's Law Dictionary, 10th Ed. (2014). Further, the term is defined as conduct involving *"a conscious* wrong or evil purpose on the part of the actor." *Id.* (emphasis added).

196.    The Supreme Court has adopted this definition and held that willfulness in the criminal context is defined as a "voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 192 (1991) (holding that such definition of willfulness was required due to the complexity of tax laws). Not only does willfulness require a voluntary, intentional violation, but "a good faith misunderstanding of the law or a *good faith belief that one is not violating the law negates willfulness whether or not the claimed belief in objectively reasonable*." *Id.* (emphasis added).

197.    In *Cheek*, the Supreme Court indicated that if the taxpayer "truly believed that the Internal Revenue Code did not purport to treat wages as income…the Government would not have carried its burden to prove willfulness, however unreasonable a court might deem such a belief." *Id.* at 202.

### (2) Knowledge Requirement is Consistent with Other Bank Secrecy Act Violations

198.    In addition to FBAR, the Bank Secrecy Act (BSA) added other reporting requirements that include the word willful. Specifically, the BSA added a provision that requires banks and other financial institutions to file reports with the Department of Treasury whenever they are involved in cash transactions exceeding a threshold amount. 31 U.S.C. § 5313.

199.    Congress added a penalty for structuring transactions to avoid the established threshold, imposing a penalty for willful violations. *See* 31 U.S.C § 5322; *Ratzlaf v. United States*, 510 U.S. 135 (1994). This is the same criminal penalty applicable for FBAR violations.

200.    In discussing the meaning of willful for penalties under Section 5322, the Supreme Court, after "considering other provisions" in the same subchapter (i.e., 31 U.S.C. §§ 5311-5332) stated that it is read to require <u>both</u> knowledge and intent. *Ratzlaf* 510 U.S. at 141. The Supreme Court thus found that to impose penalties under Section 5322, the "Government must prove that

37

the defendant acted with knowledge that [the violation] he or she undertook was unlawful…" *Id.* at 135.

201.   Other courts interpreting the meaning of other willful violations of the BSA have also concluded that an individual must actually know of and intentionally violate such requirement. *United States v. Warren*, 612 F.2d 887, 890 (5th Cir. 1980).[5] *See also United States v. Eisenstein*, 731 F.2d 1540 (11th Cir. 1984).

202.   The actual knowledge requirement is not satisfied by an individual's vague knowledge of the law. *Warren*, 612 F.2d at 890 n.4 (citing another BSA case stating that an individual's "acknowledged awareness of U.S. currency laws is too vague and unspecific" to satisfy the knowledge standard).

203.   As in *Ratzlaf*, Congress expressly made the BSA's penalty statute applicable to willful violations. The Supreme Court has held that 31 U.S.C. § 5322 willful penalties require actual knowledge. The meaning of "willful" provided in the adjacent section at issue here, Section 5321, must be interpreted in the same manner as Section 5322. *Ratzlaf*, 510 U.S. at 135 ("[t]he willfulness requirement must be construed the same way each time it is called into play.").

204.   Until at least 2006, the IRS agreed that because "willfulness" was a requirement in both Sections 5321 and 5322 (which are related sections), statutory construction principles required "willfulness" to be construed consistently. IRS CCA 200603026 (Jan. 26, 2006).

205.   The term willful cannot be read to mean two different things in adjacent sections. Accordingly, the government must prove that Ms. DeMauro acted with knowledge that his conduct violated the FBAR reporting requirements. There is no such proof.

**(3)   Voluntary, Intentional Conduct is Required to Establish Willfulness to Maintain a Two-Tiered Liability Regime**

206.   Permitting anything less than actual knowledge, i.e., mere reckless conduct, to establish willfulness would eviscerate the two-tier FBAR penalty regime, rendering the non-willful penalty impotent and turning the FBAR penalty into a *de facto* strict liability penalty.

207.   Purposeful inclusion of "willful" in Section 5321 reflects Congressional desire to require intentional conduct for liability to attach. If Congress intended a strict liability standard, it need not have included this term. *See United States v. Granda*, 565 F.2d 922 (5th Cir. 1978) (Congress by adding the term willful and knowingly in the statute took the statute "out of the ranks" of strict liability).

208.   As the Supreme Court noted in *Ratzlaf*, "[h]ad Congress wished to dispense with the [willful] requirement, it could have furnished the appropriate instruction." *Ratzlaf*, 510 U.S. at 146 (stating that Congress provided for civil forfeiture, with no willfulness requirement, for other BSA violations).

209.   Similar to its BSA counterpart, Congress specifically chose to include the term "willful" in the FBAR civil penalty statute, reflecting its intent that the FBAR penalty statute at issue not be a strict liability offense. *See* Pub. L. 91-508 § 207 (authorizing a civil penalty for each "willful" violation of the BSA).

210.   By adding a non-willful penalty in 2004, Congress reinforced that FBAR violations are not strict liability offenses and created a lesser degree of liability for instances where the government was unable to prove the taxpayer voluntarily and intentionally violated the FBAR requirement of which he or she had knowledge[6]—such as the instant case.

211.   Furthermore, because non-willful FBAR violations are excused for reasonable cause, 31 U.S.C. § 5321(a)(5)(B)(ii), defining "willfulness" as anything less than actual knowledge would render the non-willful penalty superfluous—something clearly not intended by

39

Congress considering it expressly added the penalty in 2004.

### (4) Willfulness in Other Civil Tax Matters is Limited to Voluntary, Intentional Violations

212.   Statutes regarding the same or similar subject matter should be construed alike to promote uniformity and predictability in the law. *See Estate of Sanford v. Comm'r*, 308 U.S. 39, 44 (1939) (gift tax and estate tax provisions are *in pari materia* and must be construed together); *Martin v. Comm'r*, 149 T.C. 293, 302 (2017) (Social Security provisions in Title 42 of the United States Code, and their Title 26 counterparts are often viewed *in pari materia* to "promote a symmetrical parallel" between related statutes).

213.   Accordingly, in addition to reviewing the meaning of willful under the BSA, the meaning of willful under civil tax penalties is also instructive. Requiring voluntary and intentional conduct to determine willfulness is consistent with other civil tax matters. If the government were to pursue Ms. DeMauro's tax preparer for a understatement of Ms. DeMauro's income tax liability attributable to failure to report foreign bank accounts, the government would seek civil penalties under 26 U.S.C. § 6694. This section imposes civil tax penalties on tax return preparers who *willfully* attempt in any manner to understate a taxpayer's tax liability. 26 U.S.C. § 6694(b)(1),(2)(A) (emphasis added).

214.   Willfulness "requires a conscious act or omission made in the knowledge that a duty therefore is not being met" and the definition of willfulness is "the same as the definition used in 26 U.S.C. § 7206" a criminal penalty for the same conduct which, "[a]s the Supreme Court has explained, that definition does not include recklessness." *Rodgers v. United States*, 772 Fed.Appx. 555, 556 (9th Cir. 2019) (citing *United States v. Bishop*, 412 U.S. 346, 354 (1973)).

215.   The Eleventh Circuit concurred that knowledge was a requirement to sustain a willful violation of Section 6694(b). *See Jurdisch v. United States*, 755 F.2d 823 (11th Cir.

1985). The court held that willful disregard of the Internal Revenue Code to understate a tax

liability violated Section 6694(b) and cited the Treasury regulations for an example of conduct

that would violate Sections 6694(a) and (b): "a preparer who claims a personal exemption

deduction for the taxpayer's mother with *knowledge* that the taxpayer is not entitled to the

deduction will have both intentionally disregarded rules and regulations within the meaning of

[section 6694] (a)...and willfully understated liability for tax within the meaning of [section

6694] (b)." *Id.* at 827-28 (emphasis added).

216.   Willfulness is a voluntary, intentional violation of a known legal duty, irrespective

of whether the violation is civil (e.g., Section 6694) or criminal (e.g., Section 7206). This is

logical. Willfulness is willfulness. Rather than changing the meaning of willfulness depending on

whether it is a criminal or civil penalty, the appropriate differentiation between willful civil and

willful criminal penalties is the burden of proof (i.e., the burden of proof in civil matters is

preponderance of the evidence, while the burden of proof in criminal matters is heightened to

beyond a reasonable doubt)—a position the United States previously asserted in a civil tax case.

*Richey v. United States*, 9 F.3d 1407 (9th Cir. 1993).

217.   In *Richey*, the government argued, and the court agreed, that a taxpayer was

estopped from arguing he was not willful for Section 6694 purposes after he was previously

found willful for Section 7206 purposes for the same conduct. "[T]he government maintained

that Richey was collaterally estopped from relitigating the issue whether he 'willfully' prepared

the returns based on his criminal conviction under section 7206(2) of the Code, which

necessarily established such 'willfulness' beyond a reasonable doubt." *Richey*, 9 F.3d at 1409. The

court noted that the question of the taxpayer's willfulness for criminal and civil violations

referred to the same act (i.e., the preparation of false or fraudulent tax returns). In finding for the

government, the court reasoned that "the term 'willful' has the same meaning under both sections 7206 and 6694" and "simply means a voluntary, intentional violation of a known legal duty." *Id.* at 1411. Similar to *Rodgers* and *Jurdisch*, the *Richey* court held that willfulness "requires a conscious act or omission made in the *knowledge* that a duty is therefore not being met." *Id.* (emphasis added).

218.   Willful FBAR violations can result in civil and criminal penalties for identical conduct,[11] much like tax preparer penalties under Sections 6694 and 7206 impose civil and criminal penalties for identical conduct. Similar to the Section 6694 and 7206 penalties, "willfulness" for FBAR purposes means the same thing for civil and criminal penalties—a voluntary, intentional violation of a known legal duty—the only distinction being the burden of proof required.

219.   Other FBAR cases, including *Bedrosian*, have addressed whether the *Cheek* and/or *Ratzlaf* standards should apply in the FBAR context. Although the *Bedrosian* court sided with the government and declined to adopt the *Cheek* standard, such decision should not be followed because the court mistakenly inferred an improper motive element to the *Cheek* standard. *Bedrosian*, 2017 WL 4946433 at *3 (holding that the government need not prove bad purpose or improper motive and thus, the *Cheek* standard did not apply). To the contrary, much like *Richey* above, the *Cheek* standard requires only a voluntary, intentional violation of a known legal duty, but does not require an improper motive to establish willfulness.

220.   In *Cheek*, the Supreme Court applied the *Pomponio* definition of willfulness, which is the voluntary, intentional violation of a known legal duty. *Cheek*, 498 U.S. at 192 (citing *United States v. Pomponio*, 429 U.S. 10 (1976)). However, in *Pomponio*, the Supreme Court also held that "willfulness" did not require proof of any motive other than the intentional violation of

a known legal duty. *Pomponio*, 429 U.S. at 12 (holding that willful meant a voluntary, intentional violation of a known legal duty, but no requirement to find an "evil motive").

221.   To collect over $824,087.00 in penalties from Ms. DeMauro, over and above the fraudulently failure to file penalty assessed, the government is required to prove that she voluntary and intentionally violated the FBAR reporting requirements and that such requirements were known to her. There was no evidence presented at trial confirming that Ms. DeMauro "was aware of the FBAR filings requirements."

222.   In addition, based on Ms. DeMauro's lack of sophistication, her cluelessness when it came to U.S. tax laws as well as FBAR filing requirements, and her disclosure to CPA Quellet that she transferred a significant amount of money to a Swiss bank account, negates any allegation that she was willful.

223.   Ms. DeMauro was clear in her testimony that she did not know what an FBAR was until attorney Bove informed her after the IRS started their tax investigation, at which point she took corrective measures to file FBARs for the years at issue. The government cannot point to any evidence that Ms. DeMauro knew she was aware of the FBAR filing requirements. Furthermore, Ms. DeMauro's good faith belief that the property she received from a divorce was not subject to tax. In addition, Ms. DeMauro's knowledge" of the FBAR reporting rules was non-existent.

224.   Ms. DeMauro was referred to an experienced, licensed CPA to prepare her 2001 tax return whom she informed him that she had foreign accounts.  Unfortunately, the CPA was had no knowledge of the FBAR reporting rules. Ms. DeMauro is entitled to rely on a professional, and her lack of knowledge of U.S. tax and reporting rules left her with an insufficient understanding to asked any questions had she so desired. Ms. DeMauro did not voluntarily and intentionally violate the FBAR reporting requirements in  2007, 2008, or 2009; thus, Ms.

DeMauro's FBAR violations in those years were not willful.

### (d) Ms. DeMauro Was Not Willful Even Under the Lower Recklessness Standard

225.   The United States has used the lack of definition of willful in Section 5321 to obfuscate the meaning of willfulness and attempt to establish an inappropriate and overly broad definition, by attempting to attach recklessness to FBAR cases in which clearly willful individuals engaged in egregious conduct that subsumes recklessness (e.g., funneling untaxed income offshore through abusive tax sheltering structures). *Bedrosian v. United States*, 912 F.3d 144, 152-53 (3d Cir. 2018); *McBride*, 908 F. Supp. 2d 1186, 1204.

226.   The government frequently cites to *Safeco Ins. Co. of America v. Burr* for the expansive definition that willfulness includes reckless conduct. The United States' reliance on *Safeco* in FBAR matters is misplaced. *Safeco* deals with violations of the Fair Credit Reporting Act and the cited cases and guidance on which the Court bases its rationale discuss other tortious conduct. More appropriately, willfulness in FBAR cases should be determined by the *Cheek* and *Ratzlaf* standards, given their application to tax and BSA matters, respectively. Nevertheless, not even the lower *Safeco* reckless standard can rescue the government in the present case.

#### 1.   Ms. DeMauro Was Not Reckless Because She Had No Reason to Believe She Was Required to File FBARs

227.   Although recklessness is not the operative standard, the parties are in agreement that Section 6672 of the Internal Revenue Code is instructive for determining what conduct amounts to recklessness. For Section 6672 purposes, "willfulness is necessarily directed to the state of the responsible person's state of mind, a subjective determination." *Mazo v. United States*, 591 F.2d 1151, 1157 (5th Cir. 1979).

228.   If a responsible person is aware or otherwise notified of noncompliance, reckless disregard of that knowledge can satisfy the willfulness requirement. *Id.* at 1155 (stating as an example of reckless disregard the failure of a responsible person to investigate or correct

mismanagement *after being notified* that withholding taxes were not being duly remitted) (emphasis added). For FBAR purposes, pursuant to this Circuit's recklessness definition, a person "recklessly" fails to comply with the FBAR reporting requirement when he was notified that his FBARs were not accurate and he failed to investigate or correct the noncompliance. *See Bedrosian v. United States*, 912 F.3d at 153; *Mazo v. United States*, 591 F.2d at 1157.

229.    Reckless conduct is the equivalent of deliberate indifference, *Farmer v. Brennan*, 511 U.S. 825, 836 (1994), and liability is appropriate only upon a showing that an individual was subjectively aware of the risk. *Id.* at 829. At a minimum, the individual must have knowledge that something is amiss and compliance is in jeopardy. *See Malloy v. United States*, 17 F.3d 329 (11th Cir. 1994) (holding responsible person liable under Section 6672 because he never made any inquiries into whether withholding taxes were being paid despite being aware of the predecessor company's financial difficulties). The necessary subjective analysis "does not permit liability to be premised on obviousness or constructive notice." *Farmer*, 511 U.S. at 841-42 (rejecting liability based on obviousness or constructive notice because it would violate subjective standard); *see also United States v. Flume*, 2018 WL 4378161 at *7 (S.D. Tex. 2018) (holding that constructive knowledge is inappropriate in willful FBAR penalty matters because, in part, it ignores the distinction that Congress made between willful and non-willful FBAR penalties and if every taxpayer is presumed to know of the need to file an FBAR merely by signing a tax return, it is difficult to conceive how a violation could be non-willful).

230.    Furthermore, liability does not exist if the individual reasonably responded to the known risk, "even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. *See also Byrne v. United States,* 857 F.3d 319 (6th Cir. 2017) (holding that an individual is not reckless (and therefore, not willful) if he reasonably believes he is tax compliant).

231.    Ms. DeMauro engaged CPA Quellet to prepare her U.S. tax return for the tax year 2001. Quellet testified that he prepared her 2002 tax return that was never filed. Quellet testified

he prepared a 2005 tax return that was never filed. During the course of the 2001 tax return preparation, Quellet testified that in 2002 and 2003, and during the preparation of the 2001 tax return, he had an understanding that Ms. DeMauro actually transferred a significant amount of money to a Swiss bank account. Quellet testified that Ms. DeMauro informed him she had a foreign bank account that she put there to protect from her ex-husband. Quellet prepared the 2001 tax return based on the information Ms. DeMauro provided but did not complete Part III of Schedule B with respect to whether the taxpayer had an ownership interest or signature authority in a foreign bank account.

232.   Ms. DeMauro first became aware of her potential FBAR noncompliance in February 2011, when she engaged Bove to represent her in the IRS examination. Ms. DeMauro provided Bove with authorization to request all bank records form her foreign banks (UBS, Kantonalbank, and four accounts at Oberbank) in order to make any and all corrective filings. Ms. DeMauro's subsequent conduct negates any notion that he was willful based on the *Farmer* standard articulated by the Supreme Court.

233.   Ms. DeMauro was not willful even under the lower reckless standard, and the government failed to meet its burden of proof with respect to any of the 2007, 2008, or 2009 tax years; thus, Ms. DeMauro must be found not willful.

### IV. CONCLUSIONS OF LAW ON DEMAURO'S COUNTERCLAIM

234.   26 U.S.C. section 6651(f) increases the amount of penalty that is imposed for failure to file a tax return if the failure to file the return is fraudulent.

235.   A finding of fraud requires the government to "prove affirmatively by clear and convincing evidence actual and intentional wrongdoing on the part of the [taxpayer] with a specific intent to evade. " *Crummey v. Comm'r*, 684 Fed.Appx. 416, 420 (5th Cir. 2017).

46

236.    In determining whether a "taxpayer's failure to file legitimate tax returns was fraudulent," courts have considered the "following nonexhaustive list of elements: (1) understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) giving implausible or inconsistent explanations of behavior, (5) concealing assets, (6) failing to cooperate with tax authorities, (7) engaging in illegal activities, (8) attempting to conceal illegal activities, (9) dealing in cash\), and (10) failing to make estimated tax payments." *Crummey*, 684 Fed. Appx. At 420621 (citing *Bradford v. Comm'r*, 796 F.2d 303, 307-308 ((9th Cir. 1986).

238.    The government has the burden to prove fraud by clear and convincing evidence. See 26 U.S.C. section 7454(a). That is true with respect to the fraud element of section 6651(f). *Clayton v. Commissioner,* 102 T.C. at 652-653; *Reedy v. Commissioner*, T.C. Memo. 2008-100, 2008 WL1734175, at *5.

239.    A taxpayer can attract a section 6651(f) addition <u>only</u> if she fails to file a timely return, and then only if the delinquency is fraudulent. Thus, delinquency is a necessary element of a 26 U.S.C. section 6651(f) penalty. It is undisputed that DeMauro did not file her 2005, 2006, 2007, and 2008 tax returns by the due date. In addition, fraud is a necessary element the section 6651(f) penalty.

240.    Fraud is defined in Black's Law Dictionary 775 (10th ed. 2014) as: "[a] knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment." We often define fraud for tax purposes as "an intentional wrongdoing designed to evade tax believed to be owing." e.g., *DiLeo v. Commissioner*, 96 T.C. 858, 874 (1991), <u>aff'd</u>, 959 F.2d 16 (2d Cir. 1992). We have described the necessary wrongdoing as "conduct intended to conceal, mislead, or otherwise prevent the collection of taxes." <u>e.g.</u>, *id.* Common to all three definitions is the element of deliberateness; e.g., a "<u>knowing</u> misrepresentation of the truth or

concealment of a material fact". Black's Law Dictionary 775 (emphasis added). In the tax context, the knowing misrepresentation or concealment must be "to evade tax believed to be owing." *DiLeo v. Commissioner,* 96 T.C. at 874.

241.   In section 6651(f), the adjective "fraudulent" modifies the noun "failure" ("If any failure to file any return is fraudulent"). The offense involves a knowing concealment of a material fact in order to evade tax. The increased penalty is imposed only if the taxpayer fails to file his return when due (thus concealing a material fact (that he has income subject to tax)) and only if he does so knowing that he is concealing that material fact. The taxpayer must deliberately fail to file his return on the date due, knowing that, by doing so, he is concealing the fact that he has income subject to tax. See *Bennett v. Commissioner*, 30 T.C. 114, 120, 122 (1958) (sustaining additions to tax for fraud since "the failure of petitioners to file returns for each of those years was deliberate and due to fraud with intent to evade tax"). In Ms. DeMauro's case, she demonstrated at trial that she was clueless about the U.S. tax laws, was not sophisticated in business and financial matters, had limited education, and thus did not possess the state of mind, knowledge, intent or belief regarding whether income from her foreign bank accounts was subject to tax and thus did not deliberately or intentionally fail to file tax returns.

242.   Finally, in applying section 6651(f) to determine whether a taxpayer's failure to file his return was fraudulent, Ms. DeMauro does not believe the government met its burden of proof burden by clear and convincing evidence in proving she fraudulently failed to file tax returns for the tax years 2005, 2006, 2007 and 2008. Therefore, Ms. DeMauro is entitled to the recovery of the tax penalties she paid based on the incorrect assessment of the fraudulent failure to file penalty for the tax years 2005, 2006, 2007, and 2008.

ROSSARIO M.F. RIZZO
GERARD J. LEVINS
Counsel for the Defendant

*/s/ Rosario M.F. Rizzo*
ROSARIO M.F. RIZZO
Rizzo Law Firm
801 Main Street
Concord, MA 01742-3313
T: 978-371-2500
F: 978-371-1352
E: rosario.rizzo@rizzolawfirm.com

*/s/ Gerard J. Levins*
GERARD J. LEVINS
Levins Tax Law
1671 Worcester Road, Suite 304
Framingham, MA 07017
T: 888-333-9501
F: 888-233-0291
E: gerard@levinstaxlaw.com

49