UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>

      v.                                  Case No. 17-cv-640-JL

<u>Annette B. DeMauro</u>

## <u>MEMORANDUM ORDER AND VERDICT AFTER BENCH TRIAL</u>

This is a civil tax case that turns on whether the defendant "willfully" failed to provide tax information to the Internal Revenue Service or did so with the specific, fraudulent intent to evade taxation.  The United States, with the authority of the Secretary of the Treasury and at the direction of the Attorney General, seeks enhanced money penalties against Annette B. DeMauro for failing to file foreign bank account reports ("FBARs") with the IRS.  DeMauro concedes that she failed to do so and that she was required to do so by law.  Nevertheless, she contends that her failure was not "willful"—a necessary element for the enhanced FBAR penalties the United States seeks.  She also counterclaims that the United States should remit the enhanced penalties she has already paid for late-filing her tax returns because her failure to file was not fraudulent in intent, as required for the assessment of separate, enhanced penalties for her late tax filings.

After considering the testimony and evidence adduced at trial, the court finds in favor of the United States on its willful FBAR-penalty claim, <u>see</u> 31 U.S.C. §§ 5314, 5321, but against the United States on DeMauro's counterclaims challenging the IRS's fraudulent-failure-to-file penalties, <u>see</u> 26 U.S.C. § 6651  With respect to FBAR, the United States showed by a preponderance of the evidence that DeMauro acted recklessly, and thus "willfully," by failing to seek professional tax advice on foreign accounts she

knew were earning income, even though she had consistently relied on professionals in the past and also had paid taxes on real property gained through her divorce. Even if DeMauro did not consciously avoid learning about the FBAR reporting requirement, she at the very least should have surmised that there was a grave risk she was not meeting her tax-filing obligations. Her conduct therefore constitutes a willful civil violation.

For DeMauro's counterclaims, however, the United States did not meet its burden of showing by clear and convincing evidence that DeMauro failed to timely file returns with the specific, fraudulent intent to evade taxes. While the United States correctly notes that DeMauro took steps to conceal her foreign bank accounts and money transfers, she credibly testified that she did so in an attempt to hide assets from her abusive ex-husband—an explanation that even the IRS investigating agent believed and found compelling—and because she trusted the many professionals around her to handle the finer details of her finances. Given these mitigating explanations, the counterclaims pose a closer question than the affirmative FBAR claim. On this record, the court finds that the United States did not meet its burden for assessing enhanced late-filing penalties by clear and convincing evidence, and thus orders the return of penalties already exacted. A separate entry of judgment shall follow this order.

## I.     Factual Background

The following generally draws from the parties' statement of agreed facts[1] and, where specifically indicated, the witness testimony adduced at trial or the documents admitted into evidence.

---

[1] Joint Pretrial Submission of Agr. Facts (doc. no. 21).

## A.  DeMauro's marriage and divorce

Annette DeMauro is an 82-year old woman residing in Rye Beach, New Hampshire.[2]  After completing high school, she married an Air Force lieutenant colonel, had two children, and spent most of her time living on military bases around the world.[3] In 1975, she divorced the lieutenant colonel and, in 1976, married Joseph DeMauro.[4]  She then spent most of her time living with her husband in Saudi Arabia until at least 1985.[5]

In 1993, DeMauro initiated a contested divorce proceeding against her husband on the grounds of adultery, which ultimately cost her at least $1 million in legal fees.[6]  She was represented by numerous lawyers, including S. James Boumil.[7]  After nearly nine years of litigation, the court issued a divorce decree awarding her a $35 million cash judgement, which was never paid, and three properties located in Florida, Tennessee, and Rye Beach.[8]  In the divorce decree, the court found that:

> [Joseph DeMauro] indicated to . . . [Ms. DeMauro] that unless she acceded to his offers for the payment of alimony and division of marital property, she will never receive anything from him and that he would continue, with the aid of his vast financial resources, to avoid service of process and arrest, a threat which proved to be all too accurate.[9]

The decree also provided, with respect to taxes:

---

[2] Agr. Fact ¶¶ 2-3.

[3] Id. ¶¶ 4-7.

[4] Id. ¶¶ 8-9.

[5] Id. ¶ 10.

[6] Id. ¶ 14.

[7] Id. ¶ 17; see also Feb. 18, 2020 AM Tr. 46:12-22; 47:18-21, 88:23-89:10.

[8] Agr. Fact ¶¶ 12, 16.

[9] Id. ¶ 19.

> [T]o the extent that any income and/or gift taxes may be owing to the United States of America, and State of the United States, or any foreign jurisdiction, the defendant [Joseph DeMauro] is hereby ordered to indemnify and hold harmless the plaintiff [Ms. DeMauro] from any and against the same and to be solely responsible for the payment of any costs and reasonable attorney's fees incurred by the plaintiff [Ms. DeMauro] in defense of same.[10]

DeMauro testified that her "understanding was that whatever I received from the - - my divorce decree was mine and mine alone and that went for anything that I had received and it was nontaxable."[11]

## B.    Opening of a foreign bank account at UBS

In 2000—the same year she finalized her divorce—DeMauro opened a numbered bank account with UBS AG, a Swiss bank.[12]  At that time, she maintained domestic accounts at both USAA and TD Bank, which, according to DeMauro, her ex-husband attempted to access during their separation and divorce.[13]  DeMauro testified that, during her divorce, her ex-husband repeatedly harassed her, frequently damaged her vehicles, sent groups of people around her home to threaten or intimidate her, attempted to burn the backside of her house, and one time tried to run her vehicle off the road.[14]  She further

---

[10] Id. ¶ 18.  At trial, the parties agreed to the decree's admission.  See Feb. 18, 2020 AM Tr. at 34:14-35:11.

[11] Feb. 18, 2020 AM Tr. at 110:1-7.

[12] Agr. Fact ¶¶ 15, 20; see also Trial Ex. 4 (showing "numbered account" box checked on account opening document); Feb. 18, 2020 AM Tr. 44:13-65:2.  A numbered account has no account holder name listed.

[13] Feb. 18, 2020 AM Tr. at 50:3-17.

[14] See Feb. 19, 2020 AM Tr. at 111:12-114:6.

testified that, given her ex-husband's local bank contacts, she opened the foreign bank account to "protect" her money from him.[15]

In establishing a UBS account, DeMauro formed a client relationship with UBS client advisor Hannes Rosch.[16]  At trial, DeMauro testified that she chose UBS because her son's boarding school in Switzerland used that bank.[17] After Rosch and DeMauro met in-person twice, Rosch allegedly sent DeMauro unfilled account opening documents by fax, which she signed, but did not fill out, before faxing them back.[18]  The application materials admitted at trial reflect that DeMauro signed documents that instructed UBS to hold onto any correspondence with her until she claimed it, and that UBS could destroy unclaimed correspondence after a period of three years.[19]

DeMauro testified that at the time she opened the account, she did not understand that she would not receive UBS documents in the mail.[20]  Nevertheless, she agreed that she understood her account would generate income and that Rosch had promised her a return of approximately 5% per year.[21]  According to banker's notes maintained by UBS

---

[15] Feb. 18, 2020 AM Tr. at 59:8-21.

[16] Agr. Fact ¶ 21.

[17] Feb. 18, 2020 AM Tr. at 54:6-56:14.

[18] See Feb. 18, 2020 AM Tr. 44:13-65:2.  DeMauro contends that Rosch filled in the blank, account opening documents after she signed and returned them.

[19] See Trial Ex. 4.

[20] Feb. 18, 2020 AM Tr. 69:8-70:13.  The United States claims that DeMauro gave contrary testimony in her deposition, see DeMauro Dep. Tr. 116:1-6, but it did not attempt to impeach DeMauro with this testimony at trial.  See also Feb. 18, 2020 PM Tr. 16:20-17:63 (seeking to admit the deposition at the end of the United States's direct examination of DeMauro).  The court thus gives little weight to purported inconsistencies in DeMauro's testimony on this point.

[21] Feb. 18, 2020 AM Tr. 60:7-16; Feb. 18, 2020 PM Tr. 63:20-25.

and admitted into evidence, DeMauro consulted with bank employees at times, either in person or on the phone, about the state of her account.[22]  According to DeMauro, she did not seek advice from an attorney or financial advisor about opening a foreign account.[23]

## C.    Retention of a CPA in connection with sale of real property

In 2001, DeMauro sold the Florida property she received from her divorce for approximately $7 million.[24]  She earned about $3.5 million in net sale proceeds after paying approximately $2.5 million in property taxes and legal fees and remitting $1 million to the IRS in anticipation of her 2001 federal income tax liability.[25]  The sale proceeds were deposited in DeMauro's client account at Boumil's law firm.[26]

In 2002, DeMauro instructed Boumil to transfer her real estate proceeds to her UBS account in Switzerland.[27]  That August, UBS received a $3.5 million deposit into DeMauro's account.[28]  In the following years, DeMauro's account annually accumulated tens of thousands of dollars in interest.[29]  In 2003 and again in 2004, DeMauro transferred $250,000 from her UBS account to her domestic USAA bank account, both times through the client account at Boumil's law firm.[30]

---

[22] See Trial Ex. 7, at 3.

[23] Feb. 18, 2020 PM Tr. at 76:1-77:20; 81:3-9.

[24] Agr. Fact ¶ 22.

[25] Id. ¶ 23.

[26] Id. ¶ 25.

[27] Agr. Fact ¶ 26.  Boumil testified that he transferred the money to institutions in New York.

[28] Id. ¶ 27.

[29] Id. ¶¶ 30-34.

[30] Id. ¶¶ 35-36.

Around the time of Florida property sale, DeMauro's attorneys retained CPA Ronald Ouellet to prepare a tax return reporting the sale for DeMauro and claiming a refund for an overpayment of tax, which was timely filed.[31] Ouellet testified that before he prepared the return, he met with DeMauro, and that he was "sure" he would have asked if she had any interest income for the 2001 calendar year.[32] He agreed that by 2003, he understood that DeMauro had transferred a significant amount of money to her Swiss bank account, but did not understand why interest earned from the account was not included in future returns, as it was something he would have asked about.[33] He further testified that he had no understanding as to the specific FBAR requirement in 2001 up through at least 2005.[34]

In 2004, DeMauro received a house in Tyngsboro, Massachusetts as part of her divorce.[35] She sold the house in 2005 and, in 2006, hired Ouellet to prepare a Form 1040 federal income tax return for the 2005 calendar year.[36] The prepared return included a Schedule B, which included the interest earned from DeMauro's domestic bank accounts,

---

[31] See Agr. Fact ¶ 24. Ouellet testified that someone on his staff might have prepared the return, in which case he would have reviewed it. Feb. 18, 2020 PM Tr. at 6:6-8, 7:6-13. The court also notes that the copy of the 2001 tax filing admitted into evidence is missing relevant pages, including schedule B—the schedule for taxable interest and interests in foreign accounts.

[32] Feb. 18, 2020 PM Tr. at 10:14-17, 16:1-13. Ouellet later testified that he "knew there was a foreign account in around 2001, 2002." Feb. 18, 2020 PM Tr. at 25:8-15; 37:21-23.

[33] Feb. 18, 2020 PM Tr. at 15:1-16:4.

[34] Id. at 26:3-26:18.

[35] Id. ¶ 94.

[36] Id. ¶¶ 95-96.

but not her UBS accounts.[37]  Part III of that schedule, entitled "Foreign Assets and Trusts," asked in question 7a if DeMauro had a financial interest or signature authority over a financial account in a foreign country.[38]  Although the box on the return was checked "no;" DeMauro never filed the prepared return.[39]  DeMauro testified that Ouellet never asked her if she had a foreign account or earned any interest in 2005.[40]

## D.     Creation of new foreign savings accounts at Zürcher and Oberbank

By 2006, Rosch left UBS to take a position with Zürcher Kantonalbank in Switzerland.[41]  Soon thereafter, DeMauro opened new accounts with Zürcher and transferred the $3,180,000 in her UBS account to Zürcher.[42]  From 2007 to 2009, these accounts incurred five-to-six-figure capital increases and "statement credits."[43]  During portions of 2007 and 2008, the combined balance in DeMauro's foreign accounts exceeded $3 million.[44]  Her account statements also indicate that she was charged a "hold mail" fee.[45]

---

[37] Id. ¶ 97.  At trial, DeMauro testified that she told Boumil twice that she had a foreign bank account.  See Feb. 18, 2020 PM Tr. at 75:20-77:10.

[38] Agr. Fact ¶ 98.

[39] Id. ¶¶ 99-100.

[40] Feb. 18, 2020 PM Tr. at 75:20-76:21.  The United States contends that she gave a different answer at deposition, but the transcript answer is not clear.  See DeMauro Dep. Tr. at 170:8-21.

[41] Agr. Fact ¶ 37.

[42] Id. ¶¶ 38-39.

[43] Id. ¶¶ 40-49.

[44] Id. ¶¶ 54-55.  During parts of 2009, her combined balance exceeded $2.9 million.  Id. ¶ 56.

[45] See Trial Ex. 14; Feb. 18, 2020 PM Tr. at 95:6-96:23.

In or before April 2009, DeMauro opened a bank account with Oberbank in the Czech Republic (Account 1432) under the name Ivo Strunc, using a Rye Beach P.O. Box mailing address.[46]  By September of that year, the same account was held under the name Eva Struncova with a mailing address in Nepomuk, Czech Republic.[47]  According to DeMauro, Ivo and his mother Eva are distant relatives related through her "English mother-in-law" or "brother-in-law."[48]  DeMauro testified that Ivo lived with her from 2001 until 2018, and that she opened Account 1432 in her relatives' names in order to invest in real property in Nepomuk, where Eva lived.[49]  DeMauro initially transferred approximately $200,000 from Zürcher to fund the account.[50]  But in April and June 2009, DeMauro transferred most of those funds to her client account at Boumil's firm.[51]

In August 2009, DeMauro traveled to Zurich to close her Zürcher account before meeting Oberbank representatives in the Czech Republic.  According to DeMauro, about two months earlier, Rosch had contacted her and told her that the Swiss government was making Americans close their Swiss accounts.[52]  DeMauro opened two additional bank

---

[46] Agr. Fact ¶ 60.

[47] Id.

[48] Feb. 19, 2020 AM Tr. at 8:19-9:14.  DeMauro's explanation about the exact nature of the relationship was not clear in her trial testimony.

[49] Id. at 10:3-23.

[50] Agr. Fact ¶ 61.

[51] Id. ¶¶ 69-70.  In its closing argument, the United States advanced for the first time the concept that the Oberbank accounts resembled "nominee accounts" regularly used in fraudulent financial schemes.  The United States presented no lay or expert testimony on this subject during the trial.  The court therefore accords little weight to the United States's nominee-account characterization beyond the fact that DeMauro held accounts not in her name, possibly as part of a scheme to conceal her financial transactions.

[52] See Feb. 19, 2020 AM Tr. at 22:15-23:5.

accounts with Oberbank (Accounts 1401 and 1598) while in the Czech Republic, this time in her own name.[53]   She also allegedly visited Nepomuk.[54]

**E.       Periodic transfers of money from foreign to domestic savings accounts**

After opening her Oberbank accounts, DeMauro made two transfers totaling about $250,000 from her Zürcher account to her domestic USAA bank account.[55]   She then liquidated the remainder of her Zürcher account by transferring about $721,000 to Account 1432 and approximately $2 million to Account 1598, all in U.S. dollars.[56]

In the following years, DeMauro made several transfers using her foreign accounts.   In October 2009, she transferred about $180,000 from Account 1432 to the client account at Boumil's firm, which then sent her a corresponding check.[57]   The day after the transfer, DeMauro withdrew nearly $540,000 from Oberbank by check made out to Ivo Strunc.[58]

In 2010, Ivo Strunc thrice withdrew smaller amounts of money from Oberbank (respectively, $1,300, $9,500, and $9,500) and eventually brought this cash back to the United States.[59]   On or about the same day of each withdrawal, DeMauro transferred

---

[53] Agr. Fact ¶ 63.

[54] Feb. 19, 2020 AM Tr. at 33:7-11.

[55] Agr. Fact ¶¶ 64-65.

[56] Id. ¶¶ 66-67.

[57] Id. ¶ 71.

[58] Id. ¶ 72.

[59] Id. ¶¶ 73, 74, 76.

money—nearly $100,000 each transfer—from Oberbank to the client account at Boumil's firm.[60]

From 2010 to 2011, DeMauro transferred more than $700,000 from her Oberbank accounts to her client account at Boumil's firm.[61]  At a date unknown, she also transferred $270,000 from Oberbank to the firm Bove and Langa PC as a retainer for estate planning services.[62]  Between 2012 and 2013, she further transferred over $1.3 million from her Oberbank accounts to her domestic account with USAA Bank.[63]  Nearly half of that amount, about $700,000, was transferred after her ex-husband's death in October 2013.[64]

## F.    Tax liability

DeMauro went most of her life having never filed an individual tax return for herself or her family.  She filed her first tax return in 2002, after she sold her Florida property.  As discussed above, Ouellet prepared this return on her behalf.

DeMauro did not file federal individual income tax returns for the 2002 through 2004 calendar years.[65]  Ouellet prepared extension requests for these years but did not prepare any income tax returns for DeMauro.[66]

---

[60] Id. ¶¶ 75, 77, 78.

[61] Id. ¶¶ 75, 77-83.

[62] Id. ¶ 85.

[63] Id. ¶¶ 84, 86-90.

[64] Feb. 19, 2020 AM Tr. at 11:6-15.

[65] Agr. Fact ¶ 91.

[66] Id. ¶ 92.

DeMauro delinquently filed tax returns for the 2005 through 2010 calendar years in May 2012.[67]  At trial, DeMauro conceded that for calendar years 2002 through 2009, she did not ask anyone if the income earned on her foreign accounts was taxable and did not seek professional advice about whether she should file a federal tax return.[68]

The parties agree that for the 2007, 2008, and 2009 calendar years, DeMauro was required to report her financial interest in a foreign bank, securities, or other financial account to the United States by submitting an FBAR by June 30 of the following year.[69] She nevertheless failed to do so until she delinquently filed her returns in May 2012.[70]

## G.    IRS investigation and penalty assessments

The United States represents that the IRS commenced an investigation related to DeMauro's income tax liabilities and failure to file FBARs around 2010.  Attorneys Alexander Bove and Edward DeFranceschi represented DeMauro before the IRS.[71]

To prepare DeMauro's delinquent tax returns, Bove and Langa retained CPA Jeffrey Paquin; however, in April 2012, DeMauro sent her attorneys a fax advising them to "release Mr. Paquin's services" and that she had "engaged another accountant."[72] DeMauro testified that she became frustrated with Paquin because he called her too much and asked too many questions.[73]

---

[67] Id. ¶¶ 93, 102.

[68] See Feb. 18, 2020 PM Tr. at 62:2-16, 84:2-7.

[69] Agr. Fact ¶¶ 104-05.

[70] Id. ¶¶ 106-08.

[71] Id. ¶ 85.

[72] Feb. 19, 2020 AM Tr. at 49:25-51:18.

[73] See id.

In her representative correspondence with the IRS, DeMauro did not initially disclose that she established an account at Oberbank in Ivo and/or Eva's name,[74] and only did so after the IRS revenue agent asked about transfers involving Account 1432.[75] Paquin testified that DeMauro never disclosed to him the Oberbank accounts in her relative's name(s).[76]  At trial, DeMauro testified that she had signed documents giving her attorneys permission to get information about her foreign accounts and assumed they would be able to find all of her information.[77]  During closing arguments, the United States conceded that though DeMauro failed to initially disclose the identifying information for all of her accounts, she correctly disclosed the total amount of money saved in her combined accounts.

In December 2015, the Secretary of the Treasury made an assessment under 31 U.S.C. § 5321 against DeMauro in the amount of $274,695.72 for willfully failing to submit an FBAR for the 2007 calendar year.[78]  The Secretary made equally valued assessments against DeMauro for the 2008 and 2009 calendar years.[79]  These penalties were computed by taking 36.5% of the lowest aggregate balance in DeMauro's Zürcher account as of June 30, 2009, and then equally assessing that amount for each of the three penalized years.[80]

---

[74] See Trial Exs. 18, 31, 44.

[75] See Trial Exs. 16, 32.

[76] Feb. 19, 2020 PM Tr. at 23:5-22.

[77] Feb. 18, 2020 PM Tr. at 46:10-47:24.

[78] Agr. Fact ¶ 110.

[79] Id. ¶¶ 111-12.

[80] Id. ¶ 113.

For the 2005 through 2008 calendar years, the IRS also made enhanced penalty assessments under 26 U.S.C. § 6651(f) related to DeMauro's allegedly fraudulent failure to timely file tax returns by the due date for each respective return.[81]  For 2005, the § 6651(f) penalty was $13,506.75.  For 2006, the penalty was $26,871.40.  For 2007, the penalty was $20,697.30.  And for 2008, the penalty was $17,006.33.

## H.    The United States's complaint and DeMauro's counterclaims

In November 2017, the United States, with the authorization of the Secretary of the Treasury and at the direction of the Attorney General, brought a civil action to obtain a money judgment against DeMauro in the amount assessed by the Secretary for not timely filing FBARs.[82]  (DeMauro has already paid the enhanced, late-filing penalties assessed by the IRS.)

In her answer, DeMauro denies that her conduct was willful, as required for the assessment of the enhanced FBAR penalty for willful violations, see 31 U.S.C. § 5321. In addition, DeMauro asserts two counterclaims, each relating to the IRS's imposition of a fraud-based failure-to-file penalty.[83]  First, DeMauro seeks a declaratory judgment stating that the IRS's penalty was not lawfully imposed, that she is entitled to a refund of what she has paid, and that she not be required to pay any of the amount sought by the United States for her failure to file tax returns.  See 22 U.S.C. § 2201.  Second, she contends that the IRS's actions constitute an unlawful exaction because money was improperly paid, exacted, or taken from her, in violation of 26 U.S.C. § 6651.  As such, she seeks the return of any money illegally exacted by the United States.

---

[81] See U.S. Post-Trial Brief (doc. no. 43) ¶ 189.

[82] See doc. no. 1.

[83] See doc. no. 5.

## I.      The two-day bench trial

On February 18 and 19, 2020, the court conducted a civil bench trial in which five witnesses testified.  On the first day, DeMauro and CPA Ouellet took the stand.  On the second day, the parties completed their questioning of DeMauro before calling Attorney Boumil, CPA Paquin, and IRS Territory Manager Peter Goodwin.  Most of the relevant portions of these witnesses' testimony is included in the background above.

At the end of DeMauro's examination, the United States moved to admit her deposition, Trial Exhibit 63, into evidence.  The defendant objected as the United States had more than ample opportunity to question DeMauro.  The court acknowledged defense counsel's argument that the evidence was not necessary but overruled the objection as it did not go to admissibility.[84]

On the second day, Boumil testified in more detail about the litigation concerning DeMauro's divorce and the transfers between his client account and DeMauro's personal accounts.  On cross examination, Boumil invoked the attorney-client communication privilege in response to several of the United States's questions.  The United States declined to challenge any specific invocation of privilege.

The defense also called Goodwin to testify about the IRS's investigation and its decision to assess a penalty.  The court openly questioned the relevance of such testimony, as the United States bore the burden of "reproving" its case before the court.[85] During Goodwin's examination, he acknowledged that the IRS found:

> There is no direct evidence that Annette DeMauro knew she was required to file FBARs for 2007, '8 or '9.  However, there are significant facts which indicate that she either knew or should have known.  Furthermore, under the concept of willful blindness there are significant facts that would

---

[84] Feb. 19, 2020 PM Tr. at 16:20-17:15.

[85] See id. at 33:12-43:25.

indicate Annette DeMauro made a conscious effort to avoid learning about the FBAR reporting and recordkeeping requirements.[86]

At the close of evidence, the parties jointly requested leave to file post-trial proposed findings of fact and rulings of law. The court granted the request and adjourned the proceeding without making findings as to the parties' claims.

## II.    Applicable legal standard

### A.    Standard of review

31 U.S.C. § 5321(b)(1) permits the Secretary of Treasury to "commence a civil action to recover a civil penalty assessed" for certain record and reporting violations, including FBAR-reporting violations, but does not specify the legal standard to be applied by the courts. No court in the First Circuit has ruled on what standard of review applies to a determination on the validity of an IRS penalty under § 5321. Nevertheless, the few courts from other circuits that have considered this question have applied a de novo standard because § 5321 provides no adjudicatory hearing before an FBAR penalty is assessed. Bedrosian v. United States, No. 15-cv-5853, 2017 WL 4946433, at *2 (E.D. Pa. Sept. 20, 2017), aff'd in part, rev'd in part, 912 F.3d 144, 152 (3d Cir. 2018); United States v. Williams, No. 1:09-cv-437, 2010 WL 3473311, at *1 (E.D. Va. Sept. 1, 2010), rev'd on other grounds, 489 F. App'x 655 (4th Cir. 2012).

### B.    Civil FBAR reporting penalty

Under the U.S. Money and Finance Code, a person required to file an FBAR who willfully fails to do so is subject to a civil penalty not to exceed 50% of the balance in the account at the time of the violation. 31 U.S.C. § 5321(a)(5). The United States bears the burden of proving each element of a willful FBAR reporting violation by a

---

[86] Id. at 54:4-24.

preponderance of the evidence.  E.g., United States v. Garrity, 304 F. Supp. 3d 267, 274 (D. Conn. 2018); United States v. Bohanec, 263 F. Supp. 3d 881 (C.D. Cal. 2016); United States v. McBride, 908 F. Supp. 2d 1186, 1201 (D. Utah 2012).

C.    **Penalty imposed for failing to timely file a tax return**

Under 26 U.S.C. § 6651(f), the amount of penalty imposed for failing to file a tax return increases if the failure to file is fraudulent.  Although DeMauro challenges her enhanced penalty through counterclaims, the United States bears the burden of "prov[ing] affirmatively by clear and convincing evidence actual and intentional wrongdoing on the part of the [taxpayer] with a specific intent to evade."  Crummey v. Comm'r, 684 F. App'x 416, 420 (5th Cir. 2017).   "[C]lear and convincing" means that the party's contention is highly probable—substantially more likely to be true than untrue.  Colorado v. New Mexico, 467 U.S. 310, 316 (1984).

**III.**    **Analysis**

This civil tax case turns on the intent, or lack thereof, underlying DeMauro's failure to timely file required tax forms.  The United States, through its affirmative count, contends that DeMauro's failure to timely file FBARs for the 2007, 2008, and 2009 calendar years was willful and thus warrants an enhanced penalty of $274,695.72 for each of those years.  DeMauro denies that she acted willfully and also contends that the IRS improperly assessed an enhanced penalty against her (separate from the FBAR penalty) for engaging in purportedly fraudulent behavior.  As explained below, the court finds that the United States met its burden of proving by a preponderance of the evidence that DeMauro willfully failed to timely file FBARs, but failed to meet its burden of proving by clear and convincing evidence that DeMauro failed to timely file her tax returns with the specific, fraudulent intent to evade taxation.

A.      **Willful failure to file an FBAR**

1.      The FBAR filing requirement

In 1970, Congress passed the Bank Secrecy Act to require the filing of "certain reports and records" that may be useful in "criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities." 31 U.S.C. § 5311.  Among the Act's many provisions, 31 U.S.C. § 5314 requires persons in the United States to report transactions or relations with foreign financial agencies.  In 1977, the Secretary promulgated regulations toward that end, requiring that "each person having a financial interest . . . over a foreign financial account is required to report such relationship on his [or her] Federal income tax return . . . ."  See 31 C.F.R. § 103.24 (1977).[87]  Under today's regulations, such foreign-bank-account reports "shall be filed with the Commissioner of Internal Revenue on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year."  31 C.F.R. § 1010.306(c).

In 1982, Congress amended the BSA to include, in part, criminal and civil penalties for willful violations of tax reporting requirements, including FBAR.[88]  Under the then newly-amended § 5321, the Secretary could seek civil penalties against financial institutions, but not individual filers (except for violations of § 5136), that willfully violated certain reporting requirements, including those in § 5314 and the regulations prescribed thereunder.

---

[87] As enacted through 42 Fed. Reg. 63774.  In 2011, the Secretary moved the FBAR reporting regulation to 31 C.F.R. § 1010.350.  See Transfer and Reorganization of Bank Secrecy Act Regulations, 75 Fed. Reg. 65806-01 (transferring regulations in in 31 C.F.R. Part 103 to Part 1010).

[88] See Pub. L. 97–258 (HR 6128), Pub. L. 97–258, September 13, 1982, 96 Stat. 877.

Four years later, Congress, through a separate act, further amended the BSA by adding subsection (a)(5) to § 5321, which provides that the Secretary may "impose a civil monetary penalty on any <u>person</u> who willfully violates any provision of [§ 5314]."[89]  As currently amended, the Secretary may also assess an enhanced penalty not to exceed the greater of $100,000 or 50% of the balance in the account at the time of the violation, in cases where a taxpayer's violation of § 5314 is willful.[90]  31 U.S.C. § 5321(a)(5)(A)-(D). "A civil money penalty may be imposed . . . notwithstanding the fact that a criminal penalty is imposed with respect to the same violation." <u>Id.</u> § 5321(d).

2.     <u>A willful violation of the FBAR reporting requirement</u>

Section 5321 authorizes enhanced penalties for willful violations of the FBAR reporting requirement but does not define what constitutes "willful" behavior.  The United States, invoking authority from outside the First Circuit, contends that a person willfully violates § 5314 when he or she "either knowingly or recklessly fails to file an FBAR."[91]  DeMauro, invoking various canons and principles of statutory construction, argues that a willful violation requires actual knowledge that a failure to file FBARs is unlawful, particularly given how the Supreme Court has interpreted "willful" in the context of criminal tax-reporting penalties under 31 U.S.C. § 5322.[92]  While at first

---

[89] An Act to Strengthen Federal Efforts to Encourage Foreign Cooperation, Pub. L. 99–570 (HR 5484), Pub. L. 99–570, October 27, 1986, 100 Stat. 3207 (emphasis added).

[90] The Secretary may not impose such a penalty if "such violation was due to reasonable cause, and the amount of the transaction or the balance in the account at the time of the transaction was properly reported."  31 U.S.C. § 5322(a)(5)(B)(ii).

[91] U.S. Post-Trial Brief (doc. no. 43) ¶ 204 (quoting <u>Bedrosian</u>, No. 2:15-cv-5853, 2017 WL 4946433 at *3).

[92] DeMauro Post-Trial Brief (doc. no. 46) ¶¶ 194-224 (focusing on at least four specific canons, including ordinary usage, the presumption of consistent usage, surplusage, and in pari materia).

glance, DeMauro's construction arguments have some intuitive appeal, the court rejects them as they are incongruent with how other courts construe "willfulness" both in the civil FBAR reporting context and in civil penalty statutes generally.

While no court in the First Circuit has definitively opined on § 5321's willfulness standard, every federal court that has considered the willfulness standard for civil FBAR reporting violations has found the proper standard under § 5321 is "the one used in other civil contexts—that is, a defendant has willfully violated [31 U.S.C. § 5314] when he [or she] either knowingly or recklessly fails to file [a] FBAR." See Bedrosian, 912 F.3d at 152 (quoting the district court) (alteration in the original); see also, e.g., Bohanec, 263 F. Supp. 3d at 888-89 ("[W]illfulness under 31 U.S.C. § 5321 includes reckless disregard of a statutory duty."). In Bedrosian, for example, the Third Circuit Court of Appeals remanded an FBAR reporting case for further consideration because the district court failed to determine whether the defendant's conduct was reckless after concluding it was not knowing, given his subjective motivations. 912 F.3d at 152. Similarly, in United States v. Williams, the Fourth Circuit Court of Appeals reversed a district court's finding against willfulness, on a clear error review, where it was "convinced that, at a minimum, [the defendant's] undisputed actions establish[ed] reckless conduct, which satisfies the proof requirement under § 5314." 489 F. App'x at 660.

In United States v. Toth, a recent case not cited by the parties, a district court in this Circuit came close to adopting the consensus construction for civil willfulness, albeit while addressing an argument in the alternative. No. 15-cv-13367, 2019 WL 7039627, at *6 (D. Mass. Dec. 20, 2019) (Burroughs, J.). There, the United States similarly sued to collect a civil penalty assessed against a defendant who failed to timely report her financial interest in a bank account in her name at UBS AG. During the course of the

litigation, the court sanctioned the defendant by establishing as a fact for purposes of the litigation that her failure to report was willful.  Id. at *1.  In assessing, for the sake of argument, whether the sanction was unjust, Judge Burroughs "briefly" analyzed whether the evidence provided by the parties in fact supported a finding of willfulness.  She observed that while the Court of Appeals had "not yet had the opportunity to consider the willfulness standard in the context of . . . § 5321(a)(5)(A) penalties," it had held, in other civil tax contexts, that "a finding of willfulness can apply to conduct that is reckless or willfully blind" in addition to intentional, knowing, and voluntary acts.  Id. at *6 n.6 (citing Thomsen v. United States, 887 F.2d 12, 17 (1st Cir. 1989)).  After assessing the defendant's conduct, Judge Burroughs found that the United States had provided more than sufficient evidence showing the defendant acted recklessly or with willful blindness in declining to investigate her U.S. tax obligations for her UBS account, and thus held that the sanction was not "clearly unjust," either factually or legally.[93]  Id. at *8.

In light of this ample precedent, this court construes "willfully" as used in § 5321 in accordance with its consensus interpretation, encompassing both knowing and reckless disregard of the FBAR reporting requirement.[94]  Accordingly, the court rejects DeMauro's preferred construction of the statute.  See also, e.g., Safeco Ins. of Am. V. Burr, 551 U.S. at 56-57 (finding that "willfully" generally has a different meaning when used in civil liability statutes, even when those statutes are codified within the same

---

[93]  In particular, Judge Burroughs found that the defendant had received some bank statements for her UBS bank account documenting interest gains, had filed tax returns omitting her UBS income from her filed Scheduled Bs, took administrative and account investment steps to maintain the secrecy of her account, and never questioned why UBS was not deducting funds from her account to pay U.S. taxes on her investment gains.  Id.

[94] Though DeMauro's statutory interpretation arguments are not wholly unpersuasive, they carry little weight in light of multiple circuit precedent against her position.  See, e.g., Bedrosian, 912 F.3d at 152; Williams, 489 F. App'x at 660.

statutory scheme as a similarly worded criminal statute); <u>Internal Revenue Serv. v.</u> <u>Murphy</u>, 892 F.3d 29, 35 (1st Cir. 2018) ("The statutory term 'willfully' is a chameleon. At a minimum, 'willfully' differentiates between deliberate and unwitting conduct.  In criminal law, it typically refers to a culpable state of mind, such that a 'willful violation' occurs only when a defendant act[s] with knowledge that his conduct [is] unlawful.  In contrast, [c]ivil use of the term . . . typically presents neither the textual nor the substantive reasons for pegging the threshold of liability at knowledge of wrongdoing." (internal citations omitted)).

3.    <u>DeMauro's conduct</u>

The FBAR penalty statute prescribes an enhanced civil penalty for willful violations—violations that are either knowing or reckless.  A knowing violation requires actual knowledge of the FBAR reporting requirement.  <u>See</u> <u>Ratzlaf v. United States</u>, 510 U.S. 135, 141 (1994) (noting that in the criminal-FBAR context, a willful violation "require[s] both 'knowledge of the reporting requirement' and a 'specific intent to commit the crime'" (internal citation omitted)); <u>United States v. Flume</u>, No. 5:16-cv-73, 2018 WL 4378161, at *5 (S.D. Tex. Aug. 22, 2018) (discussing "actual-knowledge theory" for willful FBAR-reporting violations).  By comparison, "a person commits a reckless violation of the FBAR statute by engaging in conduct that violates an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known."[95] <u>Bedrosian</u>, 912 F.3d at 153 (quoting <u>Safeco</u>, 551 U.S. at 68) (internal quotation marks omitted).

---

[95] At oral argument, DeMauro's counsel all but conceded that under recent case law from other circuits, reckless conduct could also constitute a knowing violation of the civil FBAR statute.

For IRS filings, a person acts recklessly when he or she "(1) clearly ought to have known that (2) there was a grave risk that the filing requirement was not being met and if (3) he [or she] was in a position to find out for certain very easily." Id. (internal citations and quotation marks omitted).  Willful blindness—as where a defendant consciously chooses to avoid learning about reporting requirements—also constitutes a form of recklessness as to the FBAR-reporting requirement. See Williams, 489 F. Appx. at 659; Flume, 2018 WL 4378161, at *7 n.11 & *8 n.15.  The United States bears the burden of proving willfulness under either theory by a preponderance of the evidence. Flume, 390 F. Supp. 3d at 854 (quoting Bedrosian, 912 F.3d at 153) (internal quotation marks omitted).

The United States contends that the preponderance of the evidence shows that DeMauro's failure to timely file FBARs for the 2007, 2008, and 2009 calendar years was willful for two reasons: (1) DeMauro took steps to conceal her account, which the United States argues evidence a conscious intent to violate the law;[96] and (2) DeMauro did not ask her attorney or tax preparer about her the tax consequences of her divorce settlement, her foreign accounts, or the interest she earned in her foreign accounts, demonstrating in the United States's eyes, a "conscious effort . . . to avoid learning about her obligation to report foreign accounts and foreign income," or, at the very least, a reckless disregard for her reporting obligations.[97]  While the trial record supports each of these contentions to some extent, the court finds that the United States has proven only willful blindness and recklessness by a preponderance of the evidence.

---

[96] U.S. Post-Trial Brief (doc. no. 43) ¶¶ 210-216.

[97] Id. ¶¶ 223-28.

*a.    Conscious intent to violate the FBAR reporting requirement*

"Willfulness may be proven through inference from conduct meant to conceal or mislead sources of income or other financial information, and it can be inferred from a conscious effort to avoid learning about reporting requirements." Flume, 390 F. Supp. 3d at 854 (internal quotation marks and citations omitted); see also Bedrosian, 912 F.3d at 152 (holding that for the purposes of civil FBAR penalties, willfulness incorporates recklessness); Williams, 489 F. App'x at 658; Bohanec, 263 F. Supp. 3d at 888-89.  As summarized above, the parties agree that: DeMauro opened a numbered bank account with UBS AG; the application materials for that account instructed UBS to maintain her correspondence; DeMauro transferred funds from UBS and Zürcher to Boumil's client account rather than her domestic bank account; and DeMauro opened up accounts containing her money in the names of her "English in-laws."  The United States maintains that DeMauro took these steps to conceal or mislead authorities; however, these actions were not necessarily nefarious and can plausibly be interpreted as lacking criminal culpability.

First, while DeMauro took steps to conceal her foreign account transactions, the evidence shows that she plausibly did so, at least in part, for good reason—to hide her assets and the paper trail for her accounts from her ex-husband. See United States v. Aversa, 984 F.2d 493 (1st Cir. 1993), cert. granted, judgment vacated sub nom. Donovan v. United States, 510 U.S. 1069 (1994) (defendant structured transactions to hide assets from a divorcing spouse).  At trial, DeMauro testified that she took steps to "protect" her money from her aggressively vengeful ex-husband, who had ties to area banks and had attempted to gain access to her domestic accounts during their separation and divorce.[98]

---

[98] Feb. 18, 2020 AM Tr. at 59:8-21; Feb. 19, 2020 AM Tr. at 111:12-114:6.

Ouellet corroborated that at the times of his respective services, DeMauro talked about her fear for her well-being and her assets.[99]  IRS Agent Goodwin relatedly testified that, at the time of the IRS investigation, the revenue agent also found DeMauro's explanation about "her ordeal with ex-husband [to be] compelling."[100]

Additionally, DeMauro's UBS account documents, admitted by the United States, bolster her testimony that she had limited involvement in establishing the structure of her accounts.  The parties agree that in establishing an account, DeMauro formed a client relationship with then-UBS client advisor Hannes Rosch.  DeMauro testified that, to open the account, Rosch sent her blank account-creation documents, which she signed, but did not fill out.  According to DeMauro, she did not understand at the time that she would not receive UBS documents in the mail, she simply trusted Rosch to take care of her affairs. DeMauro further speculated that Rosch completed the account documents for her.  A lay examination of the account documents reveals that the writing on these documents, particularly the filled-in numbers, differs drastically from other samples of DeMauro's handwriting in the record, such as her correspondence with her accountants.  While a factfinder could reasonably doubt whether DeMauro deliberately chose not to receive correspondence, any conscious decision to mask her account details can also be plausibly explained by her fear of her ex-husband.

The United States similarly fails to carry its burden through other proffered examples of concealing conduct.  For example, the United States contends that DeMauro did not tell Ouellet about the interest she earned on her foreign account when he prepared

---

[99] Feb. 18, 2020 PM. Tr. at 34:7-35:11.

[100] Feb. 19, 2020 PM Tr. at 45:14-46:6.  The revenue agent's findings do not constitute additional corroborating evidence but do add color to the United States's position on DeMauro's credibility.

a 2005 tax return for her (a tax return that was never filed).[101]  At trial, however, Ouellet

testified that he typically would learn about interest earned from clients' bank accounts by

being provided a 1099-INT[102]—a tax form not found in UBS's records for DeMauro's

account.  For comparison, the unfiled tax return prepared by Ouellet for the 2005 tax year

reflects interest earned from DeMauro's domestic USAA accounts, plausibly suggesting

that she provided Ouellet with 1099-INTs in her possession.[103]  Ouellet also testified that

he "knew there was a foreign account" around 2002.[104]

The United States also notes that DeMauro did not disclose the existence of her

account in the name of Eva Struncova and Ivo Strunc—one of her four accounts at

Oberbank—until the IRS agent asked about transfers involving these accounts.  This fact

raises questions about DeMauro's credibility and intent but may also have resulted from

good-faith error.  On the one hand, DeMauro thrice used the account (Account 1432) to

transfer in total nearly $400,000 to the client account at Boumil's law firm,[105] and also

withdrew $543,301 by issuing checks to Ivo Strunc—actions that suggest she intended to

---

[101] The United States contends that the non-filing of this tax return evidences an intent not to
provide the United States with correct information.  But the United States provided no authority
for this proposition and made no showing that in 2006, DeMauro had an outstanding tax liability
for the 2005 tax year or was otherwise required to file the return prepared by Ouellet, based on
the information contained therein at the time.  Absent such authority or showing, the court
declines to draw the inference the United States proposes from DeMauro's failure to file her
2005 tax return.

[102] Feb. 18, 2020 PM Tr. at 21:17-22:12.

[103] Tr. Ex. 8.  The copy of DeMauro's 2001 tax return admitted into evidence, which was filed
with the IRS, does not include a Schedule B—the section which pertains to taxable interest and
interests in foreign accounts.  See supra n.31.

[104] Feb. 18, 2020 PM Tr. at 25:8-15.

[105] Agr. Facts ¶¶ 60, 61, 66, 67-71.

conceal the means by which she domesticated her foreign funds.[106]  On the other hand, she testified that, during the course of the IRS's investigation, she signed documents giving her attorneys permission to get information about her foreign accounts, including her four accounts at Oberbank, and "just assumed [the bank would] be able to draw up the name of Ivo – and Eva."[107]  Both theories appear plausible on this record.  The latter seems particularly likely, as DeMauro's attorneys accurately reported the total amount of money DeMauro held in her Oberbank accounts, including the accounts in her relatives' names.

In short, while DeMauro took steps to conceal her foreign account transactions and failed to disclose information about her foreign accounts when under IRS investigation, her corroborated explanations for doing so, which this court as a factfinder partially credits, undercut the United States's theory that her actions were an attempt to evade known tax reporting obligations.  The court finds that the United States failed to prove by a preponderance of the evidence that DeMauro knowingly violated § 5314.  It thus assesses whether the United States has proven by a preponderance of the evidence that DeMauro violated § 5314 recklessly.

b.    *Reckless disregard of FBAR reporting requirement*

The United States also contends that, even if DeMauro did not knowingly disregard her FBAR reporting obligations, she still acted recklessly in failing to seek advice on whether the $3.5 million she placed in her foreign account was taxable or reportable, given the relatively large sum of money in her bank accounts.  The United

---

[106] Id. ¶ 72.

[107] Feb. 18, 2020 PM Tr. at 46:10-47:24.

States has carried its burden on this theory, as DeMauro's explanation for not seeking advice strains credulity.

As an initial matter, the United States cites no authority supporting its premise that any person with a relatively large sum of money inherently acts recklessly by not seeking professional or legal advice.  It does not appear that the law necessarily requires that taxpayers generally seek professional advice or use tax preparation services, see, e.g., Intress v. United States, 404 F. Supp. 3d 1174, 1179 (M.D. Tenn. 2019), and the United States has provided no authority establishing such a requirement.  Other courts have found that "[m]ost taxpayers are not competent to discern error in the substantive advice of an accountant or attorney," and that "[w]hen an accountant or attorney" offers substantive tax advice, "such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice." United States v. Boyle, 469 U.S. 241, 251 (1985).  And, despite the United States's argument to the contrary, DeMauro did at least retain one professional—Ouellet—to prepare her taxes for the 2001 and 2005 calendar years.  Both DeMauro and Ouellet testified that Ouellet learned of DeMauro's foreign accounts during his service.  Yet there was no testimony or evidence showing that Ouellet informed her of the FBAR reporting requirement.  To the contrary, Ouellet conceded in an embarrassingly credibility-enhancing manner that he first became aware of the FBAR form in 2014.[108]

A larger problem remains, however, as to DeMauro's explanation for not seeking legal advice or further professional advice regarding the potential tax obligations posed by her significant foreign-saved assets.  At trial, DeMauro testified that she never asked Ouellet, Boumil, or any other professional about tax obligations for her foreign accounts because she believed, based on her own interpretation of her divorce decree, that she

---

[108] Feb. 18, 2020 PM Tr. at 40:16-18.

owed no taxes on anything received from her divorce, including interest she concedes she knew was accruing.[109]  This explanation is neither objectively reasonable nor subjectively credible and thus undercuts DeMauro's representations about the reasons for her conduct.

First, the plain language of DeMauro's divorce decree does not suggest that she was relieved of tax obligations owed to the United States.  On page 8, the decree provides, under the section entitled "Taxes":

> To the extent that any income and/or gift taxes may be owing to the United States of America, any state of the United States or any foreign jurisdiction, the defendant is hereby ordered to indemnify and hold harmless the plaintiff from any and against the same and to be solely responsible for the payment of any costs and reasonable attorneys' fees incurred by the plaintiff in defense of same.[110]

This language orders DeMauro's ex-husband to indemnify her from taxes owed, but does not absolve her of tax liability.  Even if this language was ambiguous, DeMauro later explained that neither of her divorce attorneys advised her on the meaning of this provision or advised her to seek further tax advice during their representation.  While not outside the bounds of possibility, her explanation is not sufficiently plausible given the experience of her attorneys and the duration of their representation.[111]

DeMauro's other statements of record about her general tax knowledge further undercut her credibility as to her culpable mental state.  Despite her stated belief that she

---

[109] Feb. 18, 2020 PM Tr. at 76:1-77:20; 81:3-9.  She also testified that Ouellet never asked her about interest earned on her foreign accounts.

[110] Id. at 80:11-20.

[111] Id. at 80:21-81:23.  At trial, Boumil asserted the attorney-client privilege in response to questions about what specific advice, if any, he gave to DeMauro.  The United States did not specifically argue that DeMauro's testimony about whether Boumil advised her on the agreement's tax consequences waived the attorney-client privilege as to this specific subject matter.

did not owe taxes on assets gained from her divorce, DeMauro conceded that she knew, or at least became aware at some point, that her representatives paid $1 million dollars of estimated tax on her behalf when the Florida home she gained from her divorce was sold, and that Ouellet prepared a tax return for her to recover nearly $225,000 of overpaid tax.[112]  Thus, she knew, or at least became aware, that the real estate assets she gained from her divorce were taxable.  Additionally, her UBS account records reveal that in 2005, she informed her UBS client manager that "[s]he declared the account on taxes" and "clarified this with her tax lawyer."[113]  While these account notes do not prove that DeMauro actually sought tax advice from a lawyer, they demonstrate that DeMauro at the very least knew her foreign accounts posed some tax obligation.  If fully credited, they suggest that DeMauro was entirely aware of her tax misconduct.

After considering the entire record, the court makes the following findings of fact and rulings of law:

- The United States proved by a preponderance of the evidence that DeMauro willfully violated the civil FBAR reporting statute, 31 U.S.C. § 5314, by engaging in conduct that demonstrated a reckless disregard, if not a willful blindness, towards her tax reporting obligations.

- The United States failed to show by a preponderance of the evidence that DeMauro violated the statute knowingly.  While a preponderance of the evidence shows that DeMauro took steps to conceal her foreign interest earned and her transfers to the United States, it does not necessarily show that she did so to avoid a known tax obligation.  Additionally, the United States proffered no evidence that shows DeMauro should have been aware of the FBAR reporting requirement through her prior tax filings, as the

---

[112] Id. at 81:10-84:7; see also id. at 83:12-15 ("Q: Okay.  But you were aware that the tax was paid?  A. Well, they told me the tax was paid, they told me what the price of the house was, and that's all the information they gave to me.").

[113] Tr. Ex. 7 at 2.  The United States did not confront DeMauro about this conversation during its direct and cross-examination of her.  As such, the court limits the weight it attributes to this statement.

copy of her 2001 tax filing admitted into evidence is missing relevant pages, and the copy of her 2005 tax filing admitted into evidence was neither signed nor filed with the IRS.

- The United States proved by a preponderance of the evidence that DeMauro acted with willful blindness by taking "deliberate" or "conscious effort to avoid learning about [FBAR] reporting requirements," see Williams, 489 F. App'x at 659-60, including her purported failure to seek advice from tax professionals or attorneys despite (1) her past practice of relying on such professionals to handle her affairs, (2) her admission that she knew her foreign accounts were accruing interest, (3) her payment of taxes on interest earned from her domestic savings accounts, (4) her payment of taxes on residential assets she acquired through her divorce decree, and (5) her representation to UBS that she had sought unspecified tax advice for her account.

- The United States proved by a preponderance of the evidence that, even if DeMauro was not willfully blind, she acted recklessly because she "(1) clearly ought to have known that (2) there was a grave risk that" she was not meeting her tax-filing requirements for her foreign accounts and "(3) . . . was in a position to find out for certain very easily." See Bedrosian, 912 F.3d at 153 (internal quotation marks and citations omitted).

- DeMauro's violations of 31 U.S.C. § 5314, are subject to the maximum penalty provision of 31 U.S.C. § 5321 for willful violations.

- Because DeMauro has not yet paid the FBAR penalty, she is also liable for a late-payment penalty under 31 U.S.C. § 3717(e)(2) and 31 C.F.R. § 5.5(a), plus interest accruing pursuant to law.

## B.    Counterclaims challenging fraudulent-failure-to-file penalty

DeMauro counterclaims that the IRS improperly imposed an enhanced penalty for her failure to file a tax return on the purported grounds that her failure was fraudulent. The parties do not dispute that DeMauro failed to file her 2005, 2006, 2007, and 2008 tax returns by the required deadline. DeMauro only contests the United States's proof that her failure was fraudulent. The court agrees that, on this record, the United States has not met its burden of persuasion by clear and convincing evidence.

Section 6651(f) of the Internal Revenue Code prescribes the penalties for failing to timely file certain tax returns, including an enhanced penalty if the failure to file the return is fraudulent.  A finding of fraud requires the United States to "prove affirmatively by clear and convincing evidence actual and intentional wrongdoing on the part of the [taxpayer] with a specific intent to evade the tax."  Crummey, 684 F. App'x at 420. No court in the First Circuit has elaborated on what constitutes a specific intent to evade tax.  Courts from across several circuits, however, have inferred such fraudulent intent from conduct including: "(1) understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) giving implausible or inconsistent explanations of behavior, (5) concealing assets, (6) failing to cooperate with tax authorities, (7) engaging in illegal activities, (8) attempting to conceal illegal activities, (9) dealing in cash, and (10) failing to make estimated tax payments."  See, e.g., id. at 420-21 (citing Bradford v. Comm'r, 796 F.2d 303, 307-08 (9th Cir. 1986) (aggregating factors)).

Though each party cited the Crummey factors, neither party seriously engaged its multi-factor framework, perhaps given the small penalty at issue relative to the much larger civil FBAR penalty at stake.  In just one paragraph, the United States—which bears the burden of proof through clear and convincing evidence—contends that DeMauro has demonstrated many of these indicia by:

- paying for UBS and Zurcher Kantonalbank not to send her account records and to destroy any such records not claimed by her within three years, failed to timely file income tax return for each of the years;

- failing to disclose to Ouellet the income she received from her foreign bank account for the 2005 year;

- placing a substantial amount of assets in overseas bank accounts in order to conceal them;

- failing to fully cooperate with tax authorities when the examination of her delinquent income tax returns commenced; and

32

> - failing to make estimated tax payments with respect to the interest earned on the assets held in the overseas bank accounts.[114]

DeMauro counters that "she demonstrated at trial that she was clueless about the U.S. tax laws, was not sophisticated in business and financial matters, had limited education, and thus did not possess the state of mind, knowledge, intent or belief regarding whether income from her foreign bank accounts was subject to tax . . . ."[115]

DeMauro's counterclaim presents a closer case than the United States's affirmative FBAR claim. As discussed in the FBAR context, many of the United States's cited examples of conduct evidencing intent have potentially credible, and somewhat-benign explanations (e.g., a lack of tax-filing experience, a desire to conceal assets from an ex-husband, a practice of overreliance on retained professions, etc.)[116] or were simply contradicted by the trial evidence (e.g., Ouellet testifying that he knew about DeMauro's foreign account). In the same context, the court also found that DeMauro's explanations for her conduct at times strained credulity.[117] These factors proved sufficient for supporting a finding of willful blindness or recklessness under the civil FBAR reporting statute's preponderance-of-the-evidence standard, see 31 U.S.C. §§ 5314, 5321, but they fall short of proving by clear and convincing evidence that DeMauro also acted with a specific, fraudulent intent to evade tax—as required for an enhanced late-filing penalty, see 26 U.S.C. § 6651(f).

---

[114] U.S. Post-Trial Brief (doc. no. 43) ¶ 235.

[115] DeMauro Post-Trial Brief (doc. no. 46) ¶ 241.

[116] See Part III.A.3.a, supra, at 24-27.

[117] See id. at 27-31.

"Fraud implies bad faith, intentional wrongdoing and a sinister motive.  It is never imputed or presumed[,] and the court should not sustain findings of fraud upon circumstances which at most create only suspicion."  Payne v. Comm'r, 224 F.3d 415, 420 (5th Cir. 2000).  Here, DeMauro's conduct certainly creates suspicion.  But the evidence of record does not clearly and convincingly show that she possessed the knowledge or awareness necessary for a finding of fraud.  See Webb v. Comm'r, 394 F.2d 366, 380 (5th Cir. 1968) (discussing the thin line between tax negligence and tax fraud).  As such, the court does not find that DeMauro's failure to timely file tax returns was fraudulent, finds in favor of DeMauro on her counterclaims, and orders the return of DeMauro's payments to date for the enhanced late-filing penalties at issue.

## IV.    Conclusion and verdict

In sum, the United States proved by a preponderance of the evidence that DeMauro "willfully" failed to file an FBAR in violation of 31 U.S.C. §§ 5314, 5321, but failed to prove by clear and convincing evidence that she failed to timely file tax returns with a specific fraudulent intent to evade tax.  Accordingly, the court intends to enter judgment in favor of the United States on its civil FBAR reporting claim and judgment in favor of DeMauro on her counterclaims.  An entry of judgment shall follow.


**SO ORDERED.**


_____
Joseph N. Laplante
United States District Judge

Dated:  August 28, 2020

cc:    Gerard J. Levins, Esq.
        Rosario M.F. Rizzo, Esq.
        Thomas P. Cole, Esq.
        Angela R. Foster, Esq.