UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

UNITED STATES OF AMERICA,

     Plaintiff,

     v.                              17-CV-640-JL

ANNETTE B. DEMAURO,

     Defendant.

## DEFENDANT'S MOTION TO AMEND JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

COMES NOW DEFENDANT, Annette B. DeMauro ("Defendant"), by and through undersigned counsel, and hereby moves the Court to amend its August 28, 2020 verdict and September 18, 2020 judgment pursuant to Fed. R. Civ. P. 59(e). The reasons underlying Defendant's motion and requested relief are set forth in the incorporated memorandum of law.

### I.    Introduction

On August 28, 2020, the Court entered its verdict and accompanying memorandum, finding that Defendant had willfully violated her obligation to timely file Foreign Bank Account Reports ("FBARs") under 31 U.S.C. § 5314 and 31 CFR § 1010.350 for the 2007, 2008, and 2009 calendar years. ECF 48. In so doing, the Court sustained FBAR penalties and interest totaling over $1 million for those three years. Further, the Court found that Defendant was not liable for penalties assessed under IRC § 6651(f) for her alleged fraudulent failure to timely file returns for the 2005, 2006, 2007, and 2008 tax years. The Court entered its judgment on its verdict on September 18, 2020. ECF 50. To stop further accrual of interest and penalties, Defendant transferred an amount sufficient to satisfy the judgment to the Department of Justice on or about September 22, 2020.

In finding that Defendant had willfully violated her FBAR filing obligations for 2007, 2008, and 2009, the Court determined that while Defendant had not knowingly violated her filing obligations, she had recklessly (and thus willfully) violated them by "failing to seek advice on whether the $3.5 million she placed in her foreign account was taxable or reportable…." ECF 48 at p. 27. Through this motion, Defendant asserts that conclusion was clearly erroneous and warrants a limited alteration of the Court's verdict and judgment under Fed. R. Civ. P. 59(e).

## II.      Relevant Procedural Background and Argument Summary

The United States filed its complaint seeking to reduce the 2007, 2008, and 2009 FBAR penalties to judgment in November 2017. ECF 1. Defendant filed an answer and counterclaim in March 2018. ECF 5. Trial on the United States' claim and Defendant's counterclaim was held February 18 and 19, 2020. At trial, five witnesses testified: Defendant, Ronald Ouellet, James Boumil, Jeffrey Paquin, and Peter Goodwin, and a total of 78 exhibits were admitted into evidence.

Ultimately the Court concluded that Defendant willfully violated her FBAR filing obligation for 2007, 2008, and 2009 because she failed to seek advice from her tax advisor or attorneys regarding the tax obligations associated with her foreign accounts. ECF 48 at p. 28. To the Court, this failure evidenced Defendant's "conscious effort to avoid learning about [FBAR] filing requirements." ECF 48 at 31. In particular, the Court referenced five points that, to it, indicated Defendant should have sought additional insight from her tax advisor or her attorneys: (1) Defendant's past practice of relying on such professionals to handle her affairs, (2) her admission that she knew her foreign accounts were accruing interest, (3) her payment of taxes on interest earned from her domestic savings accounts, (4) her payment of taxes on real estate assets acquired through her divorce, and (5) her representation to UBS that she had sought unspecified

advice for her account.[1]   ECF 48 at p. 31.   Additionally, the Court determined that even if Defendant was not willfully blind she acted recklessly because she "(1) clearly ought to have known that (2) there was a grave risk that she was not meeting her tax-filing requirements for her foreign accounts and (3) was in a position to find out very easily."   *Id.*   The Court did not credit Defendant's explanation that she did not believe any of the property she received as part of her divorce, or resulting income, was subject to tax.   The Court concluded that the indemnification provision in Defendant's divorce decree did not justify such an understanding, and that the credibility of her explanation was further harmed by her payment of tax on the gain associated with her sale of real property in Florida in 2001.

However, the Court also found that the United States "proffered no evidence that shows [Defendant] should have been aware of the FBAR reporting requirement through her past tax filings," because the 2001 return admitted into evidence did not include a Schedule B and Defendant's draft 2005 return (on which Defendant's name was misspelled) was never received or executed by Defendant or filed with the IRS.   ECF 48 at pp. 30-31.   Moreover, the Court found that Ouellet knew of Defendant's foreign account around 2002 and knew that the amount of money Defendant had in Switzerland was "significant."   ECF 48 at p. 7.   The Court also found that despite Mr. Ouellet's status as a CPA since 1979 (and his status as tax return preparer since 1972), Mr. Ouellet was unaware of the FBAR filing obligation through at least 2005.

---

[1] The Court stated that it "limited" the weight given to these purported representations because the United States chose to not confront Defendant with them during its examination of her.   ECF 48 at p. 30 n. 113.   However, the representations should not have been given any weight.   They were made by a UBS representative—purporting, without any corroboration, to be memorializing conversations with Defendant—known to have been actively engaged in soliciting clients to violate U.S. tax laws.   The entire business model utilized by UBS was based on deception, and the drafter of the notes would have an incentive to create a false record that to his knowledge the account had been properly declared.   Knowing this, the United States chose to not question Defendant about the notes at trial.

Through this motion Defendant respectfully asserts that the Court's recklessness analysis incorrectly focused on Defendant's income reporting obligations, rather than her FBAR filing obligations, and failed to adequately account for Defendant's utter lack of relevant knowledge and experience and her voluntary disclosure of her UBS account to Ouellet.  In particular, the Court found that Defendant had no knowledge of her tax filing obligations and went so far as to describe Defendant as "clueless" about tax matters,[2] an opinion echoed by other witnesses.  Yet, those facts did not adequately inform the Court's recklessness analysis.  Moreover, Defendant provided sufficient information to her tax advisor, Mr. Ouellet, to allow him to fulfill his fiduciary obligations and inform Defendant about her FBAR filing obligation.  Additionally, Defendant was guided in financial matters for years by attorneys. That Mr. Ouellet or others failed to meet their professional obligations is inadequate to raise the level of Defendant's failures to timely file FBARs to willful.  Furthermore, in evaluating willfulness, FBAR precedent has focused on a defendant's actions in respect of their FBAR filing obligation, as opposed to their income reporting obligations.  Where income reporting failures are raised, it is almost invariably in the context of a sophisticated defendant who is engaged in a complex scheme of evasion, which is not the case here. Consequently, the Court should amend its judgment under Rule 59 and hold that the United States did not meet its burden of proof to establish willfulness.

### III.     Legal Standard

A party may seek to alter or amend a judgment under Rule 59(e).  Rule 59(e) relief is granted when "the original judgment evidenced a manifest error of law, if there is newly discovered evidence, or in certain other narrow situations." *Global Naps, Inc. v. Verizon New England, Inc.,* 489 F.3d 13, 25 (1st Cir.2007).  The First Circuit has identified four discrete bases

---

[2] Feb. 19, 2020 Tr. AM at 132:23-133:10.

for relief under Rule 59(e), specifically (1) manifest errors of law and fact; (2) newly discovered or previously unavailable evidence; (3) manifest injustice; or, (4) an intervening change in controlling law. *Marie v. Allied Home Mortgage Corp.,* 402 F.3d 1, 7 (1st Cir. 2005). Defendant asserts that the Court's decision to sustain willful FBAR penalties for 2007, 2008, and 2009, and its underlying analysis, constitutes a manifest error of law and fact, results in a manifest injustice, and consequently warrants alteration of the judgment under this rule.

Rule 59(e) allows courts to "rectify their own mistakes in the period immediately following entry of judgment." *White v. Dep't of Employment Sec.,* 455 U.S. 445, 450 (1982). Resolution of motions made under Rule 59(e) are left to the sound discretion of the trial court. *Florencio Roman, Inc. v. Puerto Rico Maritime Shipping Authority,* 454 F.Supp. 521, 526 (D. Puerto Rico 1978). This discretion has been described as "considerable." *Turner v. Burlington Northern Santa Fe R. Co.,* 338 F.3d 1058, 1063 (9th Cir.2003). Rule 59(e) motions are to be "aimed at reconsideration, not initial consideration." *Harley-Davidson Motor Co., Inc. v. Bank of New England-Old Colony, N.A.,* 897 F.2d 611, 616 (1st Cir. 1990). A district court's factual finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). "Manifest injustice occurs where the court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension...." *Campero USA Corp. v. ADS Foodservice, LLC,* 916 F.Supp.2d 1284, 1292–93 (S.D.Fla.2012).

## IV.    Argument

Defendant seeks solely to modify the Court's judgment that Defendant is liable for a willful failure to file penalty under 31 U.S.C. § 5321(a)(5)(C). The Court premised its judgment of

willfulness on the conclusion that Defendant made a conscious effort to avoid learning about her FBAR reporting requirements, or that she otherwise acted recklessly because she "ought to have known that there was a grave risk that she was not meeting her tax-filing requirements for her foreign accounts," something which she "very easily" could have found out.  *See* ECF 48 at p. 31. However, all the evidence cited by the Court in reaching this conclusion focused on Defendant's income reporting obligations, as opposed to her FBAR filing obligations.  In so doing, the Court improperly conflated income reporting and FBAR filing, and attributed to Defendant—a clearly unsophisticated party—awareness she did not possess.  The Court also failed to give sufficient weight to Defendant's utter lack of relevant knowledge and experience, and her justifiable reliance on her professionals, primarily Ouellet.

### A. Defendant Sufficiently Disclosed her Foreign Assets to Ouellet, and was Entitled to Rely on Ouellet

The trial record clearly establishes Defendant's dearth of experience and knowledge regarding taxes, tax filings, and other financial disclosures.  Defendant graduated from high school but did not receive any formal education beyond that.[3]  Defendant did not earn income for most of her life, and her 2001 return (filed in 2002) was the first tax return Defendant had ever filed.[4]  In Ouellet's opinion, Defendant could never prepare a tax return on her own.[5]  Moreover, Defendant's payment of the tax associated with the sale of the Florida property was arranged by her counsel and the receiver appointed to assist with liquidation of assets received by Defendant in her divorce,[6] as was Ouellet's preparation of the 2001 return on Defendant's behalf.[7]  Ouellet learned

---

[3] ECF 21 at ¶ 4.
[4] ECF 48 at p. 11.
[5] Feb. 18, 2020 Tr. PM at 52:20-22.
[6] Feb. 19, 2020 Tr. AM at 74:19-23.
[7] Feb. 18, 2020 Tr. PM at 6:3-16.

of Defendant's UBS account no later than 2003 (he testified that it was likely in 2002), because Defendant told him about it.[8]  Defendant subsequently told Ouellet about her foreign account a second time, which Defendant believed to be when Ouellet prepared Defendant's draft 2005 return.[9]  Ouellet also testified that he was unfamiliar with the FBAR filing requirement at least through 2005, and had never prepared one until 2014, nearly 45 years after the Bank Secrecy Act became law and Ouellet began preparing tax returns.[10]

Ouellet was a certified public accountant who had, by 2001, been preparing tax returns for nearly 30 years.[11]  In 2001, Ouellet prepared approximately 300 tax returns.[12]  There is no evidence in the trial record that Defendant was or should have been aware of relevant deficiencies in Ouellet's knowledge, competence, or skills.  In fact, Ouellet was chosen by Defendant's other advisors (who had successfully guided her through a tumultuous divorce, thereby gaining Defendant's trust and belief) to perform services on Defendant's behalf.

By telling Ouellet on at least two occasions that she had a foreign bank account, it was reasonable for someone of Defendant's level of relevant knowledge and experience to assume that Ouellet would notify her if any reporting requirements were triggered by her ownership of a foreign bank account.  However, Ouellet never did so.  In fact, Ouellet never asked Defendant any questions regarding her foreign account.[13]  Even with respect to the draft 2005 return—which included enough interest income to trigger the Schedule B filing requirement, and thus confront the questions posed in Part III of that schedule pertaining to foreign accounts—Ouellet did not ask

---

[8] Feb. 18, 2020 Tr. PM at 15:14-25; 37:21-23.
[9] Feb. 18, 2020 Tr. PM at 75:20-25.
[10] Feb. 18, 2020 Tr. PM at 26:14-17.
[11] Feb. 18, 2020 Tr. PM at 5:23.
[12] Feb. 18, 2020 Tr. PM at 4:5-17.
[13] Feb. 18, 2020 Tr. PM at 76:1-5.

Defendant about her UBS account.  While it is true that the record is unclear as to whether Ouellet knew that Defendant still had her UBS account in 2005, his past knowledge of the account should have naturally led him to ask Defendant about it, particularly given he knew the amount contained in the foreign account was "significant."  Yet he never did.[14]

Thus, on multiple occasions Defendant disclosed the existence of her UBS account to Ouellet, a CPA (who then also learned that the amount of money contained in the foreign account was significant), but was never informed by her CPA that the foreign account necessitated any particular filing requirement.  Disclosing the existence of a foreign account to a presumably qualified tax professional is the *opposite* of consciously trying to avoid a filing obligation or disregarding a known or particularly obvious risk.  In fact, that Defendant chose to divulge the existence of the account to Ouellet notwithstanding her substantial, justifiable, and credible fears that any information she provided could get back to her ex-husband shows that Defendant was being *particularly* open with Ouellet at (from Defendant's perspective at least) her own risk.

Moreover, Ouellet's failure to inform Defendant regarding the FBAR filing obligation demonstrates that Defendant was not "in a position to…very easily" find out about the requirement.  Defendant divulged sufficient information to Ouellet to allow Ouellet to properly advise her of the FBAR requirement, but proper advice was not given.  To learn otherwise, however, Defendant would have had to discern the gaps in Ouellet's knowledge or competence, something which was beyond her capabilities and the capabilities of most other taxpayers.  The Supreme Court, in *United States v. Boyle,* 469 U.S. 241, 251 (1985), a decision cited by the Court,

---

[14] In addition, the record reflects that Ouellet prepared filing extension requests for Defendant for the 2002, 2003, and 2004 tax years.  ECF 21 at ¶ 92.  Properly completed extension requests typically include an estimate of the filer's tax for the year.  However, there is no evidence that Ouellet ever asked Defendant about her income for those years, thereby foregoing another opportunity to inform Defendant about her income reporting and FBAR filing obligations.

has said as much.  Ouellet's failure to inform Defendant of her FBAR filing obligation—or even let her know she *might* have such an obligation—is akin to the "advice" discussed in *Boyle*, upon which a layman is entitled to rely, as opposed to basic facts or information (such as tax return filing dates) which layman are expected to know.  Had this been a tax penalty case, under *Boyle,* Defendant would have been acting with "ordinary business care and prudence" by providing her tax professional with sufficient information and expecting guidance as to any resulting obligations. *See e.g. Hatfried, Inc. v. Comm'r,* 162 F.2d 678 (3rd Cir. 1947)(Reversing a failure to file penalty under the Internal Revenue Code pursuant to the reasonable cause exception because the taxpayer had provided its accountant with the information necessary for the accountant to determine whether a particular return needed to be filed.).  Acting with ordinary business care and prudence is inapposite to willfully violating a legal requirement.[15]

Thus, the trial record establishes that Defendant did not hide the existence of her foreign account; rather, she disclosed it multiple times to her own tax professional, a CPA.  These were not the actions of a someone consciously seeking to avoid learning of her FBAR reporting obligations.  Instead, they were the actions of a naïve and forthcoming individual entirely reliant on professional guidance.

**B. Income Reporting Obligations are Separate and Distinct from FBAR Filing Obligations**

The Court acknowledged Defendant's disclosure of her foreign account to Ouellet and Ouellet's failure to inform Defendant of the FBAR requirement.  ECF 48 at p. 28.  However, the Court focused on evidence indicating that Defendant did not seek legal advice regarding the *tax* consequences posed by her foreign account.  *Id.*  Specifically, the Court pointed to Defendant's

---

[15] *See e.g.* IRC § 6651(a), which imposes a penalty for failure to file certain returns unless such failure is due to "reasonable cause and not *willful neglect*." (emphasis added).

Case 1:17-cv-00640-JL   Document 51   Filed 09/25/20   Page 10 of 16

testimony that she never asked her advisors about the tax obligations arising from her foreign account, and failed to credit testimony that she believed her ex-husband was obligated to pay all tax emanating from assets Defendant received in her divorce. ECF 48 at pp. 29-30. In making this determination, which ultimately provided the basis upon which the Court made its recklessness finding, the Court conflated income reporting obligations with FBAR filing obligations and inappropriately grafted recklessness with respect to income reporting onto FBAR filing. The conflation of income reporting obligations with FBAR obligations is manifest in the language of the verdict, which states "[t]his is a civil tax case"[16] and goes on to describe FBARs as being required to be filed "with the IRS,"[17] states that Defendant should have "surmised that there was a grave risk she was not meeting her tax-filing obligations,"[18] describes FBARs as "required tax forms,"[19] and lumps FBARs in with other "IRS filings."[20]

The sole basis for the penalties sought by the United States is Defendant's failure to timely file FBARs for the 2007, 2008, and 2009 calendar years. ECF 1 at ¶¶ 35-37. No aspect of Defendant's FBAR filing obligations for those years was premised on properly reporting income. Rather, Defendant's FBAR filing obligation existed independently of her income reporting obligations.[21] A person may have an FBAR filing obligation without being required to file a tax return. For instance, a person who is supported solely by gifts excluded from gross income under IRC § 102(a) or previously taxed savings would not be required to file a tax return,[22] but would

---

[16] ECF 48 at p. 1; *See also* ECF 48 at p. 17.
[17] ECF 48 at p. 1. While FBARs are filed with the Department of Treasury, they are not filed specifically with the IRS.
[18] ECF 48 at p. 2.
[19] ECF 48 at p. 17.
[20] ECF 48 at p. 23.
[21] Ouellet testified to this fact. Feb. 18, 2020 Tr. PM at 38:8-17; 40:12-15.
[22] *See* IRS Pub. 501 at p. 2, stating that for 2019 persons under 65 must file U.S. income tax returns when their *gross income* exceeds $12,200.

still be required to file an FBAR if the gift proceeds or savings were maintained in a foreign bank account that exceeded the $10,000 filing threshold in a given year.  Similarly, a foreign bank account that exceeds the filing threshold still triggers an FBAR filing requirement even if the bank account does not generate income.  For example, a U.S. person working abroad who maintains a checking account in a foreign bank with a balance in excess of $10,000, but which does not generate interest, would still be required to file an FBAR reporting the checking account notwithstanding the account's lack of income generation.

The distinct, separate nature of income reporting obligations and FBAR filing obligations is further demonstrated by their separate penalty regimes.  For instance, a person may still be penalized for failing to file an FBAR even if all income associated with their foreign account was properly reported.  Conversely, a person cannot be punished for failing to file an FBAR if a correct FBAR is timely filed, even if the person failed to properly report the associated income.  Moreover, the FBAR penalty is derivative of the relevant account balance, whereas tax penalties are typically derivative of the amount of tax stated on a return or the amount of unpaid tax.[23]  More fundamentally, the FBAR requirements are codified under Title 31 of the United States Code, whereas the tax laws are codified under Title 26.  FBARs and income taxes are two separate and distinct statutory regimes and bodies of law.

The distinction between FBAR filing and income reporting supports the notion that evidence as to Defendant's awareness of or recklessness with respect to her income reporting obligations is *not* indicative of her awareness of or recklessness with respect to her FBAR filing obligations, and the Court's reliance on such evidence was erroneous and warrants alteration of

---

[23] *See e.g.* IRC § 6651(a)(Imposing a penalty of 5 percent of the tax stated on a return for each month a return remains untimely filed).

the judgment.  Based on the trial record, there is every indication that even if Defendant had determined the amount of interest income associated with her UBS account and provided that information to Ouellet in 2005, an FBAR would *still* have not been filed.  After all, Defendant reasonably relied on Ouellet to inform her of all filing obligations associated with her income or assets as early as 2002, yet, until at least 2005 (and more likely until 2014),[24] he was himself unaware of the FBAR form, let alone the circumstances in which it must be filed.[25]  Even as part of his preparation of the draft 2005 return, which included a Schedule B, Ouellet did not address Defendant's foreign account despite his knowledge (at the very least) that as of 2002 Defendant had a foreign account with a substantial balance.  Ouellet never notified Defendant of the obligation to file an FBAR, and Defendant never had a reason to understand otherwise.  Under the analysis in the Court's verdict, in that scenario, a willfulness penalty would not have been appropriate because Defendant would have met her income reporting obligations.  Yet the facts as they pertain to Defendant's *FBAR* non-filing would have remained precisely the same.

It was erroneous to conclude that Defendant's violations rose to the level of willfulness based *solely* on actions pertaining to Defendant's income reporting obligations.  The standard articulated in *Bedrosian* and utilized by the Court requires the defendant to have engaged in conduct "entailing an unjustifiably high risk of harm that is either known or so obvious it should

---

[24] In fact, the record reflects some doubt as to whether Ouellet understood the purpose of an FBAR as of the time of trial.  For instance, he referred to an "FBAR return" as "the reporting of foreign income."  Feb. 18, 2020 Tr. PM at 31:21-25.  No income is reported on an FBAR, and the receipt or non-receipt of income is irrelevant to the FBAR filing obligation.

[25] Moreover, while there is no evidence in the record that Ouellet advised Defendant in 2008, 2009, or 2010 (the years in which the FBARs at issue were due to be filed), from Defendant's perspective, nothing materially changed in the interim.  While the banks, countries, and number of accounts had changed, fundamentally, the situation in 2007, 2008, and 2009 was the same as it had been when Defendant disclosed her foreign account to Ouellet in 2002 and again in 2005— Defendant was the owner of an interest-bearing bank account located outside the United States.

be known."  ECF 48 at p. 22 (citing *Bedrosian v. United States,* 912 F.3d 144, 153 (3rd Cir. 2018).

That Ouellet, a CPA for decades, did not know about the FBAR filing obligation through at least

2005 and did  not even see an FBAR form until 2014[26] indicates that the risk of failing to meet the

FBAR filing obligation was not so obvious that it should have been known to a particularly tax-

naive layman[27] like Defendant.[28]   Defendant's failure to further investigate the taxability of the

interest accruing in her foreign accounts does not change that.

### C.  The Court's Reliance on Defendant's Income Reporting Obligations to Establish Willfulness Lacks Precedential Support

Other courts determining recklessness with respect to FBAR penalties have focused on the

filer's FBAR-related conduct, as opposed to income reporting-related conduct.  For instance, in

*United States v. Williams,* 489 Fed. Appx. 655, 659 (4th Cir. 2012), the Court highlighted the

defendant's execution of tax returns affirmatively putting the defendant on notice of the FBAR

obligation, and his failure to read the associated instructions—a fact not present here.  In fact, there

is no evidence in the record that Defendant executed a tax return containing a Schedule B, or

realized she even had to, until 2012.  Thus, unlike *Williams* and other cases there is no basis to

conclude Defendant consciously avoided learning of her FBAR obligations by failing to

adequately review Schedule B of a Form 1040.

Further, while the *Williams* court cited the defendant's provision of false answers on a tax

organizer as support for imposing a willfulness penalty, it did so because it found such false

answers to be "meant to conceal or mislead *sources* of income or other financial information."  *Id.*

---

[26] Feb. 18, 2020 Tr. PM 43:3-6.

[27] Ouellet testified that based on his experience and personal interactions with Defendant he would classify Defendant as being in the group of people with a "lower understanding of our tax system." Feb. 18, 2020 Tr. PM at 51:10-21.

[28] Ouellet testified that in his estimation, in 2010 only 25 percent of CPAs were aware of the FBAR form.  Feb. 18, 2020 PM Tr. at 42:20-23.

(citing *United States v. Sturman,* 951 F.2d 1466, 1476 (6th Cir.1991))(emphasis added).   In *Williams,* the defendant hid information from his tax professionals.   Conversely, Defendant in this case did nothing of the sort.   Rather, on multiple occasions she disclosed her foreign account (the *source* of unreported income) to her CPA, Ouellet.   Recently, in *United States v. Toth,* No. 15-cv-13367-ADB, 2020 WL 5549111 (D. Mass. Sept. 16, 2020), the court cited the defendant's efforts to maintain the secrecy of her UBS account as evidence of willfulness, a sharp contrast to Defendant's repeated disclosures of her UBS account to Ouellet.   In neither case was the defendant's failure to investigate income reporting obligations relating to her foreign account sufficient to establish willfulness liability.

Similarly, in cases where a defendant's income-reporting failures were used as evidence of FBAR willfulness, the defendant was invariably sophisticated or engaged in complex schemes of evasion.   *See e.g. Bedrosian; United States v. Bohanec*, 263 F. Supp. 3d 881, 889–90 (C.D. Cal. 2016); *United States v. Flume,* 390 F.Supp.3d 897 (S.D.Tx. 2019)(In which the Court expressly distinguished the defendant in *Flume* from a hypothetical "unsophisticated defendant."); and *United States v. McBride,* 908 F. Supp. 2d 1186 (D. Utah 2012).   The defendants in those cases knew their non-disclosure of their foreign income and assets violated the law, and they took affirmative steps to prevent lawful disclosures being made.   Conversely, as outlined above, Defendant was the paradigmatic unsophisticated party particularly reliant on professional assistance.   She disclosed the existence of her foreign account to a tax professional and there is no evidence in the record she would have objected to or otherwise attempted to avoid disclosure of the account to the government.   Defendant's income reporting failures simply do not carry the same relevance and do not, by themselves, support a finding of willfulness with respect to Defendant's FBAR violations.

Moreover, the cases cited by the government in its post-trial brief (ECF 41) do not rely on a defendant's failure to investigate his or her income reporting obligations to find willfulness.  For example, in *United States v. Rum,* No. 17-cv-826, 2019 WL 3943250 (M.D. Fla. Aug. 2, 2019), the court premised its willfulness finding on a range of factors not applicable to Defendant, including Rum's failure to tell his return preparer about the existence of his foreign account.  The same issues plagued the defendants in *United States v. Ott,* No. 18-cv-12174, 2020 WL 913814 (E.D. Mich Feb. 26, 2020), *and United States v. Horowitz,* 361 F.Supp. 3d 511 (D. Md. 2019), where the courts pointed to the defendants' failure to timely notify their return preparers about the existence of foreign accounts.  In contrast, Defendant repeatedly informed Ouellet about the existence of her account, and the record does not contain credible evidence of the acts or omissions that supported findings of willfulness in these other cases.  As a result, the Court should amend its judgment and determine that Defendant is not liable for a willful failure to file FBAR penalty for 2007, 2008, or 2009.

## V.      Conclusion

For these reasons, Defendant respectfully requests the Court to revise its verdict and alter the judgment by finding that Defendant did not willfully fail to timely file her 2007, 2008, and 2009 FBARs, and adjust the penalty amounts for each of those years accordingly.

Respectfully Submitted,

/s/ Rosario Mario F. Rizzo                                    Dated: September 25, 2020
Rosario Mario F. Rizzo, Esq.
NH Bar # 9080
801 Main Street
Concord, MA 01742
Tel: (978) 371-2500
Fax: (978) 371-1352
Email: rosario.rizzo@rizzolawfirm.com

/s/ Gerard J. Levins
Gerard J. Levins, Esq.
Levins Tax Law
1671 Worcester Rd, Suite 304
Framingham, MA 07017
Tel: 888-333-9501
Fax: 888-233-0291
Email: gerard@levinstaxlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document is being filed through the Court's ECF system

on September 25, 2020 and will be sent electronically to all counsel of record on September 25,

2020.

/s/ Gerard J. Levins
Gerard J. Levins, Esq.