UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

United States of America

    v.                                                        Civ. 17-cv-640-JL
                                                            Opinion No. 2021 DNH 085P

Annette B. DeMauro

## **MEMORANDUM ORDER**

Annette B. DeMauro has moved to amend the verdict[1] and judgment against her in this case under Fed. R. Civ. P. 59(e). After a two-day bench trial and post-trial briefing, the court found that the United States had proven by a preponderance of the evidence that DeMauro's failure to timely report the existence of nearly $ 3 million she had hidden away in foreign banks during the 2007, 2008, and 2009 calendar years was willful, as that term is generally construed in the civil context, and was thus subject to enhanced penalties under applicable law. See 31 U.S.C. § 5314 and 31 C.F.R. § 1010.350. The court also found that the United States had not proven by clear and convincing evidence that DeMauro's failure to timely file tax returns during that period evinced the specific fraudulent intent to evade tax, as required for the assessment of separate, enhanced penalties for late tax filings. See 26 U.S.C. § 6651.

In the instant motion, DeMauro challenges the first aspect of the court's verdict under the guise that the court's conclusion—that she willfully failed to timely file Foreign Bank and Accounting Reports ("FBARs")—was clearly erroneous. At best, her arguments amount to mere disagreement with how the court judged each witness's

---

[1] See August 28, 2020 Memorandum Order and Verdict After Bench Trial (doc. no. 48) at 35 ("Aug. 28, 2020 Mem. Order and Verdict").

credibility and weighed the evidence of record—evidence which DeMauro never objected to (or sought to limit under Federal Rule of Evidence 105) at any point prior to the court's verdict. These arguments do not meet the exacting standard for granting Rule 59 relief. Nor do they persuade the court that it materially misapprehended the law or facts of this case, or erred in weighing how the totality of the evidence affected the ultimate question of DeMauro's intent. Accordingly, the court denies DeMauro's motion.

**I.     Background**

The court has provided a thorough account of this case's background in its August 28, 2020 Memorandum Order and Verdict. The following draws from that Order's findings, restating the facts most pertinent to the instant motion.

**A.     Annette DeMauro's foreign accounts and failure to file tax returns**

Annette DeMauro is an 83-year old resident of Rye Beach, New Hampshire, who up until 2002, never filed a tax return or financial disclosure for herself or her family. In 2000—the same year she finalized a contested divorce—DeMauro opened a numbered bank account with UBS AG—a bank based in Switzerland—to protect her divorce proceeds from her vengeful ex-husband. Under the divorce decree, the court awarded DeMauro a $35 million cash judgment, as well as several properties across the east coast of the United States. DeMauro's ex-husband never paid the cash judgment, prompting DeMauro to sell some of the properties awarded to her to cover her personal expenses and considerable litigation bills.

In 2001, DeMauro sold a property in Florida for approximately $7 million, earning about $3.5 million in net sale proceeds after paying approximately $2.5 million in property taxes and legal fees and remitting nearly $1.0 million to the IRS in anticipation of her 2001 federal income tax liability. The following year, DeMauro's counsel retained

certified public accountant Ronald Ouellet to prepare a tax return reporting the sale of the property for DeMauro and claiming a refund for an overpayment of tax. This was the first tax return filed by DeMauro. That same year, DeMauro instructed her counsel to transfer the proceeds from the real estate sale to her UBS account in Switzerland rather than to her domestic bank account at USAA Bank.

From 2002 to 2013, DeMauro's foreign bank accounts (first at UBS and then at two other banks) accumulated considerable interest annually. As interest accrued, DeMauro regularly transferred portions of her foreign savings to her domestic account at USAA, most times through the client account at her divorce attorney's law firm. Notably, DeMauro neither paid taxes on interest income earned from these accounts nor reported the existence of these accounts to federal authorities until investigated by the IRS. In fact, DeMauro filed no timely tax returns after 2001 and no timely FBARs whatsoever until investigated.[2] DeMauro testified at trial that it was her "understanding . . . that whatever [she] received from the - - [her] divorce decree was [hers] and [hers] alone and that went for anything that [she] had received and it was nontaxable."[3] DeMauro further asserted that she reached this conclusion without consulting any of the attorneys or other professionals she had historically relied on for advice throughout her nine-year-long contested divorce proceeding, despite having paid taxes on gains

---

[2] The record shows that Ouellet prepared a draft tax return for 2005 after the sale of another divorce property, but this return was never filed.

[3] Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 3-4 (quoting Feb. 18, 2020 AM Tr. (doc. no. 34) at 110:1-7) (internal quotation marks omitted).

3

associated with her sale of real property and having prepared a draft tax return identifying interest income earned from her domestic bank accounts.[4]

In 2006, DeMauro's account manager at UBS took a position with a competing bank, Zürcher Kantonalbank, also located in Switzerland, prompting DeMauro to transfer her account holdings, nearly $3.2 million at the time, to a new, numbered bank account with Zürcher Kantonalbank.  Then, in 2009, she moved her money to Oberbank, located in the Czech Republic, after her account manager had told her that the Swiss government was making Americans close their Swiss bank accounts.  DeMauro never inquired as to why the Swiss government purportedly took this action.  When opening her Oberbank account, DeMauro listed her Rye Beach home address but did not use her own name. Instead, she listed her distant Czech relatives—Ivo Strunc and Eva Struncova—as the account owners.  Eventually, she visited the Czech Republic and opened additional accounts in her own name before completely liquidating the remainder of her Zürcher accounts.

From 2009 to 2013, DeMauro made several transfers from her foreign bank accounts to her domestic account at USAA Bank using her attorney's client account as an intermediary.  Occasionally, she made direct transfers to her USAA account.  She also made withdrawals by making checks out to Ivo Strunc, on one occasion, in the amount of nearly $540,000.  Around 2010, the IRS commenced an investigation related to DeMauro's income tax liabilities.  Between 2012 and 2013, she completely liquidated her foreign accounts by transferring the remaining money—by then over $1.3 million—to her

---

[4] See Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 29-30 (citing Feb. 18, 2020 PM Tr. (doc. no. 37) at 80:21-84:7); DeMauro's 2005 Draft Return (Trial Ex. 8).

4

account at USAA Bank. She also retained counsel to defend her against the IRS's (and Treasury's) investigation.

In December 2015, the Secretary of the Treasury made an assessment against DeMauro under 31 U.S.C. § 5321 in the amount of $824,087 for willfully failing to timely submit an FBAR for the 2007, 2008, and 2009 calendar years. For the 2005 through 2008 calendar years, the IRS also assessed enhanced penalties against DeMauro under 26 U.S.C. § 6651(f) for her allegedly fraudulent failure to timely file tax returns by the due date for each return for each respective year.

**B.      Bench trial and verdict**

On February 18 and 19, 2020, the court conducted a civil bench trial in which five witnesses testified. During this trial, all but one of the exhibits provided by the parties were admitted into evidence without objection.[5] At the close of evidence, the parties jointly requested leave to file post-trial proposed findings of fact and rulings of law. The court granted the request and adjourned the proceeding without making findings as to the parties' claims.

On August 28, 2020, the court, having reviewed the parties' post-trial filings, entered its verdict and accompanying memorandum, finding that DeMauro had willfully failed to timely file FBARs for the 2007, 2008, and 2009 calendar years. In reaching this conclusion, the court found that:

---

[5] At the end of DeMauro's examination, the United States moved to admit a final exhibit, DeMauro's deposition testimony (Exhibit 63), into evidence. DeMauro's counsel objected on the basis that the United States had more than ample opportunity to question DeMauro. The court acknowledged defense counsel's argument that the evidence was not necessary but overruled the objection as it did not go to admissibility. See Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 15.

> DeMauro acted with willful blindness by taking "deliberate" or "conscious" effort to avoid learning about [FBAR] reporting requirements," including her purported failure to seek advice from tax professionals or attorneys despite (1) her past practice of relying on such professionals to handle her affairs, (2) her admission that she knew her foreign accounts were accruing interest, (3) her payment of taxes on interest earned from her domestic savings accounts, (4) her payment of taxes on residential assets she acquired through her divorce decree, and (5) her representation to UBS that she had sought unspecified tax advice for her account[;]
>
> [And] even if DeMauro was not willfully blind, she acted recklessly because she "(1) clearly ought to have known that (2) there was a grave risk that" she was not meeting her . . . filing requirements for her foreign accounts and "(3) . . . was in a position to find out for certain very easily."⁶

The court therefore sustained the FBAR penalties and interest assessed by the Treasury, totaling over $1 million for those three years.

The court, however, found in favor of DeMauro on her counterclaim regarding the enhanced penalties assessed by the IRS under 26 U.S.C. § 6651(f) for her failure to timely file returns for the 2005, 2006, 2007, and 2008 tax years, as it was a closer question on the evidence of record as to whether DeMauro did so with a specific intent to defraud. Judgment was entered on this verdict on September 18, 2020.⁷

## II. Applicable legal standard

Under Federal Rule of Civil Procedure 59(e), a party may seek to have the court alter or amend a judgment. To prevail on such a motion, the moving party "must establish a clear error of law or point to newly discovered evidence of sufficient consequence to make a difference." Theidon v. Harvard Univ., 948 F.3d 477, 508 (1st Cir. 2020) (internal citation omitted); Franchina v. City of Providence, 881 F.3d 32, 56

---

⁶ Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 30-31 (internal citations omitted).

⁷ Judgment (doc. no. 50).

(1st Cir. 2018); see also Marie v. Allied Home Mortg. Corp., 402 F.3d 1, 7 (1st Cir. 2005) (listing, in dicta, "manifest injustice" as another grounds for granting a Rule 59 motion). Rule 59(e) relief, however, is "an extraordinary remedy" that courts grant "sparingly." See Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 930 (1st Cir. 2014) (quoting Glob. Naps, Inc. v. Verizon New England, Inc., 489 F.3d 13, 25 (1st Cir. 2007)). "Unless the court has misapprehended some material fact or point of law, such a motion is normally not a promising vehicle for revisiting a party's case and rearguing theories previously advanced and rejected." Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006). Nor does it "provide a vehicle for a party to undo its own procedural failures" or to "advance new arguments that could or should have been presented to the district court prior to judgment." Marks 3 Zet-Ernst Marks GmBh & Co. KG v. Presstek, Inc., 455 F.3d 7, 15–16 (1st Cir. 2006).

### III. Analysis

DeMauro seeks to modify the verdict and judgment against her as to her willful failure to timely file FBARs on two grounds. First, she contends that the court, in concluding she acted willfully, "improperly conflated income reporting and FBAR filing, and attributed to [her]—a clearly unsophisticated party—awareness she did not possess."[8] Additionally, she argues that the court failed to give sufficient weight to her "utter lack of relevant knowledge and experience, and her justifiable reliance on her professionals, primarily Ouellet."[9] The court addresses each argument's shortcomings in turn. Neither persuade the court that its verdict resulted from any clear error of law or fact.

---

[8] DeMauro's Mot. to Amend Court Verdict (doc. no. 51) at 6.

[9] Id. at 6.

A.     **Conflation of income-reporting and FBAR-reporting requirements**

DeMauro contends that the court, in assessing whether her failure to timely-file FBARs was willful, improperly conflated her obligation to report income with her obligation to file FBARs and, in doing so, "inappropriately grafted recklessness with respect to income reporting onto FBAR filing."[10]  To support this argument, DeMauro cherry-picks language from the Memorandum Order and Verdict referring to this case and the two claims at issue (failure to timely file FBARs and failure to timely file tax returns) under the general subject-matter moniker of "tax."[11]  Her argument, however, misunderstands (and at times, mischaracterizes) the verdict and judgment against her.  Further, it fails to appreciate the extent to which evidence establishing her willful failure to timely file tax returns was also probative of her FBAR culpability.

Throughout the Memorandum Order and Verdict, the court thoroughly recounted and evaluated the evidence adduced in these proceedings to prove or disprove that DeMauro willfully violated the FBAR reporting requirements.  At trial, the United States presented significant testimonial and documentary evidence establishing the substantial steps DeMauro took to conceal the existence of her foreign account transactions from third parties—from pseudonymously opening multiple foreign bank accounts, to periodically writing checks to distant relatives and transferring money through her attorney to disguise the domestication of her foreign assets.  Additionally, the United

---

[10] Id. at 10.

[11] See Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 1 (generally describing this matter as "a civil tax case"); id. at 18 (referring to DeMauro's FBAR and income reports collectively as "required tax forms").  DeMauro also claims that the court erroneously "describe[d] FBARs as being required to be filed 'with the IRS.'"  DeMauro's Mot. to Amend (doc. no. 51) at 10.  While under today's regulations FBARs are filed with the Treasury, at the times relevant to this action, the applicable regulations required that DeMauro file FBARs with the IRS Commissioner.  See 31 C.F.R. § 103.24 (effective from 1987 to 2011); Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 18 (describing the Bank Secrecy Act's restructuring of the FBAR filing regulations).

8

States showed that DeMauro failed to inform her accountant, Ouellet, about the substantial interest income she earned from her foreign accounts for the purposes of preparing federal tax returns. Though the court found that several instances of DeMauro's conduct, when viewed in isolation, could "plausibly be interpreted as lacking criminal culpability," it noted that a factfinder could also reasonably interpret DeMauro's actions as attempts to conceal the existence or nature of her assets from federal authorities.[12]

On the unobjected-to evidentiary record before it, the court did not conclude, as DeMauro suggests, that her failure to timely file FBARs was willful "based solely on the actions pertaining to [her] income reporting obligations."[13] To the contrary, no singular action taken by DeMauro was dispositive on this issue. The court found that DeMauro had acted willfully after considering the totality of DeMauro's questionable conduct over the course of several years. This included, but was not limited to, the steps DeMauro took to hide the existence of her foreign accounts, as well as her deliberate decision to avoid seeking any legal or professional advice regarding the substantial proceeds from her divorce, and the requirements for saving those funds in foreign accounts, despite her history of relying on such professionals to handle her legal and financial affairs.[14] Under

---

[12] Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 25.

[13] DeMauro's Mot. to Amend (doc. no. 51) at 12 (emphasis added by DeMauro).

[14] See Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 24-31. Additionally, the court made its determination as to DeMauro's state of mind after assessing each witness's credibility. In particular, it noted that DeMauro's stated explanations for not seeking professional advice from her certified professional accountant, her divorce attorneys, or any other professional about her obligations for her foreign account were "neither objectively reasonable nor subjectively credible." Id. at 29. Nor were they consistent with other evidence in the record showing that DeMauro was aware, to some degree, that she had a reporting obligations for her foreign accounts. As such, the court found that her representations about her conduct in its entirety, not

9

the government's theory of the case, had DeMauro "properly and timely filed her income tax returns" for the 2007, 2008, and 2009 calendar years, or in her specific circumstances, sought professional aid to file income tax returns for those years, she likely "would have been alerted to the FBAR filing requirements, as the Schedule Bs attached to the 2007, 2008, and 2009 returns each asked her to identify the countries in which she might have had foreign accounts, and directed her to the FBAR reporting requirements for those accounts."[15] DeMauro, however, failed to timely file any tax returns for these years, despite earning substantial income from her foreign accounts—income she knew, or reasonably should have surmised, was taxable, given her prior tax returns reporting income derived from her domestic bank accounts and other proceeds from her divorce.[16]

Neither the court's findings of fact nor its conclusions of law as to this issue conflated DeMauro's obligation to timely file an FBAR for the 2007, 2008, and 2009 calendar years with her separate obligation to properly report her income. In its accompanying memorandum, the court recognized from the very beginning that the two obligations exist independently, and that a person may have an FBAR filing obligation without an obligation to file a tax return. For example, in the Memorandum Order and Verdict's "Applicable Legal Standard", the court clearly denoted that while tax-filing

---

just her decision to avoid professional guidance, "undercut her credibility as to her culpable mental state." Id.

[15] United States's Obj. to Mot. to Amend (doc. no. 52) at 11.

[16] See Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 26 (noting that DeMauro's 2005 draft tax return reflected the interest income she had earned form her domestic bank accounts), id. at 30 (noting how DeMauro conceded that she knew, or at least became aware at some point, that her representatives paid $1 million dollars of estimated tax on her behalf when the Florida home she gained from her divorce was sold), id. (summarizing DeMauro's UBS account notes, which recorded that she had told her UBS client manager that she had "declared the account on taxes").

requirements and penalties arise under Chapter 26 of the U.S. Code—the Internal Revenue Code—FBAR-filing requirements and penalties arise under Chapter 31—"the U.S. Money and Finance Code."[17]  It also recognized that the FBAR statute requires any person "having a financial interest . . . over a foreign financial account . . . to report such relationship," with no additional requirement that the person also have earned income from a foreign financial account.[18]

In DeMauro's view, the distinction between these two regimes "supports the notion that evidence as to [her] awareness of or recklessness with respect to her income reporting obligations is not indicative of her awareness of or recklessness with respect to her FBAR filing obligations."[19]  She contends that, had she provided Ouellet with information about the amount of interest income associated with her UBS account in 2005, "an FBAR would still have not been filed" given Ouellet's lack of familiarity with the FBAR requirement.[20]  She further asserts that, under the court's analysis, in this scenario, a willfulness penalty would not have been appropriate, even though the facts "pertain[ing] to [her] FBAR non-filing would have remained precisely the same."[21]  The court disagrees.

To start with the obvious, DeMauro's argument rests on pure speculation about how Ouellet might have reacted in a counterfactual scenario in which DeMauro had in fact provided him with full details about her foreign accounts.  The record contains no

---

[17] Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 16-17.

[18] Id. at 18.

[19] DeMauro's Mot. to Amend (doc. no. 51) at 11-12 (emphasis by DeMauro).

[20] Id. at 12.

[21] Id.

11

persuasive evidence showing what Ouellet might have done with that information, what he might have learned by reporting that information in DeMauro's tax forms, or whether that information might have prompted Ouellet to perform further diligence regarding DeMauro's obligations for her foreign accounts. Her argument also fails to account for the time period at the center of the United States's FBAR claims. In this case, the United States sought penalties for DeMauro's willful failure to timely file FBARs for the 2007, 2008, and 2009 calendar years (not 2005). For each of those years, the Schedule Bs that would have been attached to DeMauro's tax returns, had she timely filed returns, would have asked DeMauro to identify the countries in which she had foreign accounts <u>and</u> would have directed her (or the tax professional of her choice) to the FBAR reporting requirements for those accounts. DeMauro, however, did not seek tax or financial advice from Ouellet or any other professional for those years until after the IRS began its investigation.

In addition to myopically focusing on what-might-have-been, DeMauro's conflation argument fails to acknowledge how, under the Federal Rules of Evidence, evidence documenting her willful failure to timely file tax returns—admitted without objection or limitation—could be considered to evaluate other facts of consequence in this case, including whether her failure to timely file FBARs was willful, whether her failure to timely file FBARs was part of a common plan to hide her substantial assets from tax authorities, and the extent to which her testimony regarding her lack of knowledge or intent was credible. See Correa v. Hosp. San Francisco, 69 F.3d 1184, 1191 (1st Cir. 1995); Fed. R. Evid. 401 (relevance); 402 (general admissibility of relevant evidence); 404(b) (Evidence of any other crime, wrong, or act, may "be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan,

knowledge, . . . absence of mistake, or lack of accident."). With one exception—the transcript of her deposition testimony—DeMauro never objected to the admission of any evidence on the grounds of relevance, undue prejudice, or any other evidentiary doctrine, either at trial or in a motion filed at any time before the verdict issued. See Fed. R. Evid. 403. Nor did she request that the court limit itself from considering evidence of her willful failure to timely file tax returns in evaluating whether her failure to timely file FBARs was also willful. See Fed. R. Evid. 105. Accordingly, such evidence was admitted, not only without objection, but also without limitation, and could be considered by the court for any proper purpose in this case. See Correa, 69 F.3d at 1191.

        Consideration of DeMauro's income reporting obligations as evidence of her willful failure to timely file FBARs is also logically sound, reasonable, and appropriate. See, e.g., Norman v. United States, 942 F.3d 1111, 1115 (Fed. Cir. 2019) (affirming willfulness finding where income tax return falsely indicated that the taxpayer had no interest in any foreign bank account); United States v. Ott, 441 F. Supp. 3d 521, 529 (E.D. Mich. 2020) (imputing constructive knowledge of FBAR requirement to taxpayer from his signed tax returns, despite his representation that he never actually read them); United States v. Bernstein, 486 F. Supp. 3d 639, 648 (E.D.N.Y. 2020) (finding that taxpayer's failure to file FBAR was willful based, in part, on the taxpayer's improper completion of Schedule B on his income tax return). DeMauro's attempts to distinguish her specific circumstances from applicable precedent—all cases where a defendant's income-reporting failures were used as evidence of FBAR willfulness—are similarly unavailing, given how differently DeMauro and this court view the facts. This Order highlights several of those differences, see Part III.B, infra, including the court's opinion that DeMauro was in fact capable of orchestrating a complex scheme to hide her assets (from

13

both her ex-husband and federal authorities) through the use of pseudonymous foreign accounts (with multiple banks in two different countries), withheld paper correspondence,[22] concealed money transfers,[23] and other unorthodox behavior[24] over the course of several years with minimal outside guidance, despite her self-described "lack or relevant knowledge and experience" in tax and financial matters.[25]  Accordingly, DeMauro has identified no clear error in law or fact in the court's consideration of her willful failure to timely file tax returns that would justify altering or amending the judgment entered.

B.      **Weight and credibility determinations**

In addition to accusing the court of improper conflation, DeMauro devotes much of her motion to rehearsing the trial record, and the inferences that could be drawn from that record, in a light that is more favorable to her defense.  In particular, she asserts that the court failed to give sufficient weight to her "utter lack of relevant knowledge and experience" and her reliance on her certified public accountant, Ouellet.  Her quarrel with the court's weighing of the evidence and assessment of credibility, however, does not entitle her to the extraordinary remedy of Rule 59(e) relief.

---

[22] See, e.g., Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 4-6 (discussing numbered accounts at UBS); id. at 8 (numbered account at Zürcher), id. at 9 (Oberbank accounts created under the names of her distant relatives, Ivo Strunc and Eva Struncova).

[23] See id. at 10 (discussing how DeMauro transferred funds from her foreign accounts to her domestic bank through her attorney's client account).

[24] See id. (discussing how DeMauro issued large checks to Ivo, who then brought the money to the United States).

[25] See DeMauro's Mot. to Amend (doc. no. 51) at 4.

14

As stressed by the First Circuit Court of Appeals, "[u]nless the court has misapprehended some material fact or point of law," a motion to amend a judgment is "not a promising vehicle for revisiting a party's case and rearguing theories previously advanced and rejected." Palmer, 465 F.3d at 30. Nor is it a promising vehicle to challenge the court's weighing of the defendant's testimony against other evidence of record, particularly, where, as is the case here, the defendant overstates the court's original factual findings as to her actions and her credibility.[26] Though DeMauro maintains that she told Ouellet "on at least two occasions that she had a foreign bank account," it was well within the court's province as factfinder during the bench trial to disbelieve portions of DeMauro's testimony regarding her communications with Ouellet while believing her testimony as to other matters,[27] see United States v. Femia, No. CRIM. A. 86-322-Z, 1994 WL 601926, at *2 (D. Mass. Oct. 20, 1994), aff'd, 57 F.3d 43

---

[26] For example, DeMauro asserts that the court found that "Ouellet knew of [her] foreign account around 2002 and knew that the amount of money [she] had in Switzerland was 'significant.'" DeMauro's Mot. to Amend (doc. no. 51) at 3 (citing Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 7). This is not accurate. The court merely found that Ouellet testified to that effect. It did not accept that testimony as true. Nor did it find Ouellet's testimony to be credible and reliable on all fronts. This was not the only instance where DeMauro loosely represented the court's findings. DeMauro erroneously asserts that the court found that "Ouellet was unaware of the FBAR filing obligation through at least 2005," id., when, in fact, the court simply stated that Ouellet "testified that he had no understanding as to the specific FBAR requirement in 2001 up through at least 2005." Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 7. Additionally, she claims that the court found she "had no knowledge of her tax filing obligations and went so far as to describe [her] as 'clueless' about tax matters." DeMauro's Mot. to Amend (doc. no. 51) at 4. The court made no such finding in its decision; rather, it simply summarized DeMauro's closing argument, in which she argued she had demonstrated that she was "clueless" about her reporting obligations. Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 33.

[27] For example, the court partially believed DeMauro's representation that she took steps to conceal her foreign account transactions to protect her money from her aggressively vengeful ex-husband. Though the United States maintained that DeMauro took these steps to mislead authorities, the court noted that the evidence showed "she plausibly did so, at least in part, . . . to hide her assets and the paper trail for her accounts from her ex-husband." Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 24.

(1st Cir. 1995) (noting that a factfinder "may believe some portions of a witness's testimony and disbelieve others"), especially where, as was the case here, the record was quite lacking as to the sufficiency of DeMauro's communications and "repeated disclosures" to Ouellet.[28]

DeMauro's focus on Ouellet's lack of familiarity with the FBAR filing requirement similarly fails to persuade the court that DeMauro acted reasonably.[29] In her motion, DeMauro contends that Ouellet's failure to inform her of "her FBAR filing obligation—or even let her know she might have such an obligation"—was "akin" to advice that she, as an uneducated layperson was entitled to rely on, given her capabilities (as well as the capabilities of most other taxpayers).[30] She also asserts that, by informing Ouellet about her foreign accounts and expecting guidance as to any resulting obligations, she acted with "ordinary business care and prudence."[31]

Naked reliance on the services of "a professional tax advisor or an appraiser," however, "does not necessarily demonstrate" ordinary business care and prudence. Cf. United States v. Ott, No. 18-CV-12174, 2019 WL 3714491, at *2 (E.D. Mich. Aug. 7, 2019) (internal citations omitted) (discussing the standard for "reasonable cause" under

---

[28] See DeMauro's Mot. to Amend (doc. no. 51) at 14-15 (characterizing her one to two disclosures to Ouellet on unspecified dates as "repeated"). For similar reasons, the court gave less-than-full weight to DeMauro's 2005 draft return, given that the incompleteness of the record as to that draft's creation, including what information DeMauro contemporaneously provided to Ouellet and why the draft return was never signed and filed with the IRS.

[29] At trial, Ouellet testified that he was not aware of the FBAR reporting requirement when he prepared tax returns for DeMauro in 2001 and 2005 and went so far as to "concede[] in an embarrassingly credibility-enhancing manner that he first became aware of the FBAR form in 2014." See Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 28 (citing Feb. 18, 2020 PM Tr. (doc. no. 37) at 40:16-18).

[30] DeMauro's Mot. to Amend (doc. no. 51) at 8-9.

[31] Id.

the advisor-reliance defense, an affirmative defense to FBAR reporting penalties). "Rather, the taxpayer must show that, under all the circumstances," he or she reasonably relied on tax advice and did so "in good faith," for example, by providing the tax professional with "full details" and then relying upon that professional's fully-informed advice. Id.  DeMauro, by comparison, failed to present evidence persuasively showing that she fully informed Ouellet, or any of her advisors for that matter, about the interest income she knew she was earning from her foreign accounts—interest income that she knew, or at the very least should have been aware, incurred tax obligations.[32]  Nor did a preponderance of the evidence show that she relied on professional advice with respect to her foreign accounts in good faith.  To the contrary, DeMauro conceded in her testimony that she never asked Ouellet, her divorce attorneys, or any other professional about tax or reporting obligations for her foreign accounts, and instead relied "on her own interpretation of her divorce decree" to unreasonably conclude "she owed no taxes on anything received from her divorce."[33]  Additionally, her UBS account records noted that in 2005, she falsely told her UBS client manager that she had "declared the account on taxes" and "clarified this with her tax lawyer."[34]  The court thus found that her conduct was reckless, not prudent or of ordinary business care.

---

[32] See Aug. 28, 2020 Mem. Order and Verdict (doc. no. 48) at 30 (discussing the 1099-INT tax forms provided to DeMauro from her domestic banks documenting her tax liability for interest income earned from her domestic bank accounts).

[33] Id. at 28-29 (citing Feb. 18, 2020 PM Tr. (doc. no. 37) at 76:1-77:20; 81:3-9).  The court found this explanation was "neither objectively reasonable nor subjectively credible" in light of the evidence of record. Id.

[34] Id. at 30 (quoting UBS Bank Records (Trial Ex. 7) at 2).  In her motion, DeMauro argues for the first time that her statements, as reflected in her UBS account documents, should not have been given any weight, as they were memorialized by a UBS representative who might "have an incentive to create a false record."  DeMauro's Mot. to Amend (doc. no. 51) at 3 n.1.  If DeMauro thought it improper for the court to consider the UBS account documents or give them

Simply put, the court did not, as DeMauro suggests, "disregard" the evidence "supporting non-willfulness" or rely "on non-credible evidence."[35] To the contrary, it thoroughly considered the competent evidence supporting willfulness, as well as non-willfulness, and found the latter, consisting mostly of DeMauro's testimony, "wanting." Palmer, 465 F.3d at 30.

C.   **Technical correction that does not affect the court's verdict and judgment**

Despite the discussion above, the court agrees with DeMauro in one regard: In the August 28, 2020 Memorandum Order and Verdict, the court at times bluntly referred to the Foreign Bank and Financial Account Reporting ("FBAR") requirement as a "tax" requirement, despite recognizing in other parts that the obligation more precisely arose under the Money and Finance Code. Accordingly, to prevent any possible confusion about the basis of the court's verdict and judgment, the court shall issue contemporaneously with this Order a technical correction to the August 28, 2020 Memorandum Order and Verdict clarifying that the FBAR filing requirement sounds not

---

any weight, she should have filed a motion in limine or, at the very least, objected to the evidence's introduction under Federal Rules 401 and 402 (relevance), Rule 403 (undue prejudice), or any other rule of evidence or evidentiary doctrine. Cf. Correa, 69 F.3d at 1191 ("Evidence admitted without limitation can be used by the jury on any issue in the case." (citing United States v. Castro-Lara, 970 F.2d 976, 981 (1st Cir. 1992))). At the very least, she could have argued the purported weakness of this evidence at trial, instead of waiting until after the trial was over and the court rendered a verdict. Her experienced counsel took no such steps and failed to address this detrimental evidence at any point before the court issued judgment. As such, the evidence was admitted without limitation, and the court was free to make reasonable determinations as to its weight and credibility. Moreover, DeMauro waived her right to seek the functional exclusion of her memorialized statements in a post-judgment motion and cannot now use such a motion to raise arguments that could have been presented prior to judgment. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Nevertheless, even if she were correct about the UBS records' reliability (the court is not persuaded), there is still ample evidence to support the judgment against her, with or without consideration of these disputed statements.

[35] DeMauro's Reply (doc. no. 53) at 3.

in tax, but in the Money and Finance Code. None of these technical corrections are intended to affect the substance of the court's willfulness finding.

## IV.   Conclusion

In sum, DeMauro has identified no clear error of law in the court's analysis and has failed to persuade the court, in this post-trial, post-verdict procedural posture, that it misapprehended or misevaluated any fact that was material to its conclusion that DeMauro failed to timely file FBARs willfully. As such, her motion[36] to amend the judgment against her is denied.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  May 18, 2021

cc:   Gerard J. Levins, Esq.
      Rosario M.F. Rizzo, Esq.
      Kurt S. Olson, Esq.
      Thomas P. Cole, Esq.
      Angela R. Foster, Esq.

---

[36] Doc. no. 51.